ACCEPTED
13-15-00024-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
7/6/2015 3:55:22 PM
CECILE FOY GSANGER
CLERK

IN THE THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS

No. 13-15-00024-CV

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
7/6/2015 3:55:22 PM
CECILE FOY GSANGER
Clerk

MARIA ZAMARRIPA, AS GUARDIAN OF THE ESTATES OF R.F.R. AND R.J.R., MINORS, AND OLGA FLORES, AS ADMINISTRATOR OF THE ESTATE OF YOLANDA IRIS FLORES,
Appellants

v.

BAY AREA HEALTH CARE GROUP, LTD. D/B/A CORPUS CHRISTI MEDICAL CENTER, HIDALGO COUNTY EMS, AND HIDALGO COUNTY EMERGENCY MEDICAL SERVICE FOUNDATION,
Appellees.

**APPELLANTS MARIA ZAMARRIPA'S AS GUARDIAN OF R.F.R. AND R.J.R., MINORS, AND OLGA FLORES'S, AS ADMINISTRATOR OF THE ESTATE OF YOLANDA FLORES, REPLY TO BRIEF OF APPELLEES HIDALGO COUNTY EMS AND HIDALGO COUNTY EMERGENCY MEDICAL SERVICES FOUNDATION**

WEST, WEBB, ALLBRITTON & GENTRY, P.C.
Gaines West
State Bar No. 21197500
Email: gaines.west@westwebblaw.com
Jennifer D. Jasper
State Bar No. 24027026
Email: jennifer.jasper@westwebblaw.com
Donald Delgado
State Bar No. 24065139
E-mail: donald.delgado@westwebblaw.com
1515 Emerald Plaza
College Station, Texas 77845
979.694.7000 ~ Telephone
979.694.8000 ~ Facsimile

COUNSEL FOR APPELLANTS

i

# TABLE OF CONTENTS

Table of Contents  ...................................................................................... ii

Table of Authorities ................................................................................... iii

**Reply Point One:** Nurse Tibaldo is properly qualified; section 74.402(b)(1) only applies "if the defendant health care provider is an individual" and none of Hidalgo EMS's cases establish otherwise...............................................1

**Reply Point Two:** Nurse Tibaldo's reference to causation does not disqualify him when Dr. Harlass separately established causation ...................................6

**Reply Point Three:** Nurse Tibaldo's report establishes the standard of care .........7

**Reply Point Four:** Dr. Harlass's expert report is sufficient ...................................8

Prayer.......................................................................................................11

Certificate of Compliance........................................................................12

Certificate of Service...............................................................................12

# TABLE OF AUTHORITIES

CASES

*Christus Spohn Health Sys. Corp. v. Castro*,.........................................................3
      No. 13-13-00302-CV, 2013 WL 6576041
      (Tex. App.—Corpus Christi Dec. 12, 2013, no pet.)

*Columbia N. Hills Hosp. Subsidiary, L.P. v. Alvarez*, .......................................3, 4
      No. 02-10-00342-CV, 2011 WL 3211239
      (Tex. App.—Ft. Worth July 28, 2011, no pet.)

*Davis v. Webb*, .....................................................................................................7
      246 S.W.3d 768 (Tex. App.—Houston [14th Dist.] 2008, no pet.)

*Health Care Unlimited, Inc. v. Villareal*, No. .................................................4, 5
      13-09-00456-CV, 2010 WL 468061
      (Tex. App.—Corpus Christi Feb. 11, 2010, no pet.)

*Mack Trucks, Inc. v. Tamez*, ................................................................................6
      206 S.W.3d 572 (Tex. 2006)

*Renaissance Healthcare Sys., Inc. v. Swan*, .....................................................1, 2
      343 S.W.3d 571 (Tex. App.—Beaumont 2011, no pet.)

*Salais v. Tex. Dep't of Aging & Disability Servs.*, ...............................................8
      323 S.W.3d 527 (Tex. App.—Waco 2010, pet. denied)

*Tenet Hosp. Ltd. v. Barajas*, ...............................................................................1
      451 S.W.3d 535 (Tex. App.—El Paso 2014, no pet.)

*TTHR, L.P. v. Coffman*,.........................................................................................2
      338 S.W.3d 103 (Tex. App.—Fort Worth 2011, no pet.)


STATUTES

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1).............…....................*passim*

TO THE HONORABLE THIRTEENTH COURT OF APPEALS:

Maria Zamarippa, as Guardian of minors R.F.R. and R.J.R., and Olga Flores, as Administrator of the Estate of Yolanda Flores ("Appellants"), file this Reply to the Response of Appellees Hidalgo County EMS and Hidalgo County Emergency Medical Services Foundation (collectively, "Hidalgo EMS").

## REPLY POINTS

**REPLY POINT 1: Nurse Tibaldo is properly qualified; section 74.402(b)(1) only applies "if the defendant health care provider is an individual" and none of Hidalgo EMS's cases establish otherwise.**

Subsection 74.402(b)(1) provides that a person may be an expert witness if that person is:

> [P]racticing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, *if the defendant health care provider is an individual*, at the time the testimony is given or was practicing that type of health care at the time the claim arose[.]

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1) (emphasis added). Thus, the plain language of this subsection limits its application to those situations when the defendant health care provider "is an individual." *Id.*

Accordingly, Texas courts have found that this section does not apply, when the defendant is an institution. *Tenet Hosp. Ltd. v. Barajas*, 451 S.W.3d 535, 540 n.1 (Tex. App.—El Paso 2014, no pet.) (citing *Renaissance Healthcare Sys., Inc. v.*

1

*Swan*, 343 S.W.3d 571, 588 (Tex. App.—Beaumont 2011, no pet.); *TTHR, L.P. v. Coffman*, 338 S.W.3d 103, 112 (Tex. App.—Fort Worth 2011, no pet.).

In the case at bar, despite the fact that there is *no question* that Appellees Hidalgo County EMS and Hidalgo County Emergency Medical Services Foundation are both institutions (not individuals), they nevertheless insist that section 74.402(b)(1) applies in this case (to render Nurse Tibaldo unqualified). Hidalgo EMS argues that because Nurse Tibaldo was not practicing as an EMT when the claim arose (in 2012) or when his report was offered (in 2014), he is unqualified per subsection 402(b)(1). Appellees' Brief at 9; CR 71.

But such a position requires this Court to ignore 74.402(b)(1)'s plain language (applying only in cases where "the defendant is an individual") and the existing Texas case law cited above. TEX. CIV. PRAC. & REM. CODE ANN. §74.402(b)(1). *Even Appellee Corpus Christi Medical Center has conceded that (b)(1) only applies to individuals.* Brief of Appellee Corpus Christi Medical Center at 18-19.

Hidalgo EMS attempts to supports its argument regarding section 74.402(b)(1)'s application with references to three cases (*see* Appellees' Brief at 10), all of which are inapposite because none addressed the argument Appellants make on this point.

Specifically, *Christus Spohn Health Sys. Corp. v. Castro*, No. 13-13-00302-CV, 2013 WL 6576041, \*4-5 (Tex. App.—Corpus Christi Dec. 12, 2013, no pet.) found that neither a nurse nor physician was qualified, because although they both had experience with decubitus ulcers, neither had specific experience with ulcers in the context of ICU or trauma care.

In *Christus*, *there was no argument* that plaintiff's experts were not qualified under 74.402(b)(1) because they were not practicing in the same field at the time of their testimony or at the time the claim arose. (Thus, there was no argument from the plaintiff in that case that subsection (b)(1) was inapplicable because the defendant was a hospital.) The defendants in *Christus* actually recognized that both the nurse and the doctor were experts in the field of geriatrics and nursing home care, and had expertise in diagnosing and treating decubitus ulcers. *Id*. at \*4. The defendants' specific complaint was that neither expert had experience treating and diagnosing decubitus ulcers in the context of ICU care or trauma care. *Id*.

Thus, the defendants' complaints about *why* the experts were supposedly unqualified were substantively different in *Christus*, than the case at bar. For this reason, there is no application either directly or by analogy.

In *Columbia N. Hills Hosp. Subsidiary, L.P. v. Alvarez*, No. 02-10-00342-CV, 2011 WL 3211239, \*5 (Tex. App.—Ft. Worth July 28, 2011, no pet.) (mem. op.), the reviewing court affirmed a finding that an expert was not qualified to

3

testify as to a hospital's *direct* liability for a failure in its policies and procedures. The court found that, although the expert *was qualified* to render opinions on the nursing care in that case, his report did not establish his familiarity with the standard of care for setting forth a hospital's policies and procedures. *Id*.

In the case at bar, Appellants have <u>not</u> asserted any claims for direct liability against these Hidalgo EMS; and as to the vicarious claims, there is nothing in *Columbia* that supports Hidalgo EMS's position (and the expert was actually found to be qualified). *Id*. at *4. Moreover, Hidalgo EMS in this case has <u>not</u> asserted that Nurse Tibaldo lacks familiarity with the standard of care (as did the defendants in *Columbia*). Their complaint is that he was not working as an EMT when the claim arose, or when he offered his report. Appellees' Brief at 9; CR 71. Accordingly, *Columbia* is inapposite and cannot be applied by analogy.

The final case Hidalgo EMS cites on this point is *Health Care Unlimited, Inc. v. Villareal*, No. 13-09-00456-CV, 2010 WL 468061 (Tex. App.—Corpus Christi Feb. 11, 2010, no pet.) (mem. op.). That case involved a challenge to the expert's qualifications and the Court of Appeal *affirmed* the trial court's denial of the motion to dismiss, finding the expert *was qualified*. *Id*. at *2–4.

In that case, the defendants argued the expert, a family medicine specialist, was not qualified to opine about wound care treatment. The appellate court reviewed the expert's lengthy qualifications and relevant experience, and had no

4

difficulty finding the expert appropriately qualified. *Id.* The defendants argued that the expert's statements regarding his qualifications were "conclusory and unsupported by the facts." *Id.* at *4. The appellate court readily rejected this contention. *Id.*

Again, *Villareal* is distinguishable because the defendants in that case were not asserting that the expert was specifically unqualified because he was not actively practicing in the same field at the appropriate time per 74.402(b)(1); nor did the plaintiff in that case argue that section did not apply. In any event, the appellate court in *Villareal* affirmed that the expert qualified. *Id.*

While these three opinions Hidalgo EMS cites each *references* section 74.402 and its requirements, none specifically considered any argument regarding whether that subsection (b)(1)'s requirements applied when the defendant was not an individual; and for this reason they are unpersuasive.

Appellants have found <u>no</u> case law holding that section 74.402(b)(1) means the very opposite of what it says (*i.e.*, that it applies even if the defendant is <u>not</u> an individual). In fact, the cases Appellants have cited for this Court have interpreted the statute consistent with its plain language. Hidalgo EMS did <u>not</u> offer the lower court (and has not offered this Court) any sound legal basis for holding otherwise. Thus, to the extent the trial court dismissed Plaintiff's and Intervenor's claims on grounds that Nurse Tibaldo was not qualified to offer an opinion in this case

because his report did not satisfy subsection 74.402(b)(1), the trial court abused its discretion and should be reversed.

**REPLY POINT 2:  Nurse Tibaldo's reference to causation does not disqualify him when Dr. Harlass separately established causation.**

For the first time, in their Response Brief, Hidalgo EMS argues that Nurse Tibaldo has offered an opinion on causation, and because only physicians are qualified to render causation opinions, Nurse Tibaldo is disqualified from offering *any* opinions at all in this case.  Appellees' Brief at 11-13.  However, this argument was not before the trial court, and thus could not have been the basis for the trial court's ruling.  CR 68-77; CR 145-47.  Nowhere in Hidalgo EMS's Objection or Supplemental Objection did they raise this particular complaint.  CR 68-77; CR 145-47.  Thus, it is improper to consider this issue on appeal. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006).

Assuming for the sake of argument Hidalgo EMS properly raised this issue below, it should have been soundly rejected.  Plaintiffs and Intervenors in this case have offered an opinion from Dr. Harlass, a medical doctor, as to causation in this case.  CR 91, 94.  Nurse Tibaldo's mere reference to causation, in the course of his report which clearly sets forth the standard of care and breach of Hidalgo EMS,

cannot as a matter of law disqualify him from offering *any* opinions in this case. Hidalgo EMS has not offered any case law to support such a position.[1]

**<u>REPLY POINT 3</u>: Nurse Tibaldo's report establishes the standard of care.**

Hidalgo EMS generically argues that Nurse Tibaldo's report fails to set forth the standard of care applicable to Hidalgo EMS; but a plain reading of the report demonstrates otherwise. The report discusses the applicable standard of care in three paragraphs on its second page. CR 84, 154. Hidalgo EMS ignores this. Instead, Hidalgo EMS cherry-picks particular sentences and phrases from Nurse Tibaldo's report, reads them in isolation, and then claims there is no statement of the standard of care.

In particular, Hidalgo EMS argues that while Nurse Tibaldo criticized the EMTs for failing to call their Medical Director, he never explained what the standard of care was with respect to that particular criticism. Appellees' Brief at 13. This may be the case, but it does not mean that the report wholly fails to set forth *any* applicable standard of care—which it indisputably does. CR 84, 154.

Hidalgo EMS's only other argument on this point actually *concedes* that this expert <u>did</u> set forth a standard of care. Hidalgo EMS asserts that Nurse Tibaldo's report states that the standard of care requires EMTs to get a patient to the closest

---

[1] *Davis v. Webb*, 246 S.W.3d 768 (Tex. App.—Houston [14th Dist.] 2008, no pet.), which Appellees cite at length in support of this particular argument, is irrelevant, because in that case the single expert for the plaintiff was <u>not a physician</u>. The lower court held, and the reviewing court affirmed, that an optician (not a physician) was not qualified to testify as to causation.

appropriate facility when her condition worsens. Hidalgo EMS complains, nevertheless, that the report never identified which facility that would be in this case. Appellees' Brief at 13. This is a jury argument. Hidalgo EMS can argue to the jury that the EMTs had no other choice in this case but to proceed as directed. But this does not, and cannot as a matter of law, constitute a "failure" on Nurse Tibaldo's part to set forth a standard of care, so as to render his report no report at all.

The law requires the standard of care to be addressed with "sufficient specificity to inform the defendant of the conduct that plaintiff calls into question and provides a basis for the trial court to conclude that the claims have merit." *Salais v. Tex. Dep't of Aging & Disability Servs.*, 323 S.W.3d 527, 534 (Tex. App.—Waco 2010, pet. denied) (citations omitted). There is no valid argument that was not done in this case.

**REPLY POINT 4: Dr. Harlass's expert report is sufficient**

In the trial court, Hidalgo EMS criticized Dr. Harlass's report, although it was unclear then (and remains unclear from appellate briefing) whether Hidalgo EMS is saying his report fails to set forth standard of care, breach, or causation. (Hidalgo EMS has never challenged Dr. Harlass's qualifications).

Accordingly, Appellant hereinbelow attempts to summarize the complaints Hidalgo EMS raised as to the report, and responds to each.

8

Dr. Harlass opines that "the ground ambulance transfer (and the Hidalgo County EMS personnel's failure to divert) allowed her bleeding and abruption to continue to progress to where she became non-responsive and had cardiac arrest." CR 190. Hidalgo EMS points to this particular sentence, and then criticizes Dr. Harlass because he "does not establish in his report that it was the responsibility of the emergency medical technicians in the ambulance to overrule the instructions being given by the receiving hospital." Appellees' Brief at 16. However, Hidalgo EMS *recognizes* that, in his supplemental report, Dr. Harlass actually states that the EMTs should have diverted the ground transfer—thereby defeating their own argument on this point. Appellees' Brief at 16.

Hidalgo EMS then points to Dr. Harlass's assertion that the failure to divert "allowed the patient's continued bleeding that led to her death" and claims that he "does not explain the medical condition that the Plaintiff experienced." Appellees' Brief at 16-17. Dr. Harlass's report, however, plainly discusses and explains the medical condition that Yolanda experienced: placenta accreta, which put her at risk for placental abruption and significant hemorrhage. CR 91-94. Thus, this criticism appears misinformed.

The only other criticism Hidalgo EMS levels against Dr. Harlass's report was that it did not adequately link the cause of Yolanda's death to the failure to divert. Appellees' Brief at 17. Hidalgo EMS argues: "Dr. Harlass does not explain

9

what could have been done for the patient at any facilities, which he believes were available for diversion." Appellees' Brief at 17. Again, this is material for cross-examination. Hidalgo EMS can cross-examine Dr. Harlass on this issue; but it does not render his report insufficient. Dr. Harlass explains that the failure to divert resulted in Yolanda's bleeding going "unabated" for so long, that she suffered cardiac arrest. CR 190. He has thus sufficiently linked the failure on the EMT's part, to the cause of Yolanda's death.

Accordingly, Hidalgo EMS's criticisms of Dr. Harlass's report may be properly addressed at trial. His supposed failure to address Hidalgo EMS's specific, particular points in his report do not render his otherwise sufficient report, insufficient. Thus, to the extent the trial court found his report insufficient, it abused its discretion.

## **PRAYER**

Appellants pray that this Court reverse the trial court's dismissal and remand this case for further proceedings.

Respectfully submitted,

**WEST, WEBB, ALLBRITTON & GENTRY, P.C.**
1515 Emerald Plaza
College Station, Texas 77845-1515
Telephone:   (979) 694-7000
Facsimile:    (979) 694-8000

By: /s Gaines West
Gaines West
State Bar No. 21197500
gaines.west@westwebblaw.com
Jennifer D. Jasper
State Bar No.: 24027026
E-mail: jennifer.jasper@westwebblaw.com
Donald Delgado
State Bar No. 24065139
donald.delgado@westwebblaw.com

COUNSEL FOR APPELLANTS

## CERTIFICATE OF COMPLIANCE

I certify that this **Reply BRIEF OF APPELLANTS** complies with the typeface and word-count requirement set forth in the Rules of Appellate Procedure. This motion has been prepared, using Microsoft Word, in 14-point Times New Roman font for the text and 12-point Times New Roman font for any footnotes. This motion contains 2282 words, as determined by the word count feature of the word processing program used to prepare this document, excluding those portions of the notice exempted by TEX. R. APP. P. 9.4(i)(1).

/s Gaines West
Gaines West

## CERTIFICATE OF SERVICE

On July 6, 2015, the undersigned certifies that he served a copy of this Reply Brief of Appellants on the following in the manner listed below, in compliance with Texas Rules of Appellate Procedure 9.5 and 25.1(e):

Nichole G. Andrews                          *Via Facsimile ~ 713.452.4499*
Christopher Knudsen                         *ECF Email*
Margaret Garib                              *nandrews@serpejones.com*
Serpe, Jones, Andrews, Collender & Bell     *cknudsen@serpejones.com*
2929 Allen Parkway, Suite 1600             *mgarib@serpejones.com*
Houston, Texas 77019

Jeffrey D. Roerig                           *Via Facsimile ~ 956.542.0016*
David M. Roerig                             *And ECF Email*
Roerig, Oliverira & Fisher, LLP             *ruthm@rofllp.com*
855 West Price Road, Suite 9                *jroerig@rofllp.com*
Brownsville, Texas 78520-8786

/s Gaines West
Gaines West

# CASES AND STATUTES

2013 WL 6576041
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Corpus Christi–Edinburg.

CHRISTUS SPOHN HEALTH
SYSTEM CORPORATION, Appellant,
v.
Jose CASTRO, Appellee.

No. 13–13–00302–CV.   |   Dec. 12, 2013.

On appeal from the 117th District Court of Nueces County,
Texas. Sandra Watts, Judge.

**Attorneys and Law Firms**

Lori W. Hanson, Beirne, Maynard & Parsons, LLP, San
Antonio, TX, for Appellant.

Collen A. Clark, The Clark Firm, Dallas, TX, for Appellee.

Before Chief Justice VALDEZ and Justices RODRIGUEZ
and GARZA.

**MEMORANDUM OPINION**

Memorandum Opinion by Justice RODRIGUEZ.

 **\*1**  Appellant Christus Spohn Health System Corporation
(Spohn) challenges the trial court's denial of its motion to
dismiss appellee Jose Castro's health care liability claim.
*See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b)
(West 2011). By two issues, Spohn argues that: (1) Castro's
experts were not qualified to opine on the specific area of
health care involved in this suit; and (2) Castro's reports were
contradictory and conclusory and were therefore "no reports"
under the law. *See* *id.* § 74.351(*l* ), (r)(6). We reverse and
remand.

**I. Background**

Castro alleged the following facts in his petition:

On or about October 24, 2011, 50–year–old Jose Castro
was in a serious car accident. He was a belted passenger
in a Ford F–150 crew cab. The truck rolled and the roof
crushed, causing severe injuries to Mr. Castro. Mr. Castro
was transported via helicopter to the emergency room at
Christus Spohn Hospital in critical condition. Mr. Castro
sustained severe injuries including, but not limited to,
fracture and dislocation of his cervical spine at C5–C6,
multiple rib fractures, a collapsed lung, and damage to his
right phrenic nerve. He remained in intensive care through
most of December 2011. Mr. Castro had no sensation or
movement below the nipple line, putting him at high risk
of skin breakdown.

In November 2011, Mr. Castro developed a pressure ulcer
on his tail bone. The cause was the use of the tangible
property, the hospital bed. By the time Mr. Castro was
discharged from Christus Spohn Hospital in February
2012, the pressure ulcer had progressed to a grade III
decubitus ulcer....

At all relevant times hereto, Mr. Castro was a patient of
Christus Spohn Hospital.

Complaining of the pressure ulcer, in particular, Castro
brought a health care liability claim against Spohn. [1] In that
claim, Castro alleged that Spohn was negligent in: its use of
the hospital bed; its failure to develop and employ policies to
oversee patients like Castro; its failure to train and supervise
personnel to carry out such policies; its failure to render
appropriate medical and nursing intervention to Castro; its
failure to provide adequate nutritional support to Castro; its
failure to plan for and protect Castro from bedsores and
ulcers; its failure to follow Castro's doctors' orders; and
its failure to maintain the highest practical level of care
for Castro. Castro alleged that this negligence proximately
caused the injuries he suffered at Spohn.

[1]    In this same lawsuit, Castro has also alleged causes
       of action against the driver of the truck for negligence
       and against Ford Motor Company for products liability.
       Neither of those causes of action are before us in this
       accelerated, interlocutory appeal.

In support of his health care liability claim, Castro timely
filed two expert reports—one authored by Donna du Bois,
MPH, RN and another authored by Perry Starer, M.D. Both
du Bois and Dr. Starer are geriatric specialists with extensive
experience in caring for pressure ulcers in hospital and
nursing home settings. Spohn objected to both expert reports,

arguing that neither du Bois nor Dr. Starer was qualified to offer opinions as to the conditions under which Castro suffered his injuries, i.e., the development of a pressure ulcer in trauma care conditions while Castro was simultaneously suffering from quadriplegia, diabetes, bacterial infections, and respiratory distress. Spohn also filed motions to dismiss Castro's health care liability claim, arguing that Castro's reports are "no reports" and the claim should therefore be dismissed because neither du Bois nor Dr. Starer is qualified and the reports are contradictory and conclusory. After a hearing, the trial court denied Spohn's objections and motions to dismiss. This accelerated, interlocutory appeal followed. *See id.* § 51.014(a)(9) (West Supp.2011).

## II. Standard of Review

**\*2** We review a trial court's decision with respect to expert reports and the qualifications of experts for an abuse of discretion. *Larson v. Downing,* 197 S.W.3d 303, 304–05 (Tex.2006); *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 876 (Tex.2001). The trial court abuses its discretion if it acts unreasonably or arbitrarily or without reference to any guiding rules or principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003).

## III. Applicable Law

Under Chapter 74, an expert report is defined as:

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). When a document purporting to be an expert report is timely served and is properly challenged, as is the case here, the trial court "shall grant [the] motion challenging the adequacy of [the] report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to

comply with the definition of an expert report in Subsection (r)(6)."*Id.* § 74.351(*l* ); *see Loaisiga v. Cerda,* 379 S.W.3d 248, 260 (Tex.2012). To qualify as an objective good faith effort, the report must (1) inform the defendant of the specific conduct the plaintiff complains of, and (2) provide a basis for the trial court to conclude that the plaintiff's claims have merit. *Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex.2011) (citing *Palacios,* 46 S.W.3d at 879). The report and/or its accompanying curriculum vitae (CV) must also establish that the report's author is qualified to opine as an expert on the subject matter of the report.*Leland v. Brandal,* 217 S.W.3d 60, 62 (Tex.App.-San Antonio 2006), *aff'd on other grounds,*257 S.W.3d 204 (Tex.2008). Those qualifications must appear within the four corners of the expert report and cannot be inferred. *Id.; see also Palacios,* 46 S.W.3d at 878; *Baylor Coll. of Med. v. Pokluda,* 283 S.W.3d 110, 117 (Tex.App.-Houston [14th Dist.] 2009, no pet.). To meet the "good faith effort" requirement, "[n]o particular words or formality are required, but bare conclusions will not suffice. The report must address all the elements, and omissions may not be supplied by inference."*Scoresby,* 346 S.W.3d at 556 (citations omitted)."The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits."*Id.* at 554 (citation omitted).

A report meets the minimum qualifications for an expert report under the statute "if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated."*Id.* at 557.If a report meets these qualifications but is deficient, the claimant is entitled to one thirty-day extension to cure the deficiencies. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c)."All deficiencies, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case."*Scoresby,* 346 S.W.3d at 557;*see also Leland,* 257 S.W.3d at 207–08 (holding that when elements of a timely filed expert report are found deficient, either by the trial court or on appeal, one thirty-day extension to cure the report may be granted).

## IV. Qualifications of Experts

**\*3** By its first issue, Spohn contends that because the care provided to Castro by the hospital was under intensive care unit (ICU) or trauma conditions, his development of pressure ulcers must be addressed in the context of those conditions. And because neither du Bois nor Dr. Starer practice in the

field of ICU/trauma care, Spohn argues that they are not qualified to author expert reports in this case.

To be qualified to provide opinion testimony on whether a health care provider departed from the accepted standard of care, an expert must satisfy section 74.402. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(B). Section 74.402 lists three specific qualifications an expert witness must possess to provide opinion testimony on how a health care provider departed from accepted standards of health care —the expert must:

(1) [be] practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) [have] knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) [be] qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b) (West 2011).

A plaintiff offering expert medical testimony must establish that the report's author has expertise regarding "the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Broders v. Heise,* 924 S.W.2d 148, 153 (Tex.1996). Our analysis of the proffered expert's qualifications focuses on "the very matter" on which the expert is to give an opinion. *Id.*

Here, du Bois's CV shows that she has over thirty years' experience as a nurse, primarily in the field of nursing home care and other long-term facility care. In her report, du Bois stated that she is familiar with the standard of care for the "prevention of pressure ulcers... expected by ordinary prudent nurses in Texas." In his report, Dr. Starer states that he is "a practicing physician licensed by the State of New York." Dr. Starer states that he has been "board certified in Internal Medicine and Geriatrics" since 1985. Dr. Starer states that he teaches in the field of geriatrics at Mount Sinai School of Medicine and has given lectures on the prevention and treatment of pressure ulcers to both physicians and nurses. Finally, Dr. Starer states:

> In the regular course of my medical practice, I have occasion to diagnose and treat patients with conditions substantially similar to or identical with those of Jose Castro, including mobility limitations. I have also served as a primary care physician for hospital and nursing home patients since 1985. Over the course of my career, I have been the primary care physician for more than 5,000 patients in hospitals and nursing homes. Many of those patients have struggled with disabilities similar to those Jose Castro experienced. Accordingly, I have cared for and treated numerous patients who, like Jose Castro, were at risk for development of pressure ulcers.

**\*4** In their reports and CVs, neither du Bois nor Dr. Starer states that they have experience preventing and treating bedsores in the context of ICU or trauma care or explains how their fields of practice involve the same type of ICU/trauma care Spohn provided to Castro.

Spohn does not dispute that du Bois is an expert in the field of nursing home care and Dr. Starer is an expert in the field of geriatrics and nursing home care, or that these fields regularly involve the prevention and treatment of pressure ulcers. Rather, Spohn argues that neither expert is practicing or has otherwise relevant experience in ICU/trauma care, which is the relevant field of practice in this case. We agree. In his petition, Castro alleges that he remained in Spohn's trauma unit and ICU from October 24, 2011 through most of December 2011 as a result of the severe injuries he sustained in the car accident, including a collapsed lung, multiple broken ribs, and a fractured and dislocated spine. In their descriptions of Castro's conditions, both du Bois and Dr. Starer acknowledge these serious injuries and that Castro was being cared for under intensive care or trauma conditions. Castro then alleges that his pressure ulcer developed in November 2011, which is while he was in the ICU. In short, under the facts alleged in his own petition, it is clear that the care provided to Castro by Spohn was trauma and ICU care. Castro's pressure ulcer developed in this context, and his experts must be qualified to opine on his injury in the

context of these conditions. Examining only what is within the four-corners of the experts' reports and CVs, *see Palacios, 46 S.W.3d at 878; Pokluda,* 283 S.W.3d at 117, we find nothing in either du Bois or Dr. Starer's reports that meets this requirement.

Castro argues that Spohn's characterization of the relevant field of practice in this case sets the bar too high, that Spohn is essentially requiring Castro to find a specialist in the treatment of "a 50–year–old quadriplegic with diabetes, PEG tube feeding, with a tracheostomy [sic] and neurologic deficits, with prior cardiac arrest and suffering from bacterial infections."This characterization overstates what is required in this case. Although it is true that an expert need not be a practitioner in the same specialty as the defendant to qualify as an expert, *see Broders,* 924 S.W.2d at 153, he or she is only competent if he or she has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those confronting the defendant. *See Ehrlich v. Miles,* 144 S.W.3d 620, 625 (Tex.App.-Fort Worth 2004, pet. denied). In other words, the proper inquiry in assessing an expert's qualifications to submit a report is not his or her area of expertise but his or her familiarity with the specific issues involved in the claim before the court. *See Blan v. Ali,* 7 S.W.3d 741, 746 (Tex.App.-Houston [14th Dist.] 1999, no pet.); *see also Broders,* 924 S.W.2d at 153. Here, as discussed above, Castro's petition includes facts showing that the circumstances under which he developed his pressure ulcer involved trauma and ICU treatment of his severe injuries following the accident. His expert must be qualified to render an opinion on the applicable standard of care in those circumstances—i.e., the prevention and/or treatment of pressure ulcers in the context of ICU/trauma care. [2] We are not persuaded by Castro's argument to the contrary.

[2] We note that neither du Bois nor Dr. Starer's reports foreclose the possibility that they are qualified in this case and may need only to connect the experience they have gained in their thirty-plus year careers to the conditions in this case. *See infra* sections V, VI (remanding for entry of an order granting Castro a thirty-day extension to amend his reports). During his thirty-day extension, *see id.,* Castro is also entitled to serve the reports of additional experts. *See In re Buster,* 275 S.W.3d 475, 477 (Tex.2008).

**\*5** While "[t]he qualification of a witness as an expert is [a matter] within the trial court's discretion,"*Larson,* 197 S.W.3d at 304 (citing *Broders,* 924 S.W.2d at 151), such discretion

is not without limits. *See Walker,* 111 S.W.3d at 62 (holding that a court abuses its discretion if it acts without reference to guiding rules and principles). Castro was required to submit reports authored by experts who are "practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider," have "knowledge of accepted standards of care ... for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim," and are "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care."*See*TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b). Focusing on the specific issue before the trial court as alleged in Castro's petition, *see Broders,* 924 S.W.2d at 153, we cannot conclude that the information provided in du Bois and Dr. Starer's reports show them to be practicing in the relevant field of practice or show them to have any other relevant experience giving them knowledge of the standard of care for the specific conditions in this case. *See*TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b); *Blan,* 7 S.W.3d at 746. As such, the trial court did not follow guiding rules and principles in denying Spohn's objections to the expert's qualifications and motion to dismiss on this basis. Spohn's first issue is sustained.

### IV. Sufficiency of Report

By its second issue, Spohn argues that Castro's reports were contradictory and conclusory and are therefore "no report" under the statute. *See*TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6); *Scoresby,* 346 S.W.3d at 551–52.

First, Spohn argues that because du Bois and Dr. Starer identified different conduct as breaches of the standard of care, their reports, taken together, are inherently inconsistent. *See Fung v. Fischer,* 365 S.W.3d 507, 530 (Tex.App.-Austin 2012), *overruled on other grounds, Certified EMS, Inc. v. Potts,* 392 S.W.3d 625 (Tex.2013) ("Reliable expert opinion should ... be free from internal inconsistencies."). Spohn contends that du Bois identified only two breaches in her report: that the nurses caring for Castro failed to make accurate records and failed to create an appropriate treatment plan for the prevention of pressure ulcers. Spohn contends that Dr. Starer likewise identified only two breaches of care in his report: the nurses' failure to correctly use Castro's bed and failure to turn Castro more frequently. In our review of du Bois's report, we found that she also identified as breaches of the standard of care that the nurses caring for Castro failed to reposition Castro as needed, failed to assess his skin

after each turn, and failed to properly assess and provide for Castro's nutritional needs. And again, in our review of Dr. Starer's report, we found that he also identified as breaches of the standard of care that the Spohn staff caring for Castro "failed to properly develop a care plan for ulcer prevention" and "failed to maintain an accurate and complete clinical record." In light of the full range of conduct identified by du Bois and Dr. Starer, we disagree with Spohn that the breaches identified in the separate reports are contradictory; for that matter, having examined the reports in their entirety, we note that du Bois and Dr. Starer identified largely the same breaches.

**\*6** But assuming for the sake of argument that the breaches in the reports are limited to those identified by Spohn, we believe that Dr. Starer's report identified additional instances of conduct that breached the standard of care. Read together in the manner in which they are characterized by Spohn, the reports are not contradictory, but provide a more complete picture of the instances of conduct giving rise to Castro's claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(i) ("Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider."). Thus, we are not persuaded by Spohn's argument in this regard, and the trial court did not abuse its discretion in denying Spohn's motion to dismiss on this basis. Spohn's second issue is overruled in so far as it depends on this argument.

Spohn next argues that du Bois's report, in particular, did no more than "state that nurses failed to keep accurate records or to implement appropriate plans of care." Spohn argues that du Bois was required to "state what documentation was inaccurate, what documentation was lacking, on what dates it was wrong or missing and who was responsible for that charting." But du Bois's report includes the exact elements that Spohn claims are required. Du Bois refers to specific medical record dates and page numbers throughout her report and specifically identifies what she characterizes as the deficiencies in those records. Where du Bois points out that certain details are missing from the records, she does not specify page numbers, but as she is pointing to the absence of something, we cannot fault her for failing to specify where that missing detail is *not* located. In short, we are not persuaded by Spohn's generalized assertions in this regard. Again, Spohn's second issue is overruled in so far as it depends on this argument.

Finally, Spohn argues that the reports do not adequately establish causation because they do not "explain how taking any particular action would have prevented the development of a pressure ulcer given the complex medical issues involved in [Castro]'s care." Spohn argues that "[w]ithout addressing [these] critical issues, it is impossible to know if [Castro]'s pressure ulcer could have been prevented." On this account, we agree with Spohn. Although du Bois and Dr. Starer's reports go into great detail about the procedures necessary to prevent pressure ulcers in standard conditions, they do not address the specific conditions present in Castro's care. As discussed in detail above, Castro's claim involves his development of a pressure ulcer while he was being treated in Spohn's ICU over the course of several months for severe injuries he suffered in an automobile accident. Neither du Bois nor Dr. Starer discusses Castro's injuries in the context of these conditions. And the omission of this context renders any conclusion on the cause of Castro's injuries incomplete. Because Castro's reports do not adequately address the causation element, they did not provide a basis for the trial court to conclude that Castro's claims have merit. *See Palacios,* 46 S.W.3d at 879. The reports therefore do not amount to a good faith effort to comply with the statute and are deficient. *See Scoresby,* 346 S.W.3d at 556 (requiring that the report adequately address all the elements to qualify as a good-faith effort). The trial court abused its discretion in denying Spohn's objections and motions to dismiss on this basis. *See Walker,* 111 S.W.3d at 62. Spohn's second issue is sustained as to its causation argument.

### V. Thirty–Day Extension

**\*7** Although Castro's expert reports are deficient in that they do not establish the authors' qualifications and do not adequately address causation, we do not believe the reports are fatally deficient, or "no report" under the statute. Both meet the minimum qualifications set out in *Scoresby*—both du Bois and Dr. Starer are individuals with expertise who opine about Castro's injuries in great detail and implicate the conduct of Spohn's staff. *See* 346 S.W.3d at 557. Because Castro met these minimum qualifications, he is entitled to one thirty-day extension to cure the deficiencies in his reports. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c); *see also Scoresby,* 346 S.W.3d at 557 (holding that all deficiencies, whether in an expert's opinion or qualifications, are subject to being cured). This disposition is consistent with the goal of the statute, which is to deter frivolous claims but

not dispose of claims regardless of their merits. *See Scoresby,* 346 S.W.3d at 554.

### VI. Conclusion

We reverse the order of the trial court denying Spohn's motion to dismiss and remand for entry of an order granting Castro

a thirty-day extension to amend his expert reports. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c).

**All Citations**

Not Reported in S.W.3d, 2013 WL 6576041

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Columbia North Hills Hosp. Subsidiary, L.P. v. Alvarez, Not Reported in S.W.3d (2011)

2011 WL 3211239

2011 WL 3211239
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION ON REHEARING**
Court of Appeals of Texas,
Fort Worth.

COLUMBIA NORTH HILLS
HOSPITAL SUBSIDIARY, L.P., d/
b/a North Hills Hospital, Appellant.
v.
Bulmaro ALVAREZ, Individually and as
Representative of the Estate of Sandra
Alvarez, Deceased and as Next Friend of
Saray Alvarez and Marilyn Alvarez, Minors,
and Sandy Alvarez, Individually, Appellees.

No. 02–10–00342–CV.    |    July 28, 2011.

From the 96th District Court of Tarrant County, Jeff Walker,
Judge.

**Attorneys and Law Firms**

Linda M. Stimmel, Nichol L. Bunn, Wilson, Elser,
Moskowitz, Edelman & Dicker, LLP, Dallas, TX, for
appellant.

Les Weisbrod, Max Freeman, & Lawrence R. Lassiter, Miller
Weisbrod, LLP, Dallas, TX, for appellees.

Panel LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

**MEMORANDUM OPINION** [1] **ON REHEARING**

[1]      *See* Tex.R.App. P. 47.4.

SUE WALKER, Justice.

**\*1** On April 7, 2011, this court issued an opinion affirming
in part and reversing in part the trial court's order denying
Appellant Columbia North Hills Hospital Subsidiary, L.P.'s
motion to dismiss the health care liability claims asserted
against it by Appellees Bulmaro Alvarez, Individually and
as Representative of the Estate of Sandra Alvarez, Deceased

and as Next Friend of Saray Alavarez and Marilyn Alvarez,
Minors, and Sandy Alvarez, Individually. We withdraw our
opinion and judgment dated April 7, 2011, and substitute the
following.

After due consideration, we deny North Hills Hospital's
motion for rehearing and motion for en banc reconsideration.
We grant Appellees' motion for rehearing to the extent
that we modify our opinion to permit the trial court on
remand to determine whether to grant a thirty-day extension
to Appellees to cure the deficiencies in the expert report
regarding Appellees' pleaded direct liability claims.

## I. INTRODUCTION

Appellant Columbia North Hills Hospital Subsidiary, L.P.,
d/b/a North Hills Hospital appeals from the trial court's
order denying its motion to dismiss the health care liability
claims asserted against it by Appellees Bulmaro Alvarez,
Individually and as Representative of the Estate of Sandra
Alvarez, Deceased and as Next Friend of Saray Alavarez and
Marilyn Alvarez, Minors, and Sandy Alvarez, Individually.
In three issues, North Hills Hospital complains that although
Appellees timely served and timely amended the expert report
of Samuel A. Tyuluman, M.D., the trial court nonetheless
abused its discretion by refusing to dismiss the claims against
North Hills Hospital because Dr. Tyuluman was not qualified
to offer the opinions he did; because Dr. Tyuluman's report
fails to set forth a standard of care, breach, or causation
relating to North Hills Hospital; and generally because the
trial court did not dismiss Appellees' claims. Because the
record before us reflects no abuse of discretion by the trial
court concerning Appellees' vicarious liability claims against
North Hills Hospital, we will affirm the portion of the trial
court's order refusing to dismiss those claims. But because Dr.
Tyuluman's report does not demonstrate that he is qualified
to offer an opinion concerning the direct liability causes of
action that Appellees pleaded against North Hills Hospital,
we will reverse the portion of the trial court's order denying
North Hills Hospital's motion to dismiss those claims.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Forty-five-year-old Sandy Alvarez died at North Hills
Hospital after a vaginal hysterectomy was performed on
her. Following the surgery, Mrs. Alvarez was transferred to
the recovery room where she experienced difficulties. She

**Columbia North Hills Hosp. Subsidiary, L.P. v. Alvarez, Not Reported in S.W.3d (2011)**

2011 WL 3211239

was eventually diagnosed as suffering from hemorrhagic shock and returned to the operating room for surgical repair of the source of her internal bleeding. Mrs. Alvarez died approximately five hours after her second surgery. Mrs. Alvarez's autopsy report indicates that she died as a result of "(1) complications of acute hemorrhagic shock due to post-operative bleed and (2) morbid obesity with hepatomegaly, severe fatty metamorphosis and early fibrosis."

**\*2** Appellees filed suit against North Hills Hospital alleging both vicarious liability and direct liability theories of recovery. Appellees alleged that North Hills Hospital was vicariously liable for its nurses' negligence and alleged various acts and omissions by the North Hills Hospital nursing staff, including the failure to invoke the chain of command. Appellees alleged that North Hills Hospital was directly liable for failing to adequately train its nurses, failing to enforce its policies and procedures, and failing to adequately supervise its nurses. Appellees timely served on North Hills Hospital the report and curriculum vitae of Dr. Tyuluman. North Hills Hospital filed a motion to dismiss alleging that Dr. Tyuluman was not qualified to testify on the standard of care applicable to a hospital and alleging various deficiencies in Dr. Tyuluman's report. After a hearing, the trial court ruled that

> the expert reports submitted by Plaintiffs constitute a good faith effort and meet the requirements of Chapter 74 of the Civil Practice & Remedies Code, with the exception that Plaintiffs are required to submit an amended report breaking out specifically by name each defendant and/or group of defendants and the specific elements relating to the standard of care, breach of the standard of care, and causation for each defendant.

The trial court gave Appellees thirty days to file the amended report; Appellees timely served an amended report of Dr. Tyuluman. [2] North Hills Hospital then filed a second motion to dismiss again alleging that Dr. Tyuluman was not qualified and alleging the same deficiencies in his report. After a hearing, the trial court denied North Hills Hospital's second motion to dismiss, and North Hills Hospital perfected this appeal.

[2] All subsequent references to Dr. Tyuluman's report are to his amended report.

## III. STANDARD OF REVIEW

We review a trial court's denial of a motion to dismiss for an abuse of discretion. *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Maris v. Hendricks,* 262 S.W.3d 379, 383 (Tex.App.-Fort Worth 2008, pet. denied); *Ctr. for Neurological Disorders, P.A. v. George,* 261 S.W.3d 285, 290–91 (Tex.App.-Fort Worth 2008, pet. denied). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.* But a trial court has no discretion in determining what the law is or in applying the law to the facts, and thus "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig.proceeding); *Ehrlich v. Miles,* 144 S.W.3d 620, 624 (Tex.App.-Fort Worth 2004, pet. denied).

## IV. STATUTORY STANDARDS FOR EXPERT REPORTS

**\*3** Chapter 74 requires a health care liability claimant to serve defendants with an expert report and curriculum vitae within 120 days of filing the claim. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (Vernon 2011). The purpose of the expert report requirement is to inform the defendant of the specific conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001)). An expert report "need not marshal all the plaintiff's proof." *Palacios,* 46 S.W.3d at 878 (construing former Texas Revised Civil Statute article 4590i, section 13.01). Additionally, the information in the report "does not have to meet the same requirements as

Columbia North Hills Hosp. Subsidiary, L.P. v. Alvarez, Not Reported in S.W.3d (2011)

2011 WL 3211239

the evidence offered in a summary-judgment proceeding or at trial."*Id.* at 879.

If the defendant files a motion challenging the adequacy of the expert report, the court shall grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report."Tex. Civ. Prac. & Rem.Code Ann. § 74.351(*l* ). The trial court may grant the claimant one thirty-day extension to cure a deficiency in the initial expert report. *Id.* § 74.351(c).

## V. CHALLENGES TO DR. TYULUMAN'S QUALIFICATIONS

### A. Dr. Tyuluman is Qualified Concerning North Hills Hospital's Nurses' Conduct

Dr. Tyuluman's report demonstrates that he practices health care in a field of practice that involves the same type of care or treatment as that delivered by the nurses at North Hills Hospital. It states, in pertinent part,

> I practice obstetrics and gynecology in Dallas, Texas and have been since 1986. I am a Clinical Professor of Obstetrics and Gynecology, University of Texas Southwestern Medical School, Parkland Memorial Hospital. I maintain board certification with the American Board Obstetrics and Gynecology. I am a Fellow of the American College of Obstetrics and Gynecology and the American College of Surgeons.... I was the Chairman of the Texas Health Resources, Presbyterian Hospital Dallas, Quality Improvement Committee from 1998 until 2002. I served as an elected member of the Clinical Case Reviews Committee (Advisory Committee) of Margot Perot Hospital of Texas Health Resources.

Dr. Tyuluman's report demonstrates that he has knowledge of the accepted standards of health care providers for the condition at issue and by training or experience is qualified

to offer an expert opinion regarding those accepted standards. The report states, in pertinent part,

> Over the past 22 years, I have cared for patients just like Mrs. Alvarez hundreds of times. I am familiar with the standard of care for such patients based both on my personal experience and my decades in the profession. As a function of my practice in obstetrics and gynecology, as well as the administrative positions noted above, I am familiar with not only standards of care as they apply to gynecologists, but also as they apply to other physicians caring for patients in the post operative period following a vaginal hysterectomy with a suspicion of post operative hemorrhage. The standard of care is to return the patient in a situation such as this case back to surgery to fix the bleed. This standard applies across lines of specialty.... Further, I am familiar with the standards of care as they apply to nurses and to the administration of the department of gynecology from both a physician's point of view and an administrator's. I work with consulting physicians as well as recovery room and postoperative nurses and am familiar with their training and standards as they apply to them. I am qualified to review this case from all of these perspectives. For further details, please see a copy of my CV, which is attached.

**\*4** In part of its first issue, North Hills Hospital claims that the trial court abused its discretion by determining that Dr. Tyuluman was qualified to render opinions concerning post-operative nursing care or nurses invoking the chain of command in a hospital setting. North Hills Hospital argues that because Dr. Tyuluman is not a nurse, he is not qualified to opine on the nursing standard of care. When a physician states that he is familiar with the standard of care for both nurses and physicians and for the prevention and treatment of the illness, injury, or condition involved in the claim, the physician is qualified on the issue of whether the health care

**Columbia North Hills Hosp. Subsidiary, L.P. v. Alvarez, Not Reported in S.W.3d (2011)**

2011 WL 3211239

provider departed from the accepted standards of care for health care providers. *See Baylor Med. Ctr. at Waxachachie v. Wallace,* 278 S.W.3d 552, 558 (Tex.App.-Dallas 2009, no pet.)(holding doctor expert's statement that he had worked with nurses, nurse practitioners, physician's assistants, and physicians, including emergency room physicians, and was familiar with the standards of care that applied to such health care providers in similar situations, was sufficient to show expert was qualified to render opinion as to each type of health care provider); *San Jacinto Methodist Hosp. v. Bennett,* 256 S.W.3d 806, 814 (Tex.App.-Houston [14th Dist.] 2008, no pet.)(holding doctor expert qualified to render opinion on nursing standard of care in field in which doctor practiced); *see also Jorgensen v. Tex. MedClinic,* 327 S.W.3d 285, 288–89 (Tex.App.-San Antonio 2010, no pet.)(holding doctor expert qualified to render opinion as to standard of care for all health care providers concerning proper protocol for administration of flu vaccine because standard of care did not vary among health care providers).

As quoted above, after setting forth his credentials and board certification in obstetrics and gynecology, Dr. Tyuluman's report indicates that he is familiar with the standard of care for treating patients like Mrs. Alvarez, that he has cared for hundreds of patients like her during the past twenty-two years, and that he is familiar with the standards of care for recovery room and post-operative nurses caring for patients like Mrs. Alvarez through his experience working with those nurses. Looking to the four corners of Dr. Tyuluman's report, we hold that it establishes that he is qualified to testify concerning North Hills Hospital's nurses' conduct in the care of Mrs. Alvarez. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.402(b)(1), (2), (3) (Vernon 2011) (setting forth qualifications required for experts providing statutory report); *see also, e.g., Wallace,* 278 S.W.3d at 558. We hold that the trial court did not abuse its discretion by determining that Dr. Tyuluman was qualified to offer expert medical opinions concerning Appellees' vicarious liability claims against North Hills Hospital for the alleged negligence of its nurses, including negligence in failing to invoke the chain of command. We overrule the portion of North Hills Hospital's first issue contending that the trial court abused its discretion by determining that Dr. Tyuluman was qualified to opine on the recovery room nursing standard of care applicable to a patient like Mrs. Alvarez.

## B. Dr. Tyuluman is Not Qualified Concerning North Hills Hospital's Direct Liability

**\*5** In the balance of its first issue, North Hills Hospital contends that the trial court abused its discretion by determining that Dr. Tyuluman was qualified to render opinions concerning North Hills Hospital's direct liability. Appellees pleaded that North Hills Hospital was directly liable for failing to adequately train its nurses, failing to enforce its policies and procedures, and failing to adequately supervise its nurses. Looking only to the four corners of Dr. Tyuluman's report, we hold that it does not establish that he has any familiarity, training, or experience that would allow him to opine as to the standard of care for a hospital in formulating training programs, formulating or enforcing its policies and procedures, or supervising its nurses. *See Hendrick Med. Ctr. v. Conger,* 298 S.W.3d 784, 788 (Tex. App–Eastland 2009, no pet.).* As set forth above, Dr. Tyuluman is qualified to opine on the standard of care applicable to recovery room nurses caring for a patient like Mrs. Alvarez; but the standard of care applicable to a hospital in training its nurses, in enforcing its policies and procedures, and in supervising its nurses is an entirely separate standard. *See generally Denton Reg'l Med. Ctr. v. LaCroix,* 947 S.W.2d 941, 950–51 (Tex.App.-Fort Worth 1997, writ denied) (discussing theories of direct hospital liability and applicable standard of care). Although Dr. Tyuluman's report states that he has served as chairman of a hospital quality improvement committee and a member of a clinical case review committee, nowhere in the report does he state that as a result of this or other experience he is familiar with the standard of care for a reasonable, prudent hospital in training its nurses, in enforcing its policies and procedures, and in supervising its nurses. The report does not indicate that, as a result of his committee service, Dr. Tyuluman gained experience in formulating, implementing, or monitoring either hospital nurses' training or enforcement of hospital policies and procedures or hospital nurses' supervision. In short, looking only to the four corners of Dr. Tyuluman's report, we hold that it does not establish that he is qualified to opine on these hospital standards of care. We sustain the portion of North Hills Hospital's first issue contending that the trial court abused its discretion by determining that Dr. Tyuluman was qualified to opine on the standard of care applicable to a hospital in training its nurses, in enforcing its policies and procedures, and in supervising its nurses.

In a subargument included in its second issue, North Hills Hospital contends that Dr. Tyuluman's report does not provide a fair summary of how North Hills Hospital breached the standard of care applicable to a hospital. Looking to the four corners of Dr. Tyuluman's report, we hold that it does not set forth what the standard of care is for North Hills Hospital with respect to adequate training of its nurses, enforcement of its policies and procedures, or supervision of its nurses. *Accord Reed v. Granbury Hosp. Corp.,* 117 S.W.3d 404, 409 (Tex.App.-Fort Worth 2003, no pet.). That is, Dr. Tyuluman's report does not state anywhere what the standard of care is for a reasonable, prudent hospital in training its nurses, in enforcing its policies and procedures, and in supervising its nurses. [3] Accordingly, even if the four corners of Dr. Tyuluman's report had established that he was qualified to opine on these standards of care applicable to a hospital, because his report does not set forth these standards of care, we alternatively hold that any determination by the trial court that Dr. Tyuluman's report adequately set forth these standards of care constituted an abuse of discretion. [4]

[3] Dr. Tyuluman's report does state that "[t]he standard of care required the hospital to have adequately trained and qualified PACU and ICU nurses" and that "[t]he standard also required that the hospital have and enforce proper chain of command policies." But these statements are very broad, general, and conclusory; they fall short of stating any standard of care as to what specific training or policies were required. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 53 ("A conclusory report does not meet the Act's requirements, because it does not satisfy the *Palacios* test.").

[4] Because we have held that Dr. Tyuluman's report does not establish that he was qualified to opine on the hospital's standard of care on the direct liability claims pleaded by Appellees and because we have alternatively held that, in any event, Dr. Tyuluman's report does not adequately state the standard of care applicable to a hospital concerning Appellees' pleaded theories of direct liability, we need not address North Hills Hospital's contention that Dr. Tyuluman's report does not adequately set forth causation concerning Appellees' direct liability theories of recovery. *See* Tex.R.App. P. 47.1 (requiring appellate court to address in opinion only issues necessary to disposition of appeal).

## VI. CHALLENGES TO ELEMENTS OF STATUTORY EXPERT REPORT

**\*6** In its second issue, North Hills Hospital challenges the adequacy of Dr. Tyuluman's report as to specific statutory elements. In its third issue, North Hills Hospital simply argues that the trial court generally abused its discretion by failing to dismiss Appellees' health care liability claim with prejudice. North Hills Hospital argues its third issue together with its second issue in its brief. North Hills Hospital's third issue therefore presents only the same arguments and grounds for reversal as presented in its second issue. We accordingly address issues two and three together.

### A. Nurses' Breach of the Standard of Care

In part of its second and third issues, North Hills Hospital contends that Dr. Tyuluman's report does not provide a fair summary of how the nurses breached the applicable standard of post-operative nursing care.

Dr. Tyuluman's report states, in pertinent part concerning the nurses' breach of the standard of care,

> The standard of care for North Hill[s] Hospital and its nursing staff caring for a patient like Mrs. Alvarez in the PACU and CCU is to recognize the emergent and critical post-operative bleed and to fully invoke the chain of command to make sure she was returned to surgery by Dr. Allen or some other surgeon in a timely fashion. Additionally, North Hill[s] Hospital nurses were required, according to the applicable standard of care, to properly evaluate operative blood loss. The nursing staff of North Hill[s] Hospital was negligent when they grossly underestimated operative blood loss, not accounting for approximately 4800 cc's. The nursing staff of North Hill[s] Hospital was also negligent in their post-operative management of Mrs. Alvarez, watching her decline throughout the day without effectively utilizing the chain of command [ ] to make sure that Dr. Allen or some other surgeon returned Mrs. Alvarez to surgery. The standard of care

Columbia North Hills Hosp. Subsidiary, L.P. v. Alvarez, Not Reported in S.W.3d (2011)

2011 WL 3211239

for the nursing staff requires that they both recognize and effectively communicate the emergency nature of the situation and then, should Dr. Allen not move quickly to surgery, go up the chain of command. By 1900, the Assistant CNO and Nurse Manager were at the bedside. The standard of care required that the nursing staff insist on their involvement much earlier.

As set forth above, Dr. Tyuluman's report specifically identifies how North Hills Hospital's recovery room nurses breached the standard of care: they did not recognize the emergent and critical post-operative bleed; they watched Mrs. Alvarez decline throughout the day; they did not properly evaluate Mrs. Alvarez's blood loss; they failed to account for 4800 cc's of lost blood; and they failed to invoke the chain of command to get the Assistant CNO and Nurse Manager to come to Mrs. Alvarez's bedside much sooner.

Looking to the four corners of Dr. Tyuluman's report, we hold that the trial court did not abuse its discretion by determining that the report adequately sets forth how the recovery room, post-operative nurses breached the standards of care set forth in the report. We overrule the portion of North Hills Hospital's second and third issues contending otherwise.

### B. Causation Element of Nurses' Negligence

**\*7** In the balance of its second and third issues, North Hills Hospital argues that Dr. Tyuluman's report fails to adequately set forth how the nurses' negligence proximately caused Mrs. Alvarez's death. Dr. Tyuluman's report provides,

> The failure of all defendants to provide surgery to control the hemorrhage, continuing to administer pressor agents when contraindicated, failure to properly monitor intraoperative blood loss, and failure to recognize the compromised status of the patient during this process are proximate cause of the death of [Mrs.] Alvarez. Had prompt surgery been performed, it is more likely than not that the injury would have been easily found and

> corrected, preventing further blood loss. I have performed such surgeries to locate and repair injury following vaginal hysterectomy and know from my experience the effectiveness of such procedures. Had ordinary care been provided during the operative and post operative period, in all medical probability, Mrs. Alvarez would be alive today.

Looking to the four corners of Dr. Tyuluman's report, we hold that the trial court did not abuse its discretion by determining that the report adequately sets forth how the nurses' negligence proximately caused Mrs. Alvarez's death. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 52. The fact that a trier of fact may ultimately reject Dr. Tyuluman's opinion regarding the nurses' causation—i.e., that the nurses failed to properly monitor Mrs. Alvarez's blood loss, failed to recognize her compromised status, and failed to invoke the chain of command, proximately causing Mrs. Alvarez's death—does not render the report insufficient. *See Hayes v. Carroll,* 314 S.W.3d 494, 507 (Tex.App.-Austin 2010, no pet.). The report sufficiently informs North Hills Hospital of the specific conduct of its nurses that Appellees are questioning and provides a basis for the trial court to determine that Appellees' claims have merit. This is all that is required of an expert report. *See Leland v. Brandal,* 257 S.W.3d 204, 206–07 (Tex.2008) (explaining that expert report is meant to serve two purposes: (1) to inform the defendant of the specific conduct the claimant is questioning and (2) to provide a basis for the trial court to conclude the claims have merit).

We overrule the remainder of North Hills Hospital's second and third issues contending otherwise.

### VII. CONCLUSION

Having sustained the portion of North Hills Hospital's first issue claiming that the four corners of Dr. Tyuluman's report does not establish that he was qualified to opine on the standard of care applicable to a hospital in training its nurses, in enforcing its policies and procedures, and in supervising its nurses, we reverse the trial court's September 13, 2010 order to the extent that it failed to dismiss Appellees' direct liability claims against North Hills Hospital for allegedly failing to adequately train its nurses, failing to enforce its policies and

procedures, and failing to adequately supervise its nurses. Because Appellees did not have an opportunity to amend this defect in Dr. Tyuluman's report—the trial court specifically directed the deficiency to be addressed during the thirty-day extension that it granted—and because the trial court has not had an opportunity to consider whether Appellees should be granted an extension of time to cure the deficiency found by this court to exist in Dr. Tyuluman's report concerning Appellees' pleaded direct liability claims, we remand those claims to the trial court for a determination of whether to dismiss them or to grant a thirty-day extension of time for Appellees to cure the deficiencies found by this court in Dr. Tyuluman's report regarding Appellees' pleaded direct liability claims. *See TTHR Ltd. P'ship v. Moreno,* No. 02–10–00334–CV, 2011 WL 2651813, at *12–14 (Tex.App.-Fort Worth July 7, 2011, no pet. h.) (mem. op. on reh'g); *Estorque v. Schafer,* 302 S.W.3d 19, 25 (Tex.App.-Fort Worth 2009, no pet.).

**\*8** Having overruled the balance of North Hills Hospital's first issue and its second and third issues and having held that the trial court did not abuse its discretion by determining that Dr. Tyuluman was qualified to opine on the standard of care applicable to North Hills Hospital's recovery room nurses or by determining that Dr. Tyuluman's report adequately sets forth the nurses' breach of the standard of care and how that breach proximately caused Mrs. Alvarez's death, we affirm the trial court's September 13, 2010 order to the extent that it denied North Hills Hospital's motion to dismiss Appellees' vicarious liability claims. [5]

[5]    This court's November 30, 2010 order staying discovery in the trial court is lifted.

**All Citations**

Not Reported in S.W.3d, 2011 WL 3211239

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

246 S.W.3d 768
Court of Appeals of Texas,
Houston (14th Dist.).

William DAVIS, Appellant,
v.
John Q.A. WEBB, Jr., M.D., Appellee.

No. 14–07–00331–CV.   |   Jan. 22,
2008.   |   Rehearing Overruled Feb. 21, 2008.

**Synopsis**
**Background:** Patient who underwent cataract surgery brought medical malpractice action against physician who performed the surgery after fragments of lens nucleus were allegedly left in patient's eye due to a small capsular tear. The 215th District Court, Harris County, Levi James Benton, J., granted ophthalmologist's motion to dismiss based on patient's failure to timely file an expert report. Patient appealed.

**Holdings:** The Court of Appeals, Eva M. Guzman, J., held that

[1] optometrist was not qualified to give expert opinion regarding standard of care, and

[2] trial court did not abuse its discretion by awarding attorney fees and cost to physician.

Affirmed.

Price, Senior Justice, concurred and filed a separate opinion.

West Headnotes (5)

[1]     **Appeal and Error**
            Rulings on Motions Relating to Pleadings
          Court of Appeals applies an abuse of discretion standard in reviewing a trial court's decision, in an action asserting a health care liability claim, on a motion to dismiss in which a defendant claims the expert opinion was untimely served.

V.T.C.A., Civil Practices & Remedies Code § 74.351(a).

Cases that cite this headnote

[2]     **Appeal and Error**
            Abuse of Discretion
          An abuse of discretion occurs when a trial court acts in an unreasonable and arbitrary manner, or when it acts without reference to any guiding principles.

1 Cases that cite this headnote

[3]     **Appeal and Error**
            Cases Triable in Appellate Court
          **Appeal and Error**
            Conclusiveness in General
          Court of Appeals defers to the trial court's factual determinations, but reviews questions of law de novo.

2 Cases that cite this headnote

[4]     **Health**
            Affidavits of Merit or Meritorious Defense; Expert Affidavits
          Optometrist was not qualified to give expert opinion regarding standard of care in patient's medical malpractice action against physician who specialized in ophthalmology and, thus, trial court did not abuse its discretion by dismissing case for failing to timely file expert report; optometrist was not a physician, and pursuant to statute, only a physician could qualify as an expert witness on the issue of whether a physician departed from the standards of medical care, patient did not show that his act of filing expert report authored by optometrist constituted good faith effort to comply with statute, and nothing indicated that the report was curable by a discretionary 30-day extension. V.T.C.A., Civil Practices & Remedies Code §§ 74.351(a, c), 74.401(a).

6 Cases that cite this headnote

[5]     **Costs**

👉 On Dismissal, Nonsuit, Default, or Settlement

Trial court did not abuse its discretion by awarding attorney fees and cost to physician following dismissal of patient's medical malpractice action against physician for failure to timely serve required expert report; dismissal of defendant's suit was appropriate. V.T.C.A., Civil Practice & Remedies Code § 74.351(b)(1).

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*769** Jason Bradley Ostrom, Houston, for appellant.

T. Marc Calvert, Houston, for appellant.

Panel consists of Chief Justice HEDGES, Justice GUZMAN, and Justice FRANK C. PRICE. *

\*      Former Justice Frank C. Price sitting by assignment.

**MAJORITY OPINION**

EVA M. GUZMAN, Justice.

In this medical malpractice case, we determine whether an optometrist may generate an expert report concerning an ophthalmologist's alleged departure from accepted standards of medical care. Because **\*770** an ophthalmologist is a physician and an optometrist is not, and only a physician is qualified to author an expert report regarding whether a physician departed from accepted standards of medical care, we affirm the trial court's dismissal of this lawsuit. We further conclude that the trial court properly awarded appellee attorneys' fees and costs. We therefore affirm the judgment of the trial court.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

On October 7, 2004, appellee John Q.A. Webb, Jr., M.D., a physician specializing in ophthalmology, performed surgery to remove a cataract from appellant William Davis's left eye. During the surgery, fragments of lens nucleus were allegedly left in Davis's eye due to a small capsular tear. Webb saw Davis shortly after the surgery for post-operative treatment, and it is Webb's post-operative treatment that Davis claims fell below the acceptable standard of care. According to Davis's petition filed on October 6, 2006, Webb failed to: (a) perform a one-day postoperative assessment, (b) document Davis's chief complaint, (c) assess all structures of the eye, (d) perform a dilated fundus assessment, and (e) provide a treatment and management plan. He claims this alleged mistreatment caused

> blurred vision, significant pain, and seeing rings for weeks.... Mr. Davis had to undergo numerous other surgeries, suffered from cystoid macular edema in his operative eye, and will continue to suffer a severe loss of visual acuity. Mr. Davis is now at risk for developing recurrent cystoid macular edema, chronic inflammation, glaucoma, decompensation [of] which could require a corneal transplant, and retinal detachment.

Davis timely served an expert report on February 2, 2007. [1] This report was authored by Anastis Pass, O.D., M.S., J.D., FAAO, who is a doctor of optometry, but not a physician. [2] On February 23, 2007, Webb filed a motion to dismiss alleging that Davis failed to timely file an expert report because Pass does not meet the statutory qualifications for an expert. [3] Webb also timely objected to the sufficiency of the report. [4] On March 27, 2007, the **\*771** trial court granted the motion and subsequently rendered final judgment on August 6, 2007, awarding attorneys' fees and costs to Webb. This appeal followed.

[1]      The version of section 74.351(a) applicable to this suit required an expert report in a health care liability claim to be served 120 days from the date the claim was filed. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 23.02(a), (d), 2003 Tex. Gen. Laws 847, 864, 875, 884, 898–99, *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590 (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2007)). The Legislature later amended section 74.351(a) to require a claimant to serve an expert report not later than the 120th day after the original petition is filed. *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, §

1, 2005 Tex. Gen. Laws 1590, 1590 (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2007)). That amendment, however, does not apply to this lawsuit. *See* Act of May 18, 2005, 79th Leg. R.S., ch. 635, § 2, 2005 Tex. Gen. Laws 1590, 1590 (providing that 2005 amendment of section 74.351(a) applies only to causes of action that accrued on or after amendment's effective date of September 1, 2005). Thus, Davis was required to serve his expert report(s), with curriculum vitae of each expert listed in the report(s), by February 3, 2007. For simplicity's sake, references to section 74.351(a) in the remainder of this opinion will be to the version applicable to this lawsuit.

2　According to his curriculum vitae, Pass received his doctoral degree in optometry from the Illinois College of Optometry, his master's degree in physiological optics from the University of Houston, and his juris doctorate from South Texas College of Law. Pass is also a Fellow of the American Academy of Optometry.

3　*See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b) (Vernon Supp.2007).

4　*See id.* § 74.351(a).

## II. ISSUES PRESENTED

In his first issue, Davis asserts that the trial court erred in dismissing his claim because the report prepared by Pass is deficient but curable pursuant to subsection 74.351(c) of the Texas Civil Practice and Remedies Code. In his second issue, Davis contends that, because the report was deficient rather than untimely or non-existent, the award of fees and costs based on dismissal must also be reversed.

## III. ANALYSIS

### A. Standard of Review

Chapter 74 of the Texas Civil Practice and Remedies Code (the "Code") requires a health care liability claimant to serve providers with expert reports within 120 days of filing suit. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a). If the claimant fails to timely serve a report, the trial court must grant the provider's motion to dismiss the claim, and the failure to do so is subject to interlocutory appeal. *Id.* §§ 51.014(a)(9), 74.351(b) (Vernon Supp.2007). If a report is timely served, but is deficient as to one or more elements, the court may grant one 30–day extension to cure the deficiency. *Id.* § 74.351(c). But the trial court must grant a motion

challenging the adequacy of an expert report if it appears to the court, after hearing, that the report does not represent an objective good-faith effort to comply with the requirements of an expert report as set forth in section 74.351(r)(6). *Id.* § 74.351(*l* ).

Under subsection 74.351(r)(6), an "expert report" is defined as:

> a report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). In turn, "expert" means, *inter alia,:*

> with respect to a person giving opinion testimony regarding whether a *physician* departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

> with respect to a person giving opinion testimony regarding whether a *health care provider* departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402.

*Id.* § 74.351(r)(5)(A), (B) (emphasis added). Under section 74.401, only a physician may qualify as an expert regarding whether a physician departed from accepted standards of medical care. *Id.* § 74.401(a). According to section 74.402, in contrast, in a suit involving a health care liability claim against a health care provider, another health care provider may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care. *Id.* § 74.402(b). Finally, under subsection 74.351(r)(5)(C), only a physician may render opinions regarding causation in an expert medical report. [5] *Id.* § 74.351(r)(5)(C).

5　At oral argument, appellant's attorney acknowledged that an entirely new report authored by a physician would be necessary to address causation.

 **[1]** **[2]** **[3]** We apply an abuse-of-discretion standard in reviewing a trial court's decision on a motion to dismiss in which a defendant claims the expert opinion was **\*772**

untimely served. *Mokkala v. Mead,* 178 S.W.3d 66, 70 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). An abuse of discretion occurs when a trial court acts in an unreasonable and arbitrary manner, or when it acts without reference to any guiding principles. *Id.* We defer to the trial court's factual determinations, but review questions of law de novo.[6] *Id.* Thus, to the extent resolution of the issue before the trial court requires interpretation of the statute itself, we apply a de novo standard. *Id.*

[6] Our sister court has cited *Mokkala* for the proposition that the standard of review under section 74.351 is abuse of discretion even when an appeal involves an issue of statutory interpretation. *See Univ. of Tex. Health Sci. Ctr. at Houston v. Gutierrez,* 237 S.W.3d 869, 871 n. 1 (Tex.App.-Houston [1st Dist.] 2007, no pet. h.); *Intracare Hosp. N. v. Campbell,* 222 S.W.3d 790, 795 (Tex.App.-Houston [1st Dist.] 2007, no pet.). But in *Mokkala,* we specifically identified the de novo standard of review as appropriate when resolving issues involving statutory interpretation, contrary to our sister court's interpretation of this case. *Mokkala,* 178 S.W.3d at 70.

## B. The Expert Report

[4] In his first issue, Davis contends the trial court erred in dismissing his claims rather than granting a 30–day extension to cure any deficiencies in his report. In its order of dismissal, the trial court noted as follows:

> The Court concludes that under the facts of this case and the applicable law, no "expert report" has been served. Accordingly, the Court has no basis to reach the plaintiff's request for a 30–day extension to cure any deficiency found in the proffered report. In the event [the] reviewing court(s) disagree with the conclusion that no "expert report" has been served, this Court grants such extension effective the date the reviewing court(s) issue a mandate to this court. Because this Court concludes that no "expert report" was served, the Court hereby dismisses plaintiff's claims against defendant Webb with prejudice.

Davis asserts that the report filed by Pass was merely a deficient report curable pursuant to subsection 74.351(c)

of the Code, rather than "no expert report."[7] According to Davis, section 74.402 of the Code should apply when determining the statutory qualifications of an expert in this case because Davis's post-operative treatment, although provided by a physician, could have been provided by an optometrist. As noted above, section 74.402 establishes the qualifications of an expert witness testifying on the issue of whether a health care provider departed from accepted standards of care. TEX. CIV. PRAC. & REM.CODE ANN. § 74.402 (Vernon 2005). And Pass meets the statutory definition of a health care provider. *See id.* § 74.001(a)(12)(vi) (defining an optometrist as a "health care provider").

[7] We note that a trial court is not required to permit an extension when a report is deficient as to one or more elements; the statutory language leaves the determination of whether to permit an extension to the trial court's discretion. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c). Although the trial court stated in its dismissal order that it would have granted a 30–day extension had it found the report merely deficient, such language is mere surplusage and has no bearing on whether the trial court abused its discretion in dismissing Davis's suit. *See, e.g., Valley Mun. Util. Dist. No. 2 v. Hild,* 578 S.W.2d 827, 829 (Tex.Civ.App.-Houston [1st Dist.] 1979, no writ) (stating that recitations in a dismissal order that do not constitute a judgment are mere surplusage).

Webb responds that, because he is a physician, section 74.401 of the Code establishes the necessary qualifications for an expert providing an expert report regarding the care rendered by a physician. **\*773** As discussed *supra,* this section provides that only a physician may qualify as an expert witness on the issue of whether a physician departed from accepted standards of medical care.[8] *Id.* § 74.401(a). The term "physician" is defined to include, as is relevant here, those individuals licensed to practice medicine. *Id.* § 74.001(a)(23). An optometrist, on the other hand, is licensed to practice optometry rather than to practice medicine. *See* TEX. OCC.CODE ANN. § 351.002(4), (6), (7), (9) (Vernon 2004).[9]

[8] This section permits the trial court to accept an expert report that departs from the criteria only if, "under the circumstances, the court determines that there is a good reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria." *Id.* § 74.401(d) (Vernon 2005).

9 Optometrists are regulated by the State Optometry Board. *Id.* §§ 351.002–.608 (Vernon 2004 & Supp.2007). Regulations affecting optometrists are included in Title 3, Health Professions, but under Subtitle F, "Professions Related to Eyes and Vision." *Id.* Physicians, however, are regulated in Subtitle B of Title 3, "Physicians." *Id.* §§ 151.001–165.160. Physicians are regulated by the State Board of Medical Examiners and are licensed to practice medicine. *Id.* §§ 152.001, 155.001. Indeed, section 155.001 explicitly states, "A person may not practice medicine in this state unless the person holds a license issued under [Subtitle B]." *Id.* § 155.001.

Davis cites no cases in which an expert report by a health care provider such as an optometrist concerning the standard of care required of and allegedly breached by a physician has been determined to constitute a good faith effort to comply with the statutory scheme. Instead, Davis relies on *Leland v. Brandal,* a case in which a dentist was sued for malpractice and the plaintiff provided expert reports by an anesthesiologist. 217 S.W.3d 60, 62 (Tex.App.-San Antonio 2006, pet. granted). The dentist appealed the denial of his motion to strike the expert report. *Id.* The Fourth Court of Appeals determined that the anesthesiologist had not established that he was qualified to express an expert opinion regarding the injuries alleged. *Id.* The court further concluded that a report had been filed, but was deficient. *Id.* Thus, the trial court had discretion to grant a 30–day extension under subsection 74.351(c). The appellate court reversed and remanded so that the trial court could consider such an extension. *Id.*

Likewise, in *Foster v. Zavala,* on which Davis also relies, a podiatrist appealed the trial court's denial of his motion to dismiss. 214 S.W.3d 106, 108–09 (Tex.App.-Eastland 2006, pet. filed). The expert report served by Zavala was provided by a cardiovascular surgeon. *Id. at 109.* Because Zavala's expert was not practicing health care in a field of practice that involved the same type of care or treatment as the podiatrist, the Eleventh Court of Appeals reversed and remanded to permit the trial court to consider whether to grant a 30–day extension under section 74.351(c). *Id. at 117.*

These cases are readily distinguishable from Davis's suit. First, a physician authored the expert reports in each of these cases, which is specifically authorized by subsections 74.351(r)(5)(D) (dentist) and (E) (podiatrist). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(D), (E) (Vernon Supp.2007). But, as discussed above, Pass is not a physician. Thus, he is barred by statute from offering an expert opinion

regarding medical causation or the alleged breach of the standard of care applicable to a physician. *See id.* § 74.351(r)(5)(A) and (C). Second, the trial courts in both *Leland* and *Foster* did not dismiss the plaintiffs' lawsuits; instead, the defendants appealed the trial court's denial of their motions to dismiss. Here, **\*774** the trial court dismissed Davis's case when it determined that no "expert report" had been filed because, under the statutes governing expert reports, Pass is not qualified to offer an expert opinion applicable to Webb. And Davis has provided no support for his argument that filing an expert report authored by an optometrist constitutes a good faith effort to comply with the statutory requirements for an expert report in a health care liability claim against a physician. Moreover, as noted above, even if Pass were qualified to render opinion testimony regarding the standard of care, he still is not qualified to render opinion testimony about the causal relationship between Webb's alleged departure from the standard of care and Davis's injuries because he is not a physician. *See id.* § 74.351(r)(5)(C).

In sum, Davis has provided no authority supporting his contention that Pass meets the statutory requirements for an expert in a medical malpractice claim against a physician. *See id.* § 74.401 (Vernon 2005). Moreover, nothing in section 74.351(c) indicates that a report authored by an individual who is not statutorily qualified to offer an expert opinion is a deficient report curable by a discretionary 30–day extension, rather than "no expert report," as the trial court determined here. *See Danos v. Rittger,* 253 S.W.3d 294, 2007 WL 625816, at *3–4 (Tex.App.-Houston [1st Dist.] March 1, 2007, pet. filed); *see also Chisholm v. Maron,* 63 S.W.3d 903, 905 (Tex.App.-Amarillo 2001, no pet.) (determining that because expert was not qualified, no report was filed under the predecessor statute); *Cuellar v. Warm Springs Rehab. Found.,* No. 04–06–00698–CV, 2007 WL 3355611, at *3 (Tex.App.-San Antonio Nov.14, 2007, no pet. h.) (mem.op.) (concluding that reports authored by individuals not statutorily qualified as experts constituted "no report" and did not constitute a "good faith effort" to comply with the statutory requirements); *De La Vergne v. Turner,* No. 04–06–00722–CV, 2007 WL 1608872, at *1 (Tex.App.-San Antonio June 6, 2007, no pet.) (mem.op.) (reasoning that because plaintiff could cure deficiency only by obtaining a new report from a physician, trial court did not abuse its discretion in denying motion for grace period); *Methodist Health Ctr. v. Thomas,* No. 14–07–00085–CV, 2007 WL 2367619, at *4 (Tex.App.-Houston [14th Dist.] Aug. 21, 2007, no pet.) (mem.op.) (determining that plaintiffs could comply only

with the statutory requirements by filing a "wholly new report by a different expert" and therefore a thirty-day extension was not available).

Under these circumstances, we conclude the trial court was within its discretion to dismiss the case. Thus, we overrule Davis's first issue.

## C. Award of Costs and Attorneys' Fees

 **[5]**    Under subsection 74.351(b)(1), the trial court must enter an order awarding reasonable attorneys' fees and costs of court when dismissing a case for failure to timely serve the required expert report. *See* TEX. CIV. PRAC. & REM.CODE § 74.351(b)(1). Because dismissal of Davis's suit was appropriate, the award of costs and fees was also proper. *See id.* (stating that the court shall enter an order awarding reasonable attorneys' fees and costs on motion of defendant, subject to the trial court's exercise of discretion to grant a 30–day extension under subsection (c)). Accordingly, we overrule Davis's second issue.

## IV. CONCLUSION

We conclude the trial court did not abuse its discretion in holding that Davis failed to timely file the statutorily required expert report. Thus, we overrule Davis's first issue. Because the trial court did not **\*775** abuse its discretion in dismissing Davis's lawsuit, its award of attorneys' fees and costs was appropriate. We therefore overrule Davis's second issue and affirm the trial court's judgment.

FRANK C. PRICE, Senior Justice, concurring.

FRANK C. PRICE, Senior Justice, concurring (Assigned).
Appellant William Davis brought suit against John Q.A. Webb, Jr. M.D., for his failure to provide appropriate post-operative treatment. This failure led to serious medical problems for which Davis sought recovery, but that recovery was barred because of a defect in his expert report. Although timely served, the expert report did not reflect the opinion of a "physician" under Texas Civil Practice and Remedies Code section 74.401. Instead, Davis offered the expert opinion of an optometrist who was proficient and trained in post-operative treatment and care. The trial court dismissed the lawsuit with prejudice, and a majority of this court upheld that dismissal,

in accordance with the statutory requirements of Texas Civil Practice and Remedies Code sections 74.351 and 74.401. Unfortunately, sections 74.351 and 74.401 were drafted, in all likelihood inadvertently, in such a way as to create the occasional miscarriage of justice. Hence, although I agree the majority opinion is in accord with a plain reading of these sections, I cannot agree with the application of this statute under these circumstances for two reasons.

First, when a physician is engaged in the work that only a physician may render, the requirement that another physician opine concerning that treatment logically follows. When, however, a physician fails to provide the type of treatment he could have delegated to another, or the type of treatment another often performs, this negligence should not be shielded by his medical degree. In these situations, the physician is "wearing another hat," and the individuals who most often adorn that hat might be aptly trained to opine as to the standard of care or causation. Such might be true when a physician performs medical care at the site of an accident where an EMT would be best qualified to testify as to on-scene standards of care, or when a physician refers an injured patient to a physical therapist or chiropractor who, though not a physician, may have greater training and experience in rehabilitation and might be best qualified to opine as to causation in a review of post-operative care. Such is arguably true, as in the present case, where an optometrist is well-trained in post-operative treatment and is often charged by an ophthalmologist to conduct this very care. When a doctor provides the type of after-care that another professional could provide, and does so negligently, his credentials should not force the plaintiff to face a higher predicate to bringing suit. In fact, the non-physician professional may be more equipped to perform the follow-up treatment, and that non-physician may be the more appropriate person to opine on the quality of treatment provided.

Second, our application of Texas Civil Practice and Remedies Code sections 74.351 and 74.401 creates a dual standard in our courts, whereby an individual cannot be an expert for the purposes of an expert report *unless he is a physician,* but for the same individual to testify at trial the court could conduct the more permissive *Daubert/Robinson* test. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *E.I. du Pont de Nemours and Co., Inc. v. Robinson,* 923 S.W.2d 549 (Tex.1995). If the court is capable of being the gate-keeper at trial, the same latitude should be **\*776** allotted the court in analysis of the expert report.

The Legislature drafted Texas Civil Practice and Remedies Code sections 74.351 and 74.401 with an eye toward reducing the number of frivolous medical malpractice lawsuits in Texas, but in so doing failed to consider many possible scenarios where an expert who is not a physician might be qualified to opine as to the standard of care and/or causation in a case pursued against a physician.

Accordingly, while concurring in the disposition of this case under the current law, I believe the application of the law to all fact-scenarios is problematic and can lead to the miscarriage of justice in some instances.

**All Citations**

246 S.W.3d 768

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 468061
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas,
Corpus Christi-Edinburg.

HEALTH CARE UNLIMITED, INC. and
Health Care Unlimited-McAllen, Appellants,
v.
Servando VILLARREAL, Appellee.

No. 13-09-00456-CV.    |    Feb. 11, 2010.

West KeySummary

1    **Health**

**Affidavits of merit or meritorious defense;
expert affidavits**

A doctor who had been continuously practicing medicine in a field involving the same type of care involved in a health care liability claim was qualified to submit an expert report. The patient alleged that the defendant hospital had left a sponge inside of his body when they operated on him. The sponge caused an infection, multiple health problems and had to be removed surgically. The doctor stated in his report that he had been licensed to practice medicine and had continuously practiced medicine in the state of Texas since 1985. The doctor also stated that he was familiar with wound treatment and the standards of care applicable to physicians, nurses, hospitals, emergency departments, wound care centers and home health care agencies. He also routinely was in contact with other medical staff that takes care of patients with similar condition as the patient. Tex. Civ. Prac. & Rem.Code Ann. § 74.402(b)(1)-(3), (c)(1)-(2).

1 Cases that cite this headnote

On appeal from the 206th District Court of Hidalgo County, Texas, Rose Guerra Reyna, Judge.

**Attorneys and Law Firms**

David Luningham, Lauren M. Lockett, Fort Worth, for appellants.

Mark Lesher, Texarkana, Steven M. Gonzalez, Edward Castillo, Gonzalez Palacios L.L.P., McAllen, for appellee.

Before Justices RODRIGUEZ, GARZA, and BENAVIDES.

**MEMORANDUM OPINION**

Memorandum Opinion by Justice RODRIGUEZ.

**\*1** Appellants Health Care Unlimited, Inc. and Health Care Unlimited-McAllen (collectively HCU) complain of the trial court's denial of their motion to dismiss appellee Servando Villarreal's health care liability claim for failure to serve an adequate expert report, as required by section 74.351. *See*TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a)-(b) (Vernon Supp.2009). By one issue, HCU complains that the trial court abused its discretion by failing to dismiss Villarreal's claims because his expert report did not demonstrate that the expert is qualified, identify the applicable standard of care, or explain the causal connection between the alleged breach and Villarreal's injury. We affirm.

**I. BACKGROUND**

In late July 2005, Villarreal underwent spinal fusion surgery to repair a fractured lumbar vertebra in his back. Over the course of the next year, Villarreal suffered complications, including chronic refractory osteomyelitis-a recurring severe abscess-on what Villarreal's expert report describes as his left flank. [1] Villarreal was hospitalized once in January 2006, twice in March 2006, and once in August 2006, for treatment of the abscess; each time, the abscess was surgically drained, and at the March and August surgeries, the wound was fitted with a vacuum assisted closure (VAC) sponge device to promote healing. After discharge from his August 2006 hospital stay, Villarreal began receiving home health care from HCU, which continued the use of the VAC sponge device in its treatment of Villarreal.

Osteomyelitis is defined as an "[i]nflammation of the bone marrow caused by bacteria, such as staphylococci, that gains entry through a wound or injury."IDA G. DOX ET AL., ATTORNEY'S ILLUSTRATED MEDICAL DICTIONARY O21 (1997). Flank is defined as the "side of the body between the ribs and the pelvis."*Id.* at F21.Villarreal's expert report refers to the site of his infection interchangeably as his left flank or hip.

In June 2007, Villarreal was again admitted to the hospital because of continued drainage from the same wound in his left flank; doctors at the hospital determined that the wound was infected. During surgery to incise and drain the wound, doctors discovered a foreign body in the wound, which was eventually determined to be a sponge from the VAC device. The doctor who performed the surgery noted that the sponge had been left in the wound so long that tissue had grown into the sponge. In September 2007, Villarreal underwent another surgery to remove more sponge material from the same wound.

On October 10, 2008, Villarreal sued HCU,[2] alleging that it had negligently left a sponge from the VAC device in Villarreal's wound causing extended hospitalization and multiple surgeries to remove the sponge. Villarreal prayed for damages in the form of past and future medical expenses, past and future lost wages, past and future pain and mental anguish, disfigurement, loss of enjoyment of life, and any other damages allowed by law. Villarreal served an expert report authored by Keith Miller, M.D. on January 29, 2009. HCU objected to the adequacy of the report and filed a motion to dismiss Villarreal's claims on the grounds that Dr. Miller was unqualified as an expert, failed to identify the applicable standard of care, and failed to explain the causal relationship between HCU's alleged breach and Villarreal's injuries. *See id.* § 74.351(a)-(b), (r)(6). On April 13, 2009, the trial court found the report deficient but granted Villarreal a thirty-day extension to submit a sufficient amended report. *See id.* § 74.351(c). On May 11, 2009, Dr. Miller submitted an amended report, to which HCU filed further objections. After a hearing on HCU's objections and motion to dismiss, the trial court overruled HCU's objections to the report and denied its motion to dismiss. This interlocutory appeal ensued. *See id.* § 51.014(a)(9) (Vernon 2008) (authorizing an interlocutory appeal of the denial of a motion to dismiss filed under section 74.351(b)).

[2] Villarreal also sued Drs. Noel Oliveira and Raul Barreda, Doctors Hospital at Renaissance Wound Care Center, Edinburg Regional Medical Center, Rehab Center at Renaissance Doctors Hospital, and Doctors Hospital, Ltd. However, none of the foregoing are parties to this appeal.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

**\*2** We review a trial court's decision on a motion to dismiss under section 74.351 of the civil practice and remedies code for abuse of discretion. *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). The trial court abuses its discretion if it acts unreasonably or arbitrarily or without reference to any guiding rules or principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003).

Under section 74.351 of the Texas Civil Practice and Remedies Code, a claimant must "serve on each party or the party's attorney" an expert report and curriculum vitae "not later than the 120th day after the date the original petition was filed."TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a). An expert report is "a written report by an expert that provides a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care rendered ... failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."*Id.* § 74.351(r)(6).

In our review of the expert report, we are limited to the four corners of the report in determining whether the report manifests a good faith effort to comply with the statutory definition of an expert report. *Palacios,* 46 S.W.3d at 878;*see*TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ) (requiring that the trial court "grant a motion challenging the adequacy of the expert report only if appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with the statutory definition). The report "need not marshal all the plaintiff's proof."*Palacios,* 46 S.W.3d at 878; *Jernigan,* 195 S.W.3d at 93. If the expert report puts the defendant on notice of the specific conduct complained of and provides the trial court a basis on which to conclude the claims have merit, the report represents a good-faith effort to comply with the statute.*Palacios,* 46 S.W.3d at 879.

## III. DISCUSSION

By its sole issue, HCU argues that the trial court erred in denying its motion to dismiss Villarreal's claims because his expert report was inadequate under section 74.351. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a)-(b).

### A. Qualifications of Dr. Miller

First, HCU complains that Dr. Miller's amended report fails to demonstrate that he is qualified to be an expert in Villarreal's case. HCU contends, in particular, that Dr. Miller's certification in family medicine does not qualify him to render an opinion regarding chronic wound care management, the type of care HCU provided to Villarreal.

In a suit alleging health care liability against a health care provider,[3] a person qualifies as an expert witness if the person:

[3] It is undisputed that HCU is a health care provider subject to chapter 74 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(12)(A) (Vernon 2005).

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

**\*3** (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b)(1)-(3) (Vernon 2005). In determining whether a witness is qualified on the basis of training or experience, we consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(c)(1)-(2); *see also Polone v. Shearer,* 287 S.W.3d 229, 238 (Tex.App.-Fort Worth 2009, no pet.). Chapter 74 does not require that the expert be a specialist in the exact same field as the health care provider. *See Roberts v. Williamson,* 111 S.W.3d 113, 121 (Tex.2003). Our analysis of the qualifications of an expert under section 74.351 is limited to the four corners of the expert's report and curriculum vitae. *San Jacinto Methodist Hosp. v. Bennett,* 256 S.W.3d 806, 813 (Tex.App.-Houston [14th Dist.] 2008, no pet.).

Our review of Dr. Miller's expert report and curriculum vitae reveals that he is a medical doctor licensed in the State of Texas and board-certified in family medicine who has been practicing for over twenty years. Dr. Miller served as a commissioner on the Texas State Board of Medical Examiners for nearly four years and as a faculty member at both the University of Texas Health Science Center Family Practice Residency Program and the Panola College School of Licensed Vocational and Registered Nursing. He also worked for two years as the chief of staff and for ten years as the director of emergency services at the Shelby Regional Medical Center in Center, Texas. Dr. Miller's expert report provides the following with regard to his qualifications that is specifically relevant to this case:

> I am a medical doctor currently licensed to practice in the state of Texas. I have been a licensed medical doctor since 1985, have been practicing medicine continuously since then, including during the time of this claim, and as part of my practice, have been, and am currently involved in the diagnosis, care, and treatment of many patients similar to Mr. Servando Villarreal. I am familiar with the diagnosis and treatment of patients with conditions and their complications similar to those experienced by Mr. Servando Villarreal. I am familiar with the standards of care applicable to physicians, nurses, hospitals, emergency departments, wound care centers, and home health care agencies, which treat patients with

conditions similar to Mr. Servando Villarreal.... In addition, I interact with nursing and other staff at hospitals, clinics, emergency rooms, wound care centers, and home health care agencies, on a daily basis, and I am familiar with the standard procedures for physicians and nurses taking care of patients like Mr. Servando Villarreal. I am familiar with these standard procedures ... because I have treated many patients with these conditions.

**\*4** After summarizing the facts of Villarreal's treatment, Dr. Miller further described his qualifications as follows:

I am familiar with the accepted medical standards of care applicable to the assessment, diagnosis, and treatment of patients with wound infections, and their causes, as well as their complications.... I know this on the basis of my education, knowledge, training, and direct experience.

I acquired this education, knowledge, training, and direct experience through:

1) my attending, and successfully completing, medical school classes, and residency, that teach the evaluation, diagnosis, care and treatment of patients with ... wound infections;

2) practical experience of diagnosing and treating patients with ... wound infections;

3) discussions with colleagues at yearly conferences, seminars and meetings;

4) study of technical works routinely published in textbooks, journals and literature concerning the evaluation, diagnosis, care and treatment of patients with ... wound infections;

5) my routine discussions and consultations with other physicians who also treat patients with the same or similar conditions as Mr. Servando Villarreal and wound infections;

6) my routine and regular contact with hospital nurses, staff and residents who take care of patients with the same or similar conditions as Mr. Servando Villarreal and wound infections;

7) my knowledge and experience giving lectures and in-service conferences to nurses and staff;

8) my experience serving on numerous hospital committees;

9) my observation of nurses and nurse conduct, supervising residents, and instructing nurses and residents in the evaluation, diagnosis, care and treatment of patients the same as, or similar to, Mr. Servando Villarreal and wound infections; and

10) my past use of wound VAC sponge devices on patients similar to Mr. Servando Villarreal....

....

I have had training and experience concerning providing home health care for patients receiving wound treatment, generally, and wound VAC therapy specifically, to patients such as Mr. Villarreal....

HCU argues that Dr. Miller's statements regarding his qualifications are conclusory and unsupported by the facts. We disagree. The information provided in Dr. Miller's report shows that he has been continuously practicing in a "field of practice that involves the same type of care or treatment as that delivered" by HCU, wound treatment and maintenance. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(1); *Roberts,* 111 S.W.3d at 121 (holding that an expert need not be a specialist in the exact field so long as he has knowledge, skills, expertise, and training regarding the specific issue in the case); *see also Polone,* 287 S.W.3d at 238-39 (holding that a doctor is qualified where report states that he has experience treating other patients with conditions similar to those of the plaintiff). Furthermore, Dr. Miller states in his report that, through his education and direct experience, he has knowledge of the standards of care applicable to HCU in their treatment of patients with wounds like Villarreal. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(2); *see also Bennett,* 256 S.W.3d at 814 (affirming the denial of a health care provider's motion to dismiss because, in part, the doctor was qualified to author the report based on his experience working with and instructing nurses and other staff who care for patients with bed sores). Finally, Dr. Miller is licensed to practice in the state of Texas and has been actively practicing medicine that is relevant to Villarreal's claim, which demonstrates that he is "qualified on the basis of training or experience to offer an expert opinion regarding" the standard of care applicable to this case. *See* TEX. CIV.

PRAC. & REM.CODE ANN. § 74.402(b)(3), (c)(1)-(2). We therefore conclude that Dr. Miller is qualified to provide an expert report in Villarreal's case.

### B. Standard of Care and Breach

**\*5** Second, HCU complains that Dr. Miller's amended report fails to set forth the applicable standard of care. Specifically, HCU contends that "Dr. Miller wholly fails to provide a fair summary of the care which was expected or specify what [HCU] should have done or indicate what actions taken by [HCU] deviated from the applicable standard of care."*See id.*§ 74.351(r)(6).

In his amended report, Dr. Miller opines that the applicable standard of care requires that HCU "do what a reasonable home health care agency would have done under the same or similar circumstances, or not do what a reasonable home health care agency would not have done under the same or similar circumstances."Dr. Miller emphasizes that the staff of HCU "were responsible for assessing, removing, and/or changing this patient's wound VAC sponge device."The amended expert report then sets forth the standard of care as follows:

The accepted standards of medical care applicable to ... [HCU] in [its] care of Mr. Servando Villarreal ... include, but are not limited to, the following standards:

1) This is a device which is placed routinely and as a matter of course by the nurses and staff of facilities such as ... [HCU], and this same device should have been removed and/or changed by ... the nurses and staffs.

....

3) The standard of care required that, during the time they were caring for Mr. Servando Villarreal in 2006 and 2007, [HCU] ... should have discovered the presence of a foreign body in the left flank wound of this patient and alerted physicians for appropriate treatment. The staff of [HCU] ... should have assessed Mr. Villarreal on a daily basis and make [sic] sure that no wound VAC device remain [sic] in this patient's hip for more than two days. Since it was the staff of this facility that was treating Mr. Villarreal for his wound, it was their obligation to assess the wound at least every two days.

4) The standard of care required that during the time they were caring for Mr. Servando Villarreal in 2006 and 2007 ... [HCU] ... should have properly cleaned the wound in Mr. Villarreal's left flank and properly removed and/or replaced the wound VAC sponge device at least every two days. Proper technique in removing and/or replacing the wound VAC sponge device, [sic] would have involved thoroughly exploring the full extent of the wound at each removal and/or replacement. This would ensure that any old sponge devices or portions of the same would always be found and removed and no foreign bodies would be left in this patient's wound. The nurses and staffs of ... [HCU] should have documented in the medical record that this wound had indeed been thoroughly explored, cleaned, and any old sponge device of [sic] parts thereof, [sic] had been completely removed prior to replacing any new sponge devices into the wound.

....

The breaches and violations of the standards of care are as follows:

**\*6** ....

2) [HCU] ... failed the standard of care which required that ... [HCU] should have discovered the presence of a foreign body in the left flank wound of this patient and alerted his physicians for appropriate treatment. The staff ... failed to assess Mr. Villarreal on a daily basis and make sure that no wound VAC device remained in this patient's hip for more than two days....

A "fair summary" of the applicable standard of care and breach identifies the type of care expected but not rendered and that is precisely the information that Dr. Miller's amended report provides. *See Palacios,* 46 S.W.3d at 880. He explains the specific tasks and responsibilities required of HCU and notes that HCU failed to perform those tasks and responsibilities. We conclude that Dr. Miller's report sufficiently sets forth the standard of care and breach elements required of expert reports under section 74.351. *See*TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

### C. Causation

Third, HCU complains that Dr. Miller's amended report did not adequately identify the causal connection between HCU's

alleged breach and Villarreal's injuries. HCU notes that Villarreal was hospitalized four times in 2006 for treatment of the abscess prior to the time HCU began caring for Villarreal in August 2006. Emphasizing this fact, HCU argues that Dr. Miller's statements regarding causation are conclusory, fail to rule out conditions existing before HCU's treatment of Villarreal, and fail to differentiate between the alleged negligence of HCU and the potentially negligent acts of other health care providers who treated Villarreal before August 2006. Our review of Dr. Miller's report indicates otherwise.

In his report, Dr. Miller describes Villarreal's injuries as they appeared in June 2007:

> Mr. Villarreal was admitted .... from 6-18-07 through 6-26-07 for continued drainage from the same wound from his left flank from which he had experienced trouble.... Upon admission, this patient was diagnosed with osteomyelitis of his lumbar spine with infection from multiple organisms. Mr. Villarreal was taken to surgery for incision and drainage of the this wound.... [The surgeon] immediately discovered a foreign body in this wound which was determined to be an old wound VAC sponge left in place. [The surgeon] noted that the sponge had been in place for so long that it "... appeared to have tissue grown into it".
>
> [The surgeon] sent the removed sponge to pathology for analysis which confirmed that the object was a "... wound vac sponge showing reactive fibrosis and granulation tissue with foreign body giant cell reaction... negative for significant acute inflammation".
>
> On 9-25-07, Mr. Villarreal was admitted ... with continued drainage from his left flank wound. At this admission, he was taken to surgery ... [which uncovered] more sponge material in the wound....

Dr. Miller opines that during the time it was caring for Villarreal in 2006 and 2007, HCU "should have discovered the presence of a foreign body" in Villarreal's wound and alerted his doctors for treatment. Dr. Miller further notes that it was HCU's obligation to "assess the wound on a daily basis" and "change or remove any wound VAC device at least every two days." He then states that HCU staff failed to perform these obligations and specifically concludes that:

> *7 Because this foreign body was left in Mr. Villarreal's hip too long, it caused severe infection which spread all the way into this patient's

bones and spine, resulting in a severe bone infection or osteomyelitis, neither of which would have occurred had the wound VAC device been timely discovered and removed. Had [HCU] ... cared for Mr. Servando Villarreal according to the acceptable standards of care, then more likely than not and to a reasonable degree of medical certainty, the foreign body in this patient's flank would have been found and removed in a timely manner and Mr. Villarreal would not have undergone prolonged pain and suffering, multiple hospitalizations and surgical procedures, as well as overall worsening of his condition, pain mental anguish, and loss of dignity.

To comply with section 74.351's requirements, an expert report must include an explanation of the causal connection between a defendant health care provider's departure from the standard of care and the injury, harm, and/or damages claimed by the plaintiff. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). This requirement is met if the report explains the basis of the expert's statements and links his conclusions to the facts. *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). By explaining how the sponge negligently left in Villarreal's wound by HCU caused a severe infection that spread all the way to his bones and spine necessitating multiple painful surgeries, Dr. Miller has done just that. In other words, the expert report demonstrated the basis of Dr. Miller's statement linking HCU's breach to Villarreal's infected abscess, resulting 2007 hospitalizations, and painful recovery. *See id.*

Based on the foregoing, we cannot conclude that the trial court abused its discretion in denying HCU's motion to dismiss. *See Jernigan,* 195 S.W.3d at 93; *Palacios,* 46 S.W.3d at 878. Looking only within the four corners of Dr. Miller's amended report, we hold that the report adequately identified Dr. Miller's qualifications and the applicable standard of care and HCU's breach and explained how, in Dr. Miller's opinion, the breach caused Villarreal's injuries. *See Palacios,* 46 S.W.3d at 878. The report was a good faith effort to comply with the statute because it put HCU on notice of the specific conduct complained of and provided the trial court a basis on which to conclude the claims have merit. *See id.* at 879; TEX.

CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ). HCU's sole issue is overruled.

**IV. CONCLUSION**

The order of the trial court is affirmed.

**All Citations**

Not Reported in S.W.3d, 2010 WL 468061

---

**End of Document**                                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

206 S.W.3d 572
Supreme Court of Texas.

MACK TRUCKS, INC., Petitioner,

v.

Elizabeth TAMEZ et. al., Respondent.

No. 03–0526.   |   Argued Oct. 20, 2004.   |   Decided Oct. 27, 2006.   |   Rehearing Denied Dec. 22, 2006.

**Synopsis**

**Background:** Survivors of petroleum tanker driver who died when his truck burst into flames brought action against the tanker manufacturer, asserting claims for negligence, strict liability, breach of implied warranty, and misrepresentation. The 105th District Court, Nueces County, J. Manuel Banales, J., granted summary judgment for the defendant manufacturer. The survivors appealed. The Corpus Christi–Edinburg Court of Appeals, Thirteenth District, 100 S.W.3d 549, reversed and remanded. Tanker manufacturer appealed.

**Holdings:** The Supreme Court, Phil Johnson, J., held that:

[1] the Court of Appeals could not consider expert's causation testimony from bill of exceptions, and

[2] testimony on causation from post-collision fuel-fed fire expert was not admissible.

Reversed and rendered.

West Headnotes (19)

**[1]    Appeal and Error**

        **Consideration of evidence excluded**

The Court of Appeals could not consider expert's causation testimony from bill of exceptions, in strict liability and negligence action arising from petroleum tanker fire that allegedly resulted from defective fuel line, where the Court of Appeals did not first determine that the trial court erred when it refused to admit expert's testimony and reconsider its decision to exclude expert's

causation opinions. Rules App.Proc., Rule 33.2; Rules of Evid., Rule 103(a)(2).

9 Cases that cite this headnote

**[2]    Appeal and Error**

        **Necessity of presentation in general**

Except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties.

26 Cases that cite this headnote

**[3]    Evidence**
        **Necessity and sufficiency**

In determining whether expert testimony is reliable, a court should examine the principles, research, and methodology underlying an expert's conclusions. Rules of Evid., Rule 702.

10 Cases that cite this headnote

**[4]    Evidence**
        **Necessity and sufficiency**

When the testimony involves scientific knowledge, the expert's conclusions must be grounded in the methods and procedures of science. Rules of Evid., Rule 702.

Cases that cite this headnote

**[5]    Evidence**
        **Necessity and sufficiency**

Trial court should consider the following factors when determining the reliability of expert testimony involving scientific knowledge; (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique. Rules of Evid., Rule 702.

12 Cases that cite this headnote

**[6]    Evidence**
    👈 Determination of question of competency

A trial court has broad discretion in determining whether expert testimony is admissible. Rules of Evid., Rule 702.

10 Cases that cite this headnote

**[7]    Appeal and Error**
    👈 Competency of witness

The trial court's ruling concerning the admissibility of expert testimony will be reversed only if that discretion is abused.

5 Cases that cite this headnote

**[8]    Evidence**
    👈 Preliminary evidence as to competency

Because the party sponsoring the expert bears the burden of showing that the expert's testimony is admissible, the burden of presenting understandable evidence that will persuade the trial court to admit the expert's testimony is on the presenting party. Rules of Evid., Rule 702.

6 Cases that cite this headnote

**[9]    Evidence**
    👈 Necessity and sufficiency

When an expert's processes or methodologies are obscured or concealed by testimony that is excessively internally contradictory, non-responsive or evasive, a trial court will not have abused its discretion in determining that the expert's testimony is not admissible. Rules of Evid., Rule 702.

3 Cases that cite this headnote

**[10]    Evidence**
    👈 Necessity and sufficiency

A trial court should consider the factors mentioned in *E.I. du Pont de Nemours and Co. v. Robinson* for determining the admissibility

of an expert's testimony when doing so will be helpful in determining reliability of an expert's testimony, regardless of whether the testimony is scientific in nature or experience-based. Rules of Evid., Rule 702.

17 Cases that cite this headnote

**[11]    Evidence**
    👈 Necessity and sufficiency

In determining the reliability of an expert's testimony, the trial court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand. Rules of Evid., Rule 702.

9 Cases that cite this headnote

**[12]    Evidence**
    👈 Automobile Cases

Testimony on causation from post-collision fuel-fed fire expert was not admissible, in strict liability and negligence action arising from petroleum tanker fire that allegedly resulted from defective fuel line; at the hearing to determine the admissibility of expert's testimony expert opined that the fire began in the fuel and battery systems of the tractor, he did not identify an alleged defect in the tractor's fuel system that was the source of the fire, he did not specify which studies supported his conclusions, he did not testify that he analyzed or tested characteristics of batteries like the battery in the wrecked tractor, and he did not describe the process in which he excluded other sources of ignition. Rules of Evid., Rule 702.

4 Cases that cite this headnote

**[13]    Products Liability**
    👈 Proximate Cause
    **Products Liability**
    👈 Design
    **Products Liability**
    👈 Miscellaneous products
    **Sales**

 Damages from breach

There was no evidence that alleged defects in petroleum tanker's fuel system, which allegedly caused diesel fuel leak, caused fire that occurred in connection with tanker accident, as required to support claims asserted against tanker manufacturer by survivors of tanker driver, alleging negligence, misrepresentation, breach of warranty, and design, manufacturing, and marketing defects.

4 Cases that cite this headnote

**[14]    Evidence**

 Particular Facts or Issues

Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition.

24 Cases that cite this headnote

**[15]    Evidence**

 Weight and Conclusiveness in General

Expert testimony is required when an issue involves matters beyond jurors' common understanding.

12 Cases that cite this headnote

**[16]    Trial**

 Province of Court and Jury

Whether expert testimony is necessary to prove a matter or theory is a question of law.

3 Cases that cite this headnote

**[17]    Products Liability**

 Trailers

**Products Liability**

 Design defect

Expert testimony was required, in design defect action brought by survivors of petroleum tanker driver against tanker manufacturer, to establish

that alleged defects caused diesel fuel leak in tanker and that leak caused by the defect was ignition point for fire that occurred in connection with accident; such causation issues presented matters beyond the general understanding and common knowledge of lay jurors.

16 Cases that cite this headnote

**[18]    Judgment**

 Torts

Expert testimony that an arced battery cable found in tractor of petroleum tanker could possibly have ignited fire that occurred in connection with tanker accident, offered in opposition to tanker manufacturer's motion for summary judgment in strict liability and negligence action by driver's survivors alleging design defects, was speculative, and thus insufficient to prevent summary judgment, since expert did not testify that battery or its cable probably ignited the fire, and expert could not determine whether cable arced before the fire was ignited or as it was being burned by an otherwise-ignited fire.

24 Cases that cite this headnote

**[19]    Judgment**

 Torts

Circumstantial summary judgment evidence suggesting that fire that occurred in connection with petroleum tanker accident quickly reached tanker driver, though consistent with theory asserted by driver's survivors, in strict liability and negligence action against tanker manufacturer, that fire originated with fuel from tractor's allegedly defective diesel fuel system, did not make it more likely than not that the battery or some other allegedly improperly located ignition source ignited diesel from the tractor, as opposed to other possible sources of ignition such as the cargo of crude oil, and thus such evidence was insufficient to preclude summary judgment for manufacturer in survivors' action alleging negligence, misrepresentation, breach

of warranty, and design, manufacturing, and marketing defects.

209 Cases that cite this headnote

**Attorneys and Law Firms**

**\*575** Sean E. Breen, Randy Howry, Herman Howry & Breen, L.L.P., Austin, Robert Lee Galloway, Kellye Ruth Koehn, Thompson & Knight LLP, Houston, for petitioner.

John Blaise Gsanger, William R. Edwards, William R. Edwards III, The Edwards Law Firm, L.L.P., Corpus Christi, John Gonzales, John Gonzales & Associates, San Antonio, David O. Gonzalez, Law Offices of Baldemar Gutierrez, Alice, Glenn M. Boudreaux, Maryellen Hester, Boudreaux Leonard & Hammond, P.C., Houston, for for respondent.

**Opinion**

Justice JOHNSON delivered the opinion of the Court.

In this truck accident case the trial court excluded expert testimony as to what caused a post-accident fire that burned the truck and the driver. After excluding the expert testimony because it was not reliable, the trial court granted summary judgment. The court of appeals reversed. We hold that the trial court did not err, reverse the court of appeals' judgment, and render judgment that the plaintiffs take nothing.

**I. Background**

On October 19, 1996, Abram Tamez was operating a Mack Truck tractor hauling a trailer of crude oil. Tamez was rounding a curve in the road when the tractor and trailer overturned. A fire erupted and burned the trailer, its cargo, and the tractor. Tamez was able to climb out of the tractor, but he was badly burned and died as a result of his injuries.

As a result of Tamez's death, suit was filed [1] against the tractor's manufacturer, Mack Trucks, Inc., and others. [2] The Tamezes alleged that Mack defectively designed, manufactured and marketed the tractor. They claimed that Mack was liable for negligence, gross negligence, strict products liability, breach of warranty, and misrepresentation. All five theories were based on the same complaint: diesel fuel from the truck's fuel system originated the fire that burned

Abram Tamez. Specifically, the Tamezes alleged that the tractor had design and manufacturing defects because (1) the fuel system was unreasonably prone to fail and release diesel fuel in an environment conducive to ignition and fire; and (2) the tractor had ignition sources **\*576** such as hot manifolds and electric batteries in areas likely to contain released flammable fluids. The Tamezes also alleged that Mack failed to provide warnings about the defects.

[1] Elizabeth Tamez filed suit. Elsa Guerrero, Rosendo Tamez, Sr., Dora Tamez, Rosa Elvia Gonzales, Donna Kim Cantu, and Terrie L. Zay intervened. Rosa subsequently nonsuited. For ease of reference all the claimants will be referred to collectively as "the Tamezes" or "the plaintiffs."

[2] Other defendants were Fruehauf Trailer Corporation, Norco Crude Gathering, Inc., Glitsch Canada, Ltd., and Snyder Tank Corp. The claims against those defendants were either nonsuited or settled and were severed from the claims against Mack.

In connection with its claims against Mack, the Tamezes identified Ronald Elwell as an expert on post-collision, fuel-fed fires. Mack moved to exclude his testimony as unreliable and moved for summary judgment. Mack asserted multiple grounds for seeking summary judgment. Some grounds for its motion were directed at particular plaintiffs, while some grounds were directed at all the Tamezes. One part of Mack's motion directed at all the Tamezes was a Rule 166a(i) motion urging that the Tamezes could present no evidence that any alleged defects caused the fire. The Tamezes responded to the no-evidence part of Mack's motion, in part, by filing Elwell's deposition and his expert report. They also later submitted Elwell's testimony from a bill of exceptions.

Pretrial matters, including a *Robinson* [3] hearing pursuant to Mack's motion to exclude Elwell's testimony, were scheduled and heard. During the *Robinson* hearing Elwell testified. He expressed the opinion that the fire was started by the tractor's battery, which was located too near the fuel tanks, igniting the tractor's diesel fuel, which in turn ignited the trailer's cargo of crude oil.

[3] *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995).

The trial court granted Mack's motion to exclude Elwell's testimony as to causation. The Tamezes later moved the trial court to reconsider its decision. The court denied the motion but allowed the Tamezes to have Elwell testify again

to create a bill of exceptions. [4] The court signed an order excluding the causation portion of Elwell's testimony from being considered as evidence at any trial or hearing because it was not sufficiently reliable. Mack's motion for summary judgment was granted.

[4]      An offer of proof is sometimes referred to as a bill of exceptions. *See* TEX.R. EVID. 103(a)(2); TEX.R.APP. P. 33 (comment to 1997 change). As the court of appeals and the parties refer to the offer of proof in this case as a bill of exceptions, we will, also.

The court of appeals reversed the summary judgment, concluding that the trial court abused its discretion in excluding Elwell's causation testimony, [5] and also concluding that Elwell's testimony provided some evidence of causation. The court of appeals' opinion indicates that in reaching its decision it considered Elwell's testimony from both the *Robinson* hearing and the bill of exceptions. *See* 100 S.W.3d 549, 556, 559, 561.

[5]      After Elwell's expert testimony was excluded by the trial court, the Tamezes obtained testimony from another expert witness, Douglas Holmes. Mack moved to exclude Holmes's testimony, and the trial court orally granted the motion. The court of appeals upheld the exclusion of Holmes's testimony. 100 S.W.3d 549, 559. The Tamezes do not challenge the court of appeals' ruling as to Holmes.

Mack urges that the trial court correctly excluded Elwell's testimony on causation, did not abuse its discretion in refusing to reconsider that ruling, and properly granted summary judgment because the Tamezes presented no evidence of causation. Mack asserts, among other matters, that the court of appeals erred by (1) considering Elwell's causation testimony from both the *Robinson* hearing and the bill of exceptions; (2) reversing the trial court's ruling as to admissibility of Elwell's causation testimony; and (3) reversing the summary judgment.

We conclude that the trial court did not abuse its discretion in excluding Elwell's testimony on causation and that the court **\*577** of appeals erred in considering testimony from the bill of exceptions in evaluating the trial court's exclusion of Elwell's causation testimony. We further conclude that the Tamezes presented no summary judgment evidence of causation and summary judgment was properly granted.

## II. Elwell's Bill of Exceptions Testimony

**[1]**      Mack argues that the court of appeals erred by considering testimony admitted only for the bill when it reviewed the trial court's exclusion of Elwell's causation testimony. The Tamezes claim that whether Elwell's bill of exceptions testimony is considered is not relevant because his bill testimony added nothing to his *Robinson* hearing testimony. Further, in their brief and at oral argument the Tamezes disclaim having urged in the court of appeals that the trial court erred in (1) holding a *Robinson* hearing, (2) the manner in which the hearing was conducted, (3) the timing of the hearing, or (4) denying their motion for reconsideration. Our review of their briefs in the court of appeals confirms the Tamezes' position. They do not contend here either that the bill of exceptions testimony was improperly excluded or that the trial court erred in denying their motion to reconsider.

The purpose of a bill of exceptions is to allow a party to make a record for appellate review of matters that do not otherwise appear in the record, such as evidence that was excluded. TEX. R. APP. P. 33.2; TEX. R. EVID. 103(a)(2); *see also In re Ford Motor Co.,* 988 S.W.2d 714, 721 (Tex.1998). The court of appeals' opinion indicates that it considered Elwell's bill of exceptions testimony in evaluating the admissibility of his opinions even though the trial court did not. *See* 100 S.W.3d at 556, 559. As one example, the court of appeals referenced Elwell's opinion that at least one of the tractor's side fuel tanks became displaced during the rollover and separated the balance line connecting the two fuel tanks. *Id.* at 557. The court pointed to Elwell's testimony interpreting photographic evidence of steel straps which held the tanks as support for his opinion. *Id.* The referenced testimony as to Elwell's opinion and interpretation of photographic evidence was given as part of his bill of exceptions testimony, but he did not give similar testimony during the *Robinson* hearing.

**[2]**      Except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties. *See In the Interest of B.L.D.,* 113 S.W.3d 340, 350–52 (Tex.2003). We have described fundamental error as those instances in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or Constitution of our State, or instances in which the record affirmatively and conclusively shows that the court rendering the judgment was without jurisdiction of the subject matter. *See McCauley v. Consol. Underwriters,* 157 Tex. 475, 304 S.W.2d 265, 266 (1957).

The court of appeals did not classify the trial court's refusal to allow the Tamezes to present further evidence and to then reconsider its ruling to exclude Elwell's causation testimony as fundamental error, and neither do we. The court of appeals erred in considering Elwell's causation testimony from the bill of exceptions without having first determined, pursuant to properly assigned error, that the trial court erred in refusing to admit the testimony and reconsider its decision to exclude Elwell's causation opinions. Under the record and issues presented to us, we may not consider Elwell's testimony from the bill of exceptions in determining whether the trial court erred in excluding Elwell's causation **\*578** testimony. *See Exito Elecs. Co. v. Trejo,* 142 S.W.3d 302, 304 n. 1 (Tex.2004).

### III. Reliability of Elwell's Testimony

#### A. Standard of Review

**[3]** **[4]** **[5]** An expert witness may testify regarding "scientific, technical, or other specialized" matters if the expert is qualified and if the expert's opinion is relevant and based on a reliable foundation. TEX. R. EVID. 702; *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 499 (Tex.2001); *Robinson,* 923 S.W.2d at 556. In determining whether expert testimony is reliable, a court should examine "the principles, research, and methodology underlying an expert's conclusions." *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex.2002). When the testimony involves scientific knowledge, the expert's conclusions must be "grounded 'in the methods and procedures of science.' " *Robinson,* 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Otherwise, the testimony is "no more than 'subjective belief or unsupported speculation.' " *Id.* (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786). We have identified several non-exclusive factors that trial courts should consider when determining the reliability of expert testimony involving scientific knowledge.[6] We recognize that these factors may not apply when testimony is not scientific, but, rather, involves technical or other specialized knowledge. *Gammill v. Jack Williams Chevrolet,* 972 S.W.2d 713, 726 (Tex.1998). Even then, however, there must be some basis for the opinion to show its reliability. *Id.* An expert's bare opinion will not suffice. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). And, there cannot be " 'too great an analytical gap between the data and the opinion proffered.' " *Gammill,* 972 S.W.2d at 726 (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

6    *Id.* (identifying the following considerations regarding reliability of scientific testimony: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique).

**[6]** **[7]** **[8]** **[9]** A trial court has broad discretion in determining whether expert testimony is admissible. *Zwahr,* 88 S.W.3d at 629. Its ruling will be reversed only if that discretion is abused. *K–Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex.2000). Because the party sponsoring the expert bears the burden of showing that the expert's testimony is admissible, the burden of presenting understandable evidence that will persuade the trial court is on the presenting party. *See Robinson,* 923 S.W.2d at 557. When an expert's "processes" or "methodologies" are obscured or concealed by testimony that is excessively internally contradictory, non-responsive or evasive, a trial court will not have abused its discretion in determining that the expert's testimony is not admissible. *See GMC v. Iracheta,* 161 S.W.3d 462, 470–72 (Tex.2005).

#### B. Reliability Factors

The court of appeals noted that Elwell's testimony largely applied his knowledge, training, and experience to the underlying data and that his methodology was not easily tested by objective criteria such as identifiable scientific formulas. The court of appeals concluded that under such circumstances **\*579** the reliability of Elwell's opinion is not properly measured by a *Robinson*-factor analysis, but that the "analytical gap" test should be applied. 100 S.W.3d at 555–56.

Mack argues that the court of appeals' analysis is flawed. Mack urges that Elwell's inability to demonstrate at least one of the *Robinson* factors, coupled with his inability to eliminate the crude oil tanker as the source of the fire, rendered Elwell's testimony unreliable. The Tamezes, on the other hand, argue that because Elwell's testimony was based on his training and

experience, and not science, application of the analytical gap test, as opposed to use of *Robinson* factors, was appropriate. They contend that Elwell's opinion was reliable because there were no analytical gaps in his testimony. *See Gammill,* 972 S.W.2d at 726.

In *Gammill* we clarified that the list of non-exclusive factors listed in *Robinson* may not be applicable when assessing certain kinds of expert testimony. 972 S.W.2d at 720. We held that *Robinson* factors did not apply to the mechanical engineer expert under consideration in *Gammill,* even though his claimed expertise was scientific in nature. *Id.* at 727. In so holding, however, we did not mean to imply that a trial court should never consider the *Robinson* factors when evaluating the reliability of expert testimony that is based on knowledge, training or experience, or that the factors can only be applied when evaluating scientific expert testimony. We recognized that the criteria for assessing reliability must vary depending on the nature of the evidence. *Id.* at 726.

 **[10]**    The United States Supreme Court has noted that it is not possible to "rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert." Kumho Tire v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Nor can the Court "now do so for subsets of cases categorized by category of expert or by kind of evidence," as "[t]oo much depends upon the particular circumstances of the particular case at issue." *Id.* In *Robinson* we likewise explained that the factors mentioned do not constitute an exclusive list and that the trial court's gatekeeping inquiry will differ with each particular case depending on the "[t]he factors a trial court will find helpful in determining whether the underlying theories and techniques ... are scientifically reliable." *Robinson,* 923 S.W.2d at 557. Thus, a trial court should consider the factors mentioned in *Robinson* when doing so will be helpful in determining reliability of an expert's testimony, regardless of whether the testimony is scientific in nature or experience-based. *See Kumho Tire,* 526 U.S. at 139, 119 S.Ct. 1167; *Gammill,* 972 S.W.2d at 726.

 **[11]**    In determining reliability, the trial court "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *See Amorgianos v. Amtrak,* 303 F.3d 256, 267 (2d Cir.2002). A significant part of the trial court's gatekeeper function is to evaluate the expert's qualifications, listen to the testimony, view the evidence,

and determine which factors and evaluation methodology are most appropriate to apply. For example, in the present case the trial court would have been within its discretion to measure the reliability of Elwell's testimony, at least in part, by considering (1) the extent to which Elwell's theory had been or could be tested; (2) the extent to which his methodology relied upon his subjective interpretation; (3) the methodology's potential rate **\*580** of error; (4) whether the underlying theory or methodology has been generally accepted as valid by the accident reconstruction and post-collision fire investigation community; and (5) the non-judicial uses that have been made of his methodology. These are similar to factors 1, 2, 4, 5 and 6 of those enumerated in *Robinson.* But, as we have said above, that is not to imply that the trial court was precluded from measuring Elwell's methodology by *Gammill's* analytical gap analysis.

### C. Elwell's Causation Testimony

 **[12]**    At the *Robinson* hearing, Elwell testified that the fuel and battery system on the tractor were designed improperly, and suggested safer designs. He criticized the placement of the fuel tanks and also of the batteries'[7] proximity to the fuel tanks. He criticized certain parts of the fuel system such as the crossover or "balance line" hose between the two fuel tanks and the spigots by which the hose was attached to each of the tanks. He referenced a particular report, which was not introduced, which he asserted supported his design critiques and his suggested safer designs.

[7]     The record is not clear whether the tractor had one battery or two.

Elwell's analysis and conclusion that the fire began with the fuel system and the battery system were based on the "fire triangle" theory. He explained that under the fire triangle theory, a post-collision fuel-fed fire such as the one under consideration must be analyzed with an eye toward the ignition, fuel, and oxygen sources that were available. Because the air provided oxygen, his analysis centered on the other parts required to complete the triangle, "the source of fluids that could be ignited and what would it take to ignite those fluids and fuel, of course, is the primary suspect, either fuel or crude oil in this particular case."

He did not testify that he inspected the remnants of the burned tractor and trailer or that he performed or reviewed any accident reconstruction analysis as to how the rollover

occurred and how different parts of the vehicle would have been affected or harmed thereby. His *Robinson* hearing testimony did not identify a particular alleged defect of the tractor's fuel system that he concluded was the source of a diesel fuel leak that initiated the fire.

On cross-examination he testified that he had read and relied on "over 5,000" studies on the subject of the causes of post-collision fuel-fed fires. He did not specify any studies that supported his conclusion as to the specifics involved in the accident, and none were offered as evidence for the trial court to consider in evaluating his testimony.

In coming to his conclusion that the fire began with the fuel system and battery system of the tractor, Elwell asserted that he relied on several specific factors and facts. Each of the factors and facts he enumerated supported conclusions that Tamez was burned by diesel and that the diesel ignited so quickly that Tamez could not escape.

Even assuming that what Elwell relied on and classified as "factors" and "facts" were true, however, which Mack denies, the factors and facts are merely consistent with diesel fuel having been released during the rollover and Tamez having been burned by part of the fire fed by the tractor's diesel fuel. They are not probative evidence that diesel fuel was released because of one of the asserted defects in the fuel system or that it was ignited by the battery system. He did not testify to having analyzed, tested, or investigated the characteristics of batteries like the battery in the wrecked tractor to support his **\*581** opinion that the battery system was involved in causing the fire. He failed to set out any process by which he excluded other sources for ignition of the diesel fuel such as mechanical sparks which could be generated when parts of a truck make contact with the pavement, or ignition of the cargo fuel which in turn could have ignited the diesel fuel. *See Gammill,* 972 S.W.2d at 728; *see also Robinson,* 923 S.W.2d at 559 (noting that an expert who is trying to find a cause of something should carefully consider alternative causes). For example, when Elwell was asked during the *Robinson* hearing why he concluded that the fire originated with the fuel and battery systems instead of with the crude oil cargo, his response was that "if [crude oil] remains to be burned, that after five or ten or fifteen minutes, then that's not the fuel that started the fire." He did not explain any investigation or research that supported such a conclusion. He did not elaborate on the amount of crude that was in the trailer when the wreck occurred, calculate the amount of time it would take the cargo to burn, or discuss or compare the relative ease of

ignition or flash points of the crude and diesel fuel. He did not address any analysis or process by which he concluded that some part of a trailer of crude oil would continue to burn for several minutes only if it was ignited by, rather than being the ignitor of, diesel fuel from the tractor's fuel system.

In sum, Elwell did not testify at the *Robinson* hearing to a methodology by which he reached the conclusions as to the fire having been caused by defects in the tractor's fuel and battery systems. In order for Elwell's testimony on causation to be reliable, he was required to present some methodology that reliably supported his opinions that the "fuel" and "ignition" parts of the fire triangle were supplied, respectively, by the tractor's alleged fuel system defects and battery system. He did not do so. The mere fact that the fuel system had a design that could cause the hoses to separate is not evidence that the hoses separated in this case.

Elwell's testimony did no more than set out "factors" and "facts" which were consistent with his opinions, then conclude that the fire began with diesel fuel from the tractor. The reliability inquiry as to expert testimony does not ask whether the expert's conclusions appear to be correct; it asks whether the methodology and analysis used to reach those conclusions is reliable. *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254 (Tex.2004). The trial court was not required to accept his opinions at face value just because Elwell was experienced in examining post-collision fuel-fed fires. *See Gammill,* 972 S.W.2d at 726 (holding that a court should not admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert).

We conclude that the trial court did not abuse its discretion when it excluded Elwell's testimony on causation. The court of appeals erred when it determined otherwise.

### IV. The Summary Judgment

Mack moved for summary judgment on multiple grounds, including the ground that there was no evidence Mack's fuel system design was a producing or proximate cause of Tamez's injuries. The Tamezes contend that even without Elwell's testimony as to causation, they presented sufficient evidence to survive summary judgment.

### A. Standard of Review

A summary judgment motion pursuant to TEX. R. CIV. P. 166a(i) is essentially a motion for a pretrial directed verdict. *See* **\*582** *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). Once such a motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. *Id.; W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005). We review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005); *Johnson v. Brewer & Pritchard, P. C.,* 73 S.W.3d 193, 208 (Tex.2002).

### B. Causation

Producing or proximate cause is an element of all of the Tamezes' claims, which included negligence, misrepresentation, breach of warranty, and design, manufacturing, and marketing defects. Causation-in-fact is common to both proximate and producing cause, including the requirement that the defendant's conduct or product be a substantial factor in bringing about the injuries in question. *See Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995).

All the Tamezes' theories regarding the fire's cause were based on allegations that the tractor's fuel system was defectively designed and manufactured so as to be unreasonably prone to fail and release flammable fluids in an environment conducive to ignition and fire; that such defects caused the release of diesel fuel; and that a defectively designed and placed ignition source then caused ignition of the released diesel.

 [13]  To survive summary judgment on their theory that a defect in the tractor's fuel system was the cause of the fire, the Tamezes were required to present more than evidence of a fuel leak. *See Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600–01 (Tex.2004) (affirming summary judgment because the plaintiffs' evidence "establishe[d] only that a fire occurred, and [the plaintiffs' expert] could say no more than that he 'suspects' the electrical system caused the fire"). They had to present evidence that (1) the diesel fuel leaked because of one or more of the alleged defects, and (2) the leak caused by the defect was the ignition point for the fire.

*See Iracheta,* 161 S.W.3d at 470 (holding that the possibility that the fire occurred in the manner the plaintiff suggested is not enough to support the jury's findings); *Nissan Motor Co. v. Armstrong,* 145 S.W.3d 131, 137 (Tex.2004).

The Tamezes point to several parts of their summary judgment evidence that they say are sufficient, individually or collectively, to defeat summary judgment: (1) an accident witness's "personal assumption," based on his averred experience with and ability to recognize the smell of diesel fuel, that Tamez was burned by diesel fuel because Tamez was coated with a shiny, oily substance and did not smell like crude oil; (2) a notation by Mack's accident reconstruction expert noting a diesel fuel spill on the road; (3) a statement by Elwell that the design of the system was such that if there was any significant dislodgement of the fuel tanks, the fuel line would separate; [8] (4) a statement by Mack's expert witness that it was possible that a battery cable found in the tractor had arced and ignited the fire, although **\*583** the witness ultimately concluded that the crude-oil cargo caused the fire; and (5) an eyewitness's statement implying that it took the fire a short period of time to reach Tamez, who exited and crawled away from the tractor after the accident.

[8]     Elwell's testimony on design defect, as opposed to his testimony on causation, was not excluded.

 [14]   [15]   [16]   Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition. Expert testimony is required when an issue involves matters beyond jurors' common understanding. *See Alexander v. Turtur & Assocs.,* 146 S.W.3d 113, 119–20 (Tex.2004). Whether expert testimony is necessary to prove a matter or theory is a question of law. *See FFE Transp. Servs., Inc. v. Fulgham,* 154 S.W.3d 84, 89 (Tex.2004). In *Fulgham* we held that expert testimony was necessary to establish the standard of care for connecting refrigerated trailers to tractors and for the frequency and type of inspection and maintenance of such connectors, because those matters were not within the general experience and common understanding of laypersons. *Id.* at 91; *See also Turbines, Inc. v. Dardis,* 1 S.W.3d 726, 738 (Tex.App.-Amarillo 1999, pet. denied) (holding that performance of mechanical work on turbine aircraft engines is not within the experience of a layperson).

 **[17]** A lay juror's general experience and common knowledge do not extend to whether design defects such as those alleged in this case caused releases of diesel fuel during a rollover accident. *See Nissan Motor Co.,* 145 S.W.3d at 137 (stating that we have consistently required competent expert testimony and objective proof that a defect caused the condition complained of). Nor would a lay juror's general experience and common knowledge extend to determining which of the fire triangle's fuel sources, diesel from the tractor or crude from the tanker, would have first ignited, or the source for the first ignition. That part of Elwell's testimony that was properly before the trial court and the testimony of other experts as to the amount of time they spent in studying, investigating, and working in the field of post-collision, fuel-fed fires demonstrated the intricacies of such subject matter. Issues such as those regarding the fire's cause(s) present matters beyond the general understanding and common knowledge of lay jurors. Proof of causation in this case also required expert testimony.

The summary judgment evidence presented by the Tamezes did not contain proof that any of the possible sources of diesel fuel was more likely than any other, or more likely than the crude oil cargo, to have been the source of liquids that first caught fire. Accordingly, there is no evidence that the source was one of the alleged fuel system defects. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

 **[18]** The Tamezes also alleged that several ignition sources were located in areas likely to contain diesel that would be released in a wreck. The Tamezes point to expert testimony that an arced battery cable found in the tractor could possibly have ignited the fire. But, testimony that the battery or its cable could possibly have ignited the fire is not evidence that it probably did so. The expert who provided this testimony could not determine whether the cable arced before the fire was ignited or as it was being burned by an otherwise-ignited fire. As proof of what caused the fire, such evidence is speculative and is insufficient to prevent summary judgment. *See Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998).

 **\*584** **[19]** The plaintiffs also rely on circumstantial evidence suggesting that the fire quickly reached Tamez. That evidence is consistent with the Tamezes' theory that the fire originated with fuel from the tractor's diesel fuel system. But, such evidence does not make it more likely than not that the battery or some other allegedly improperly located ignition source ignited diesel from the tractor, as opposed to other possible sources of ignition such as the cargo of crude oil. Accordingly, the circumstantial evidence is not sufficient to prevent summary judgment. *Id.*

### V. Conclusion

The plaintiffs produced no evidence that the alleged defects of the Mack tractor were a cause-in-fact of injuries to Abram Tamez. Because causation is a required element of each of the Tamezes' claims, the trial court properly granted summary judgment. Accordingly, we reverse the court of appeals' judgment and render judgment that the plaintiffs take nothing.

### All Citations

206 S.W.3d 572, 50 Tex. Sup. Ct. J. 80

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

343 S.W.3d 571
Court of Appeals of Texas,
Beaumont.

RENAISSANCE HEALTHCARE SYSTEMS,
INC., Renaissance Hospital, Inc., and
Houston Community Hospital, Inc. d/
b/a Renaissance Hospital, Appellants,
v.
Dianne SWAN, individually and as Representative
of the Estate of Jennifer Renee Abshire, and
for and on behalf of any Wrongful Death
Beneficiaries of Jennifer Renee Abshire, Jason
Holst, Individually, and David "Andrew" Maxey,
as next Friend of Trista Maxey, Appellees.

No. 09–10–00433–CV.    |    Submitted
March 3, 2011.    |    Decided June 30, 2011.

**Synopsis**
**Background:** Deceased patient's mother, individually and as
representative of patient's estate, and other plaintiffs brought a
medical malpractice action against hospital and several other
medical defendants. Defendants subsequently filed a motion
to dismiss, challenging the sufficiency of the plaintiffs' expert
reports. The 60th District Court, Jefferson County, Gary
Sanderson, J., denied the motion, and defendants appealed.

**[Holding:]** The Court of Appeals, Steve McKeithen, C.J.,
held that plaintiffs' expert reports, considered together,
discussed the standards of care, breach, and causation with
sufficient specificity as to each of the defendants to inform
them of the conduct plaintiffs called into question.

Affirmed.

West Headnotes (14)

**[1]**    **Appeal and Error**
       👉 Rulings on Motions Relating to Pleadings
       Appellate court reviews a trial court's decision
       regarding the adequacy of an expert report in

a medical malpractice action under an abuse of
discretion standard.

Cases that cite this headnote

**[2]**    **Appeal and Error**
       👉 Abuse of discretion
       A trial court abuses its discretion if it acts in
       an arbitrary or unreasonable manner without
       reference to any guiding rules or principles.

Cases that cite this headnote

**[3]**    **Appeal and Error**
       👉 Abuse of discretion
       A trial court abuses its discretion if it fails to
       analyze or apply the law correctly.

Cases that cite this headnote

**[4]**    **Health**
       👉 Affidavits of merit or meritorious defense;
       expert affidavits
       When determining whether the expert report in
       a medical malpractice action represents a good-
       faith effort to comply with the definition of an
       expert report in applicable statute, the trial court's
       inquiry is limited to the four corners of the report.
       V.T.C.A., Civil Practice & Remedies Code §
       74.351(a), (r)(6).

Cases that cite this headnote

**[5]**    **Health**
       👉 Affidavits of merit or meritorious defense;
       expert affidavits
       To constitute a "good-faith effort," the expert
       report in a medical malpractice action must
       discuss the standard of care, breach, and
       causation with sufficient specificity to inform the
       defendant of the conduct the plaintiff has called
       into question and to provide a basis for the trial
       court to conclude that the claims have merit.
       V.T.C.A., Civil Practice & Remedies Code §
       74.351(a), (r)(6).

Cases that cite this headnote

**[6]      Health**

⚷ Affidavits of merit or meritorious defense; expert affidavits

When a plaintiff in a medical malpractice action sues more than one defendant, the expert report or reports must set forth the standard of care applicable to each defendant and explain the causal relationship between each defendant's individual acts and the injury. V.T.C.A., Civil Practice & Remedies Code § 74.351(a), (r)(6).

Cases that cite this headnote

**[7]      Health**

⚷ Affidavits of merit or meritorious defense; expert affidavits

An expert report in a medical malpractice action need not marshal all of the plaintiff's proof; however, a report that omits any of the elements required by statute does not constitute a good-faith effort to comply with the statutory definition of an expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351(a), (r)(6).

Cases that cite this headnote

**[8]      Health**

⚷ Affidavits of merit or meritorious defense; expert affidavits

With regard to determining the adequacy of an expert report in a medical malpractice action, the expert must explain the basis of his statements to link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code § 74.351(a), (r)(6).

Cases that cite this headnote

**[9]      Appeal and Error**

⚷ On Separate Appeal from Interlocutory Judgment or Order

Several of defendants' claims in medical malpractice action, including that the peer review privilege immunized them from suit, that respondeat superior did not apply, and that the plaintiffs' expert reports stated an inappropriate standard of care for the nurses, were issues for either trial or summary judgment, and would

not be addressed by appellate court on appeal following trial court's denial of defendants' motion to dismiss, challenging the sufficiency of plaintiffs' expert reports. V.T.C.A., Civil Practice & Remedies Code § 74.351(a), (r)(6).

Cases that cite this headnote

**[10]      Joint Adventures**

⚷ Rights and Liabilities of Parties as to Third Persons

The theory of joint enterprise imputes liability to one who, although he did no wrong, is so closely connected to the wrongdoer that it justifies the imposition of vicarious liability.

Cases that cite this headnote

**[11]      Health**

⚷ Hospitals or Clinics

**Health**

⚷ Affidavits of merit or meritorious defense; expert affidavits

When a medical malpractice petition asserts theories of liability that are purely vicarious, the conduct being called into question involves legal principles, and is not measured by a medical standard of care, since hospital entities cannot practice medicine; therefore, an expert report in such a case that adequately implicates the actions of the entity's agents or employees is sufficient. V.T.C.A., Civil Practice & Remedies Code § 74.351(a), (r)(6).

3 Cases that cite this headnote

**[12]      Health**

⚷ Affidavits of merit or meritorious defense; expert affidavits

Although the expert report in a medical malpractice action must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit, each specific factual allegation of negligence does not need be

discussed in the expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351(a), (r)(6).

1 Cases that cite this headnote

**[13]    Evidence**
☞ Due care and proper conduct in general
**Health**
☞ Affidavits of merit or meritorious defense; expert affidavits

Physician's lack of involvement in hospital quality assurance committees since 1997 did not render him unable to qualify as an expert witness and offer an expert report in medical malpractice action. V.T.C.A., Civil Practice & Remedies Code § 74.403(a).

Cases that cite this headnote

**[14]    Health**
☞ Affidavits of merit or meritorious defense; expert affidavits

Plaintiffs' expert reports in medical malpractice action, considered together, discussed the standards of care, breach, and causation with sufficient specificity as to each of the defendants to inform them of the conduct plaintiffs called into question and to provide a basis for the trial court to conclude that the claims had merit; physician, board certified in anesthesiology and internal medicine, explained that the standard of care required physicians and nursing personnel to recognize the signs of hemorrhage, and that if the nurses had promptly recognized deceased patient's symptoms, summoned a physician to patient's bedside, and instituted the chain of command, patient would "more likely than not have been appropriately treated and her life saved," and second physician indicated that defendants had a duty to follow applicable standards in credentialing physicians, and that if they had denied or revoked orthopedic surgeon's surgical credentials, in all reasonable medical probability, a competent surgeon would have operated on patient, patient's artery would not have been severed, and she would not have died. V.T.C.A., Civil Practice & Remedies Code § 74.351(a), (r)(6).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*573** Gordon M. Carver, III, Heather M. Morlang, Watt Beckworth Thompson & Henneman, L.L.P., Houston, for appellants.

Brian D. Sutton, Joseph N. Jannise, Jr., Stephanie H. Harris, Sutton & Jacobs, L.L.P., Beaumont, for appellees.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

**\*574  OPINION**

STEVE McKEITHEN, Chief Justice.

This is an accelerated appeal from the trial court's order denying a motion to dismiss filed pursuant to section 74.351 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West 2011); *see also id.* § 51.014(a)(9) (West 2008). We affirm the trial court's judgment.

**BACKGROUND**

Dianne Swan, individually and as representative of the estate of Jennifer Renee Abshire, and for and on behalf of any wrongful death beneficiaries of Abshire; Jason Holst, individually; and David "Andrew" Maxey, as next friend of Trista Maxey, (collectively "appellees") brought a healthcare liability claim against Renaissance Healthcare Systems, Inc., Renaissance Hospital, Inc., and Houston Community Hospital, Inc. d/b/a Renaissance Hospital (collectively "appellants"), and other defendants. [1] According to appellees, Dr. John Q.A. Webb, who was treating Abshire for a herniated disc, referred Abshire to Dr. Merrimon Baker, an orthopedic surgeon. Appellees contend that Webb was "acting as an agent and/or employee of and/or on behalf of" one or more of the hospital defendants. Appellees assert that Baker performed a bilateral lumbar laminectomy and diskectomy on Abshire at Renaissance Hospital, and during the surgery, Baker transected Abshire's "right internal iliac artery, failed to recognize that he had done so, and thus failed to repair the artery prior to closing."

Abshire suffered massive internal hemorrhaging, which led to cardiac arrest and her death.

1   In an earlier appeal, we addressed the adequacy of the expert reports as to defendants Beaumont Spine & Sports Medicine Clinic, Inc., individually and d/b/a Beaumont Spine Pain & Sports Medicine, Beaumont Spine & Sports Medicine, Dr. John Q.A. Webb, John Q.A. Webb, Jr., M.D., P.A., individually and d/b/a Beaumont Medical Clinic, and Beaumont Medical Clinic. *Beaumont Spine Pain & Sports Medicine Clinic, Inc. v. Swan,* No. 09–10–00347–CV, 2011 WL 379168 (Tex.App.-Beaumont Feb. 3, 2011, pet. denied).

Appellees asserted causes of action against appellants for malicious credentialing of Baker, negligence, and gross negligence. According to appellees' petition, because Webb was acting as the "agent, employee, member, officer[,] and/or director" of Beaumont Spine Pain & Sports Medicine Clinic, Inc. ("Beaumont Spine"), and appellants allegedly owned and operated Beaumont Spine, appellees' allegations of negligence against Webb also applied to appellants under the doctrine of *respondeat superior.* According to appellees, appellants failed to maintain an appropriate standard of care by permitting physicians whom appellants knew to be incompetent and unqualified to operate on Abshire.

Appellees also contended that, by permitting nurses and other staff members who lacked appropriate training and experience to care for Abshire, appellants failed to carefully evaluate and select competent nurses and other staff members, adequately train nurses and other staff members, adequately supervise the treatment provided by nurses and other staff members, and maintain an appropriate standard of care. In addition, appellees alleged that the various defendants were involved in a joint enterprise "for monetary profit via the delivery of medical services" to Abshire.

Appellees filed expert reports authored by Dr. Emilio B. Lobato and Dr. J. Michael Simpson. Appellants objected to the reports and filed motions to dismiss. *See* **\*575** Tex. Civ. Prac. & Rem.Code Ann. § 74.351(*l* ). Appellees filed a supplemental report by Lobato after appellants filed their objections. The trial court sustained appellants' objections and granted appellees a thirty-day extension to file additional reports. Appellees subsequently filed additional reports from Dr. Keith E. Miller and Arthur S. Shorr, FACHE, [2] as well as a supplemental report from Shorr. After appellants filed objections and motions to dismiss concerning the additional and supplemental reports, the trial court overruled appellants' objections and denied appellants' motions to dismiss. Appellants then filed this appeal, in which they present three issues for our review.

2   "FACHE" stands for "Fellow of the American College of Healthcare Executives."

## THE EXPERT REPORTS

### *Dr. Emilio B. Lobato*

In his initial report, Lobato, who is board certified in anesthesiology and internal medicine, explained that Abshire was admitted to "Renaissance Hospital Houston" on August 11, 2006, to undergo a lumbar laminectomy and bilateral diskectomy of L5–S1. Lobato noted that during surgery, Abshire's blood pressure decreased to 80/50, and when Abshire was moved to the PACU (post-anesthesia care unit) after surgery, her blood pressure was 88/31, and her heart rate was 121. According to Lobato, "[t]he PACU record reveals a pattern of persistent hypotension since her admission with values as low as 50 mm Hg systolic. This was accompanied by extreme tachycardia eventually followed by terminal bradycardia." Lobato opined as follows:

In my professional opinion, and with a great degree of medical certainty, Ms. Abshire suffered from severe hemorrhagic shock following a surgical transection caused by Dr. Baker of her right iliac artery which occurred during her lumbar laminectomy. Ms. Abshire continued to hemorrhage in the PACU causing hypovolemic shock which went inappropriately treated, thus, leading to her demise. In other words, Ms. Abshire's death was directly caused by Dr. Baker's trans[e]ction of the right internal iliac artery combined with the failure of Dr. Baker, Dr. McHargue [Abshire's anesthesiologist] and the PACU nursing staff to diagnose and [treat] the resulting hemorrhage and hypovolemic shock.

Ms. Abshire's death was a direct result of the negligent actions of the surgeon ..., the anesthesiologist ... and the PACU nurses from Renaissance Hospital in Houston[,] Texas. The untimely diagnosed and untreated severe hemorrhage suffered by Ms. Abshire was a direct and proximate cause of her death. The lack of timely identification and appropriate treatment by the above care providers was directly responsible for her prolonged state of shock, leading to her untimely death.

According to Lobato, Abshire "was clearly manifesting enough signs of hypovolemic shock that a medical student should have diagnosed it." Lobato stated that Abshire exhibited symptoms of "a class IV hemorrhagic shock which is clinically associated with more than 40% blood loss[,]" and that a class IV hemorrhage is "immediately life threatening." Lobato explained that the symptoms of class IV hemorrhage include "marked tachycardia, decreased systolic blood pressure, narrowed pulse pressure (or immeasurable diastolic pressure), markedly decreased (or no) urinary output, depressed mental status (or loss of consciousness), and cold, pale skin."

Lobato opined that "the standard of care requires that both physicians and nursing **\*576** personnel recognize the signs and symptoms of progressive and severe hemorrhage." Lobato stated that severe tachycardia without concomitant elevation of blood pressure, followed shortly by hypotension, pallor, and obtundation, are the classic signs of hypovolemic shock, and the injury must be timely recognized and treated in a timely fashion because failure to do so will result in a fatality. Lobato stated as follows:

> Ms. Abshire exhibited florid signs of hypovolemic shock including tachycardia, hypotension, pallor, decrease in mental status and progressive hypoxemia eventually culminating into pulseless electrical activity. The fact that Ms. Abshire displayed flagrant hemorrhagic shock without appropriate therapy in the eyes of anesthesiologists, orthopaedic surgeon, and post anesthesia care unit nurses, is beyond belief. All of these health care team members share responsibility for the eventual demise that Ms. Abshire suffered.

With respect to appellants in particular, Lobato explained that he understood from reviewing the original petition that "the Renaissance entities have common ownership, are all part of the same healthcare system, and/or are all involved in a joint enterprise for the provision of healthcare to patients such as Ms. Abshire." Lobato stated, "Therefore, my criticisms of the nursing staff of Renaissance Hospital—Houston are directed to the remaining Renaissance entities as well since they all have related or common ownership and/or are all involved in a joint enterprise." Lobato opined

that the standard of care "requires that a qualified PACU nurse recognize signs and symptoms of hypovolemia such as tachycardia and progressive hypotension (assessment and nursing diagnosis)." Lobato explained that PACU nurses should also know that treating hypovolemia requires "aggressive fluid resuscitation and frequent evaluation of the response to treatment[.]" In addition, Lobato opined as follows:

> The standard of care also demands that the nursing staff inform the surgeon and the anesthesiologist of severe hypotension particularly if it is recurring and demand their presence to personally assess. A qualified PACU nurse also has the obligation to act as the patient's advocate. In the presence of a clinically unstable patient[,] [a] PACU nurse should have insisted that either Dr. Baker or Dr. McHargue come to and remain at the bedside. In addition, should the anesthesiologist or neurosurgeon fail to institute the right treatment[,] ... the nurse has not only the right but the obligation to rapidly institute the chain of command. This requires the involvement of a qualified supervisor and involves the summoning of another qualified anesthesiologist and surgeon to provide the appropriate care of the patient.

> PACU Nurses at the Hospital caring for Ms. Abshire were obligated to work on the patient's behalf, not the physician's. In this case, the blatant neglect by Dr. Baker and the mismanagement by Dr. McHargue made the PACU nurses the last resort to prevent her death. Instead of behaving as patients' advocates, PACU Nurses limited themselves to record the progression of Ms. Abshire's hemorrhage towards her inexorable death and to uncritically institute what was clearly suboptimal and incomplete therapy.

Lobato explained that the PACU nurses failed to recognize severe and progressive hypovolemia, failed to demand more aggressive fluid resuscitation, failed to demand that a physician be continuously present at Abshire's bedside, and failed "to **\*577** institute the chain of command to provide a qualified medical provider to institute the right therapy in a timely fashion...." According to Lobato, if the PACU nursing staff had taken appropriate measures, "more likely than not, at least one physician caring for Ms. Abshire would have realized that they were dealing with a hemorrhage, ... and once that connection had been made, Ms. Abshire more likely than not would have been appropriately treated and her life saved." Lobato stated that the failure of Baker, McHargue, and the PACU nursing staff to follow the standards of care "resulted

in the irreversible shock suffered by Ms. Jennifer Abshire and ultimately her death. Thus, their actions were[,] in reasonable medical probability[,] the proximate cause of Ms. Abshire's death. Had the standard of care been observed ..., it is my opinion that her untimely death would have been prevented."

In his supplemental report, Lobato stated as follows:

> I am not suggesting ... that nurses should be "practicing medicine" or prescribing treatments, but rather, that they should be performing adequate nursing assessments and nursing diagnoses that they are not only qualified to make but are obligated to make. In this instance, it is the duty of a PACU nurse to recognize signs and symptoms of hypovolemia because of the likelihood that hypovolemia in a post-surgical patient indicates hemorrhage, and because of the possible fatal consequences of such a hemorrhage. This clearly falls within the category of "nursing diagnoses" and "nursing assessments."

Lobato further noted a nurse should pay close attention to a patient's physical appearance, and Lobato explained that "the autopsy report notes that upon *external* examination, Ms. Abshire's skin color was 'strikingly pale' and that her abdomen was protuberant." Lobato stated that upon reviewing the autopsy photographs of Abshire's abdomen, he noted that Abshire's abdomen

> is so protuberant as to resemble that of a woman in late pregnancy. This distension is visible to the naked eye, even through her hospital gown, and would have been visible to the PACU nurses and anyone else who happened to glance in the area of her abdomen. Her abdomen would not have suddenly swelled to that size in the moments before her death; rather, the abdomen protruded because it was filling with the 4680 milliliters of blood hemorrhaged from the severed artery. The expansion of the belly would have occurred during the entire course of Ms. Abshire's time

in the PACU, and as it expanded, provided easily accessible evidence that there was a problem in the area where the surgery was performed. The expanding abdomen, when coupled with the clinical picture of the falling blood pressures, should have alerted the nurses of the strong possibility of hemorrhage."

Lobato also explained in his supplemental report that a hospital must "properly train its PACU nursing staff to recognize hypovolemia in post-surgical patients, to know its potential causes, and to act quickly and decisively in the face of such signs and symptoms...." Lobato also stated as follows:

> Again, by this I do not mean that the Hospital should have trained its staff to make medical diagnoses or prescribe treatment, but rather to train them to be aware of the signs and symptoms of major and potentially lethal post-operative complications.... If the Hospital in this case had conducted any such training, it was clearly ineffective, as the PACU nurses caring for Ms. Abshire **\*578** exhibited no signs of recognizing what was happening to Ms. Abshire, nor did they take any of the required actions ... which would have led to a diagnosis of the hemorrhage and hypovolemia in time to treat it and save Ms. Abshire's life.

Lobato explained that if the nurses had recognized Abshire's hypovolemic shock and demanded "the immediate presence of the operating surgeon at the bedside for an immediate consultation with a general or vascular surgeon while read[y]ing an operating room for an emergency exploratory laparotomy," a surgeon would have recognized that Abshire was suffering from an acute intra-abdominal hemorrhage and "taken Ms. Abshire to the operating room immediately in order to identify the bleeding, clamp and repair the lacerated vessel, thus effectively stopping the hemorrhage." Lobato opined that although Abshire would have required significant blood transfusions, as well as post-operative care in the intensive care unit, "had she been returned to the operating room shortly after her arrival to the PACU, it is very likely

(in other words, more likely than not) that she would have survived."

### *Dr. J. Michael Simpson*

Simpson explained that he is a board-certified orthopedic surgeon, and he has served in hospital administration, including his present position as medical director of St. Mary's Spine Center. Simpson stated that, as a result of his experience as a practicing orthopedic surgeon and in hospital administration, he has "knowledge of the standards of care applicable to the credentialing of physicians, and in particular surgeons, to practice in hospitals[,]" as well as the standards of care applicable to a physician who is referring a patient to another physician. Simpson explained that Webb's records do not indicate how Webb arranged Abshire's referral to Baker or whether Webb investigated Baker's competence prior to making the referral. Simpson stated, "[A]ccording to public documents attached to Plaintiff's Original Petition, which I have reviewed, by the time Dr. Webb referred Ms. Abshire to Dr. Baker, Dr. Baker had a well-known public history, both in the medical community and in the community at large, for incompetence and drug use."

Simpson explained that two appellate court opinions, both of which were published before Webb referred Abshire to Baker, set forth Baker's history, and that Simpson had served as an expert witness in one of the cases. According to Simpson, one of the appellate opinions involved a patient who suffered an injury that was quite similar to Abshire's injury. Simpson also noted that at the time of the referral, the Texas Board of Medical Examiners ("TBME") had filed several complaints against Baker. Simpson stated that information contained in the TBME complaints was publicly accessible.

According to Simpson, the standard of care required Webb to "have a basic knowledge of the skills and professional reputation of the physician to whom the patient is being referred." Simpson explained that the standard of care also required a referring physician to "refrain from referring a patient to a physician with a well-documented history of drug use, malpractice, and repeated complaints by the board of medical examiners." Simpson opined that Webb's referral of Abshire to Baker

> was the direct cause of Dr. Baker's performing surgery on Ms. Abshire, absent which, Dr. Baker would not

have been the surgeon operating on Ms. Abshire. In all reasonable medical probability, had Dr. Baker, a physician with a well-known reputation for surgical incompetence, not been Ms. Abshire's surgeon, **\*579** her right internal iliac artery would not have been transected and the transaction left undiscovered to cause exsanguination and death.

Simpson also stated that based upon the documents he had reviewed, Webb's employer, Beaumont Spine Pain & Sports Medicine Clinic, Inc. was owned and operated by the various Renaissance Hospital entities, "thus making Dr. Webb an employee" of the Renaissance entities. Accordingly, Simpson explicitly incorporated by reference his criticisms of Webb as to the Renaissance entities. Simpson also explained that his "criticisms of the nursing staff and hospital administration responsible for credentialing Dr. Baker at Renaissance Hospital—Houston, are directed to the remaining Renaissance entities as well since they all have related or common ownership and/or are all involved in a joint enterprise."

According to Simpson, Renaissance Hospital had a duty to follow JCAH (Joint Commission on Accreditation of Hospitals)[3] standards in credentialing physicians, and JCAH standards required Baker to disclose his record of malpractice records and settlements. Simpson also noted that because the appellate opinions and the state board complaints were publicly accessible, "a reasonably prudent credentialing committee should have limited, denied[,] or revoked Dr. Baker's privileges." Simpson stated that Renaissance Hospital failed to follow the proper credentialing process because Baker's malpractice history "would have been well known in medical and hospital administration circles in the Houston area. Had the Hospital done even a bare minimum of investigation of Dr. Baker's malpractice history, it should have never granted privileges to Dr. Baker." According to Simpson, appellants could have decided to deny or revoke Baker's credentials

[3]  See *Mitchell v. Amarillo Hosp. Dist.,* 855 S.W.2d 857, 867 (Tex.App.-Amarillo 1993, writ denied) (discussing the meaning of the acronym "JCAH").

based solely on information that was in the public domain at the time, or at the very least, the sheer volume of

this information available to the public, and well-known throughout the medical community, should have alerted the Hospital to do a thorough investigation of Dr. Baker and his malpractice history and state board status, which surely would have resulted in any reasonable credentialing committee's denying such privileges.

Simpson opined that if the hospital had denied or revoked Baker's surgical credentials, in all reasonable medical probability, a competent surgeon would have operated on Abshire, Abshire's artery would not have been severed, and Abshire would not have bled to death.

Simpson further explained that the standard of care requires PACU nurses to recognize signs and symptoms of hypovolemia as part of assessment and nursing diagnosis, to insist upon rapid intravenous administration of fluids, and to inform the surgeon and anesthesiologist of severe hypotension, "particularly if it is recurring and demand their presence to personally assess." Simpson explained as follows:

> A qualified PACU nurse also has the obligation to act as the patient's advocate. In the presence of a clinically unstable patient[,] [a] PACU nurse should have insisted that either Dr. Baker or Dr. McHargue come to and remain at the bedside. In addition, should the anesthesiologist or neurosurgeon fail to institute the right treatment ... the nurse has not only the right but the obligation to rapidly institute the chain of command. This requires the **\*580** involvement of a qualified supervisor and involves the summoning of another qualified anesthesiologist and surgeon to provide the appropriate care of the patient.

Simpson opined that the hospital's nurses breached the standard of care by failing to (1) recognize severe and progressive hypovolemia, (2) demand more aggressive fluid resuscitation, (3) demand that a physician be continuously present at Abshire's bedside, and (4) institute the chain of command so that a qualified medical provider could have timely instituted the proper treatment. According to Simpson, if the PACU nurses had undertaken appropriate measures, "more likely than not, at least one physician caring for Ms. Abshire would have realized that they were dealing with a hemorrhage, ... and once that connection had been made, Ms.

Abshire more likely than not would have been appropriately treated and her life saved."

### *Dr. Keith E. Miller*

Miller, a family physician with experience serving on hospital committees, explained that he is familiar with the standards of care applicable to physicians, nurses, hospitals, and emergency departments that treat patients such as Abshire. In addition, Miller explained that he had previously served as a commissioner of the Texas Medical Board. Miller stated as follows:

> According to public documents, information available to the public on the Texas Medical Board website, and in a newsletter published by the Texas Medical Board which is mailed to every physician in Texas, including Dr. Webb, Dr. Baker had a well-known public history, both in the medical community and in the community at large, for incompetence and drug use at the time Dr. Webb made the referral of Ms. Abshire.

Miller noted that when Webb referred Abshire to Baker, Baker was defending several complaints filed by the Texas Medical Board. In addition, Miller stated that Baker "had also been the subject of a rather notorious court case [,] during which it was reported that Dr. Baker had ... drug problems, mental health problems[,] and erratic behavior, and ... he had lost privileges at two hospitals."

According to Miller, the standard of care required Webb to use "reasonable medical judgment and effort in determining the need for a referral and in selecting a competent physician to which [Abshire] could appropriately be referred." Miller stated that all physicians in Texas receive the Texas Medical Board newsletter and are expected to be familiar with its contents, including information about disciplinary actions taken by the board against physicians. Miller also indicated that the standard of care required that Webb should not have referred Abshire to Baker "for medical care due to his well-known history of drug use, erratic behavior[,] and most of all, his history of serious adverse patient outcomes."

Miller explained that Webb breached the standard of care by referring Abshire to Baker. Miller stated that "[a]

reasonable physician practicing according to acceptable standards of medical care would have used reasonable efforts to ascertain the qualifications of physicians to which they refer patients....” Miller opined that “[h]ad proper care ... been given to Ms. Abshire[,] then more likely than not and to a reasonable degree of medical certainty and probability, Ms. Abshire would not have undergone surgery by Dr. Merrimon Baker, would not have had her iliac artery mistakenly and negligently severed during surgery, and would not have died.” Like Lobato and Simpson, Miller stated that because he understood that appellants **\*581** owned Beaumont Spine, where Webb practiced medicine, Miller incorporated his criticisms of Webb as to appellants.

### Arthur S. Shorr, FACHE

Shorr stated that he is board certified in hospital and healthcare administration, and is a Fellow of the American College of Healthcare Executives. Shorr also stated that he has worked in senior executive management at acute care hospitals for sixteen years, and he is also president of Arthur S. Shorr & Associates, Inc., a management consulting firm that provides consulting services to hospitals and physicians. Shorr explained that his background, training, and experience make him “an expert in the administrative community standards applicable to all acute care hospitals in the United States, including Renaissance Hospital in Houston.”

Shorr explained that the administrative community standards for hospitals in Texas are promulgated by the Center for Medicare & Medicaid Services (CMS), the Texas Department of Health, The Joint Commission, and the American Osteopathic Association (AOA), and he explained that the Joint Commission and AOA standards applied to Renaissance Hospital. According to Shorr, “It is the fiduciary responsibility of the hospital's governing body and chief executive officer ... to ensure that all applicable administrative community standards are met.”

Shorr stated that the Joint Commission standards for hospital accreditation provide that when granting, renewing, or revising clinical privileges, the relevant criteria “include evidence of current competence[,]” as well as “peer recommendations when required.” Shorr quoted as follows from the Joint Commission 2006 Hospital Accreditation Standards:

Before granting privileges, the organized medical staff evaluates the following: Challenges to any licensure or registration; Voluntary and involuntary relinquishment of any license or registration; Voluntary and involuntary termination of medical staff membership; Voluntary and involuntary limitation, reduction, or loss of clinical privileges; Any evidence of an unusual pattern or an excessive number of professional liability actions resulting in a final judgment against the applicant; Documentation as to the applicant's health status; Relevant practitioner-specific data are compared to aggregate data, when available; Morbidity and mortality data, when available.

Each reappraisal includes information concerning professional performance, including clinical and technical skills and information from hospital performance improvement activities, when such data are available.

...

The applicant's ability to perform privileges requested must be evaluated. This evaluation is documented in the individual's credentials file....

At the time of renewal of privileges, the organized medical staff evaluates individuals for their continued ability to provide quality care, treatment, and services for the privileges requested as defined in the medical staff bylaws.

...

The process for renewal of privileges involves the same steps ... and additionally requires the medical staff to evaluate a practitioner's ability to perform the privileges requested based upon his or her performance during the period of time he or she has been practicing at the organization.... Current competence is determined by the results of performance improvement activities and peer recommendations.

**\*582** Evidence of current ability to perform privileges requested is required of all applicants for renewal of clinical privileges.... The process should identify quality of care, treatment and services issues for groups of individuals as well as individual practitioners.

Shorr further explained that hospital licensing regulations contained in the Texas Administrative Code require a hospital to have a governing body that is responsible for appointing medical staff, among other things. The governing body must

"[d]etermine, in accordance with state law and with the advice of the medical staff, which categories of practitioners are eligible candidates for appointment to the medical staff; ... [e]nsure that criteria for selection include individual character, competence, training, experience, and judgment"; and "[e]nsure that the medical staff is accountable to the governing body for the quality of care provided to patients[.]"

According to Shorr, the federal regulations applicable to Medicare/Medicaid facilities require that the hospital must have an effective governing body to determine which categories of practitioners are eligible candidates for appointment to the medical staff; appoint members of the medical staff "after considering the recommendations of the existing members of the medical staff"; "[e]nsure that the medical staff is accountable to the governing body for the quality of care provided to patients"; and "[e]nsure [that] the criteria for selection are individual character, competence, training, experience, and judgment[.]" Shorr also explained that the hospital's medical staff "must periodically conduct appraisals of its members" and "examine credentials of candidates for medical staff membership and make recommendations to the governing body on the appointment of the candidates." The medical staff must also "be well organized and accountable to the governing body for the quality of the medical care provided to patients."

Shorr opined that Renaissance Hospital–Houston breached the administrative community standards as follows:

> The governing body and chief executive officer failed to carry out their fiduciary duties to the community by maliciously and negligently granting orthopedic surgery privileges to Dr. Baker, in light of his "well-documented history of malpractice and professional incompetence in performing similar procedures in recent years[,]" "well-documented history of drug addiction and mental problems[,]" and "history of loss of privileges at other hospitals."

According to Shorr, a prudent governing body and chief executive officer, "acting reasonably, would conclude based upon Dr. Baker's history that granting orthopedic surgery privileges to Dr. Baker would put the hospital's patients in harm's way, and would act to protect the hospital's patients by denying such privileges[,]" and Renaissance Hospital—Houston's failure "to prevent Dr. Baker from obtaining or maintaining orthopedic surgery privileges at Renaissance Hospital—Houston is evidence of its malicious acts."

In his supplemental report, Shorr stated that Baker's "checkered history" included being the subject of two well-publicized judicial opinions, in which it was noted that Baker was addicted to Vicodin, exhibited mood swings, and had a "significant malpractice history, including two wrong-limb surgeries and a retained sponge surgery." Shorr also noted that as of August 16, 2005, the state medical board had filed complaints concerning Baker's care of six patients. Shorr indicated that he had reviewed materials from the board of medical examiners concerning each of the six patients, and he opined that in all of the cases, "Dr. Baker's actions or omissions **\*583** fell below the standard of care." Shorr stated that the medical board documents indicate that Baker had a continuing pattern of poor surgical outcomes and numerous surgical and post-operative complications. Shorr explained as follows: "It is my understanding that at the time Dr. Webb referred Ms. Abshire to Dr. Baker in 2006, all of the above information, including the judicial opinions and more importantly the information from the medical board, were all available to the public and were easily accessible through the internet." Shorr opined that

> the Hospital negligently and maliciously breached the administrative community standards ... by credentialing Dr. Baker in the face of his well-documented history of malpractice and professional incompetence in performing similar procedures in recent years; his well-documented history of drug addiction and mental problems; and his well-documented history of loss of privileges at other hospitals.

Shorr explained that typical procedures used by hospitals to comply with the applicable standards for credentialing physicians include requiring an applicant for privileges to complete an extensive application that requests information concerning the applicant's malpractice history, whether the applicant has had privileges at other hospitals denied or suspended, and peer recommendations; verifying the information on the application by checking peer recommendations, reviewing licenses in other states, and contacting such agencies as the state board of medical examiners, state law enforcement agencies, and the drug enforcement agency; and consulting the National Practitioner Database. Shorr opined that if appellants had employed such

procedures, they would have discovered Baker's extensive malpractice history and the fact that other institutions had taken adverse actions against his privileges.

According to Shorr, appellants

> either failed to engage in a proper credentialing process in granting and/or renewing Dr. Baker's privileges, or chose to ignore the information gathered in such a process because a prudent governing body and chief executive officer, acting reasonably, would conclude, based on Dr. Baker's history, that granting orthopedic surgery privileges to Dr. Baker would put the hospital's patients in harm['s] way, and would act to protect the hospital's patients by denying such privileges. The failure of the governing body and chief executive officer to prevent Dr. Baker from obtaining or maintaining orthopedic surgery privileges at the Hospital is evidence of it[s] grossly negligent and malicious acts in that the Hospital either failed to follow any credentialing procedure at all, or if it did do any investigation, it knew of the extreme degree of risk Dr. Baker posed to its patients and credentialed him anyway. Either way, the Hospital's conduct involved an extreme degree of risk, considering the magnitude of potential harm of which the Hospital knew but nonetheless proceeded with conscious indifference to the safety and welfare of its patients.

> In other words, the Hospital breached numerous specified administrative community standards, and thus, the standard of care, in granting Dr. Baker privileges to practice medicine and orthopedic surgery at its facility.

Finally, Shorr explained that because he understood that the Renaissance entities have common ownership, are part of the same healthcare system, or are "involved in a joint enterprise for the provision of healthcare to patients such as Ms. Abshire[,]" his "criticisms of the Hospital administration **\*584** responsible for credentialing Dr. Baker at Renaissance Hospital—Houston, are directed to the remaining Renaissance entities as well since they all have related or common ownership and/or are all involved in a joint enterprise."

## STANDARD OF REVIEW AND PERTINENT LAW

 **[1]**    **[2]**    **[3]**    We review a trial court's decision regarding the adequacy of an expert report under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). "A trial court

abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). A trial court also abuses its discretion if it fails to analyze or apply the law correctly. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

A healthcare liability claimant must provide each defendant physician and healthcare provider with an expert report no later than the 120th day after the date of the filing of the original petition. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). The statute defines "expert report" as

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). If a plaintiff furnishes the required report within the time permitted, the defendant may file a motion challenging the adequacy of the report. *Id.* § 74.351(*l* ). Section 74.351(i) provides that a claimant may satisfy the requirements of section 74.351

> by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

*Id.* § 74.351(i).

 **[4]**    **[5]**    The statute provides that the trial court "shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does

not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." *Id.* § 74.351(*l* ). When determining whether the report represents a good-faith effort, the trial court's inquiry is limited to the four corners of the report. *Wright,* 79 S.W.3d at 53; *Palacios,* 46 S.W.3d at 878. To constitute a good-faith effort, the report "must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios,* 46 S.W.3d at 875. The expert report must set forth the applicable standard of care, how the standard was breached, and explain the causal relationship between the defendant's acts and the injury. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a), (r)(6); *Doades v. Syed,* 94 S.W.3d 664, 671–72 (Tex.App.-San Antonio 2002, no pet.); *Rittmer v. Garza,* 65 S.W.3d 718, 722–23 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

**\*585** **[6]** **[7]** **[8]** When a plaintiff sues more than one defendant, the expert report or reports must set forth the standard of care applicable to each defendant and explain the causal relationship between each defendant's individual acts and the injury. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a), (r)(6). An expert report need not marshal all of the plaintiff's proof; however, a report that omits any of the elements required by the statute does not constitute a good-faith effort. *Palacios,* 46 S.W.3d at 878–79. An expert "must explain the basis of his statements to link his conclusions to the facts." *Wright,* 79 S.W.3d at 52.

## THE ISSUES

In three issues, appellants assert that the trial court abused its discretion by overruling their objections, denying their motions to dismiss, and failing to sign an order awarding them their reasonable attorney's fees and court costs because appellees' expert reports do not constitute an objective, good-faith effort to comply with the requirements of section 74.351(r)(6) and *Palacios.* [4] *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6); *Palacios,* 46 S.W.3d at 875. We address appellants' issues together.

[4] Appellants' issues are identical, except that issue one refers to Houston Community Hospital, Inc. d/b/a Renaissance Hospital, issue two involves Renaissance Hospital, Inc., and issue three pertains to Renaissance Healthcare Systems, Inc.

Appellants make numerous arguments concerning the alleged inadequacy of the reports. With respect to the malicious credentialing claim, appellants contend that the peer review privilege immunizes them from suit. Appellants argue that the reports fail to identify malice "or a specific intent to harm Ms. Abshire, her heirs, or patients in general." Appellants also assert that the reports fail to provide a report as to each of the appellants due to "a lack of [a] direct relationship between Ms. Abshire and two of the three [a]ppellants." In addition, appellants maintain that the experts' reliance upon certain standards for healthcare entities is "misplaced[,]" and that the experts had not "read [a]ppellants' bylaws prior to forming their opinion[s]." Appellants also assert that the experts' opinions are speculative and conclusory,

> particularly when the experts offer no detail about: (1) when Dr. Baker was granted initial privileges at the Houston hospital; (2) when Dr. Baker applied for renewal of his privileges; (3) what Dr. Baker told the Houston hospital in his applications[;] and (4) what the Houston hospital knew about Dr. Baker from other sources and when that information was discovered.

Appellants also complain that the experts instead "focus on public information to glean Dr. Baker's history[.]"

With respect to the report authored by Simpson, appellants argue that because Simpson's involvement with hospital quality assurance committees ended in 1997, [5] the report does not establish that Simpson was qualified to offer an expert report concerning a cause of action that arose in 2006. With respect to the negligence causes of action, appellants contend that the reports of Simpson and Lobato fail to adequately address the following: duty, breach, and proximate cause; each appellant; and each of appellees' "twenty-two counts of negligence[.]" Appellants also complain that Shorr "is not a physician and thus lacks the statutory qualifications **\*586** to render opinion testimony on proximate causation...."

[5] The curriculum vitae attached to Simpson's report indicates that Simpson last served on a hospital quality assurance committee in 1997.

According to appellants, contrary to the reports, nurses are not required to diagnose medical conditions, prescribe corrective measures, or second-guess physicians' diagnoses, and appellants argue that the reports do not provide a

sufficient nexus between the nurses' alleged breaches and Abshire's cardiac arrest. Appellants maintain that the reports fail to address loss of chance, and that Texas law "does not permit recovery of damages for lost chance of survival or cure in medical negligence cases where the adverse result probably would have occurred anyway." In addition, appellants argue that the reports are based on assumption and speculation, and are conclusory. Furthermore, appellants argue that they "have denied being Dr. Webb's employer in their respective original answers[,]" and that they "are not liable for the acts of an independent contractor physician and the doctrine of *respondeat superior* does not apply."

 [9]     Appellants' argument that the peer review privilege immunizes them from suit should be addressed in a motion for summary judgment or at trial, rather than in a motion to dismiss under chapter 74 of the Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (Statute requires that expert report provide a fair summary of the expert's opinions regarding the applicable standards of care, how the care that was provided failed to meet the standards, and the causal relationship between the failure and the alleged injury.); *Palacios,* 46 S.W.3d at 875; *see generally Wissa v. Voosen,* 243 S.W.3d 165, 169–70 (Tex.App.-San Antonio 2007, pet. denied) (Scope of physician's legal duty to patient was proper inquiry for summary judgment or trial, but "is simply not a determination contemplated or required under the statutory language of Chapter 74.").

Likewise, appellants' argument that *respondeat superior* does not apply because their answer denied that they were Webb's employer, as well as their argument that the experts improperly relied upon certain standards for healthcare entities and did not read appellants' bylaws, should be addressed at summary judgment or trial. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6); *Palacios,* 46 S.W.3d at 875; *Methodist Hosp. v. Shepherd–Sherman,* 296 S.W.3d 193, 199 n. 2 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (Whether the experts' conclusions are correct is an issue for either trial or summary judgment.); *Wissa,* 243 S.W.3d at 169–70.

In addition, appellants' argument that the expert reports state an inappropriate standard of care for the nurses (*i.e.,* that the nurses diagnose medical conditions, prescribe corrective measures, and second-guess physicians' diagnoses) should also be the subject of a motion for summary judgment or an issue at trial, not a motion to dismiss concerning the sufficiency of the expert reports. *See Shepherd–Sherman,* 296 S.W.3d at 199 n. 2. Furthermore, we note that Lobato's

supplemental report clarifies that nurses are not required to practice medicine or to prescribe treatments, but that the standard of care for PACU nurses does require them to recognize the signs and symptoms of hypovolemia, and Lobato explains that the expansion of Abshire's abdomen would have been physically visible because of the volume of blood that was present.

 [10]     [11]     With respect to appellants' argument that the reports are inadequate as to each of the appellants because of the lack of a direct relationship between Abshire and two of the three appellants, we note that the expert reports provided by Lobato, Simpson, and Shorr clearly explain  **\*587**  that their opinions concerning the entities other than Renaissance Hospital—Houston are based upon the understanding that those entities share common ownership and are involved in a joint enterprise for the provision of healthcare services. "The theory of joint enterprise imputes liability to one who, although he did no wrong, is so closely connected to the wrongdoer that it justifies the imposition of vicarious liability." *David L. Smith & Assocs., L.L.P. v. Stealth Detection, Inc.,* 327 S.W.3d 873, 878 (Tex.App.-Dallas 2010, no pet.); *see also St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 517 (Tex.2002) (noting that joint enterprise is a theory of vicarious liability). When a petition asserts theories of liability that are purely vicarious, the conduct being called into question involves legal principles, and is not measured by a medical standard of care, since hospital entities cannot practice medicine. *See Gardner v. U.S. Imaging, Inc.,* 274 S.W.3d 669, 671–72 (Tex.2008). Therefore, a report that adequately implicates the actions of the entity's agents or employees is sufficient. *Id.; Univ. of Tex. Sw. Med. Ctr. v. Dale,* 188 S.W.3d 877, 879 (Tex.App.-Dallas 2006, no pet.); *In re CHCA Conroe, L.P.,* No. 09–04–453 CV, 2004 WL 2671863, at \*1 (Tex.App.-Beaumont Nov. 23, 2004) (orig. proceeding) (mem. op.).

Appellants cite no authorities supporting their contention that the experts' reliance upon information about Baker that was available in the public domain was improper. *See* Tex.R.App. P. 38.1(i) (An appellant's brief must contain appropriate citations to authorities.). In addition, appellants cite no authorities that hold that a report on a malicious credentialing claim is insufficient if the expert does not state that he has read the hospital's bylaws, and if the report does not discuss specifics concerning when the physician's privileges were granted and renewed, what the physician disclosed in his application, and when information from other sources was discovered.

Furthermore, although appellants cite section 74.351(a) of the Texas Civil Practice and Remedies Code, *Palacios,* and this Court's decision in *Beaumont Bone & Joint Institute, P.A. v. Slaughter,* those authorities do not stand for the proposition for which appellants cite them. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a); *Palacios,* 46 S.W.3d at 875; *Beaumont Bone & Joint Institute, P.A. v. Slaughter,* No. 09–09–00316–CV, 2010 WL 730152, at *4 (Tex.App.-Beaumont Mar. 4, 2010, pet. denied) (mem. op.).

 [12]    Section 74.351(a) requires that a claimant must serve an expert report as to each healthcare provider against whom a "liability claim" is asserted. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). *Palacios* holds that the expert report must discuss "the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios,* 46 S.W.3d at 875. Neither section 74.351(a) nor *Palacios* stands for the proposition that each specific factual allegation of negligence must be discussed in an expert report. *See id.* In *Slaughter,* this Court discussed four particular allegations in the plaintiff's petition, which we explained all constituted direct negligence claims, and held that a report was insufficient because it failed to adequately address the direct negligence claims. *Slaughter,* 2010 WL 730152, at *4. *Slaughter* does not stand for the proposition that an expert report must discuss each factual allegation of an act of negligence enumerated in a plaintiff's petition. Rather, *Slaughter* holds that the report **\*588** must address each type of negligence claim. *See id.* The twenty-two allegations in appellees' petition pertain to each of their general categories of claims: negligence, malicious credentialing, and gross negligence on the part of appellants, as well as Dr. Webb (for whose conduct appellees allege appellants are vicariously liable). Appellants' argument is an overly broad reading of the term "claim," and we decline to adopt that interpretation here. The reports, when considered together, adequately address each type of claim asserted by appellees.

With respect to appellants' argument concerning the reports' failure to address "loss of chance," we note that this is not a case in which the patient was already suffering from the injury or illness which ultimately led to her death. *See Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 398, 400 (Tex.1993) (In case involving failure to accurately diagnose a patient's cancer, the Supreme Court held that Texas law does not recognize a cause of action for loss of chance

of survival when the adverse result would probably have "occurred anyway."). The reports by Lobato, Simpson, and Miller clearly explain that Baker caused Abshire's death when he transected her right iliac artery while performing a laminectomy and diskectomy, and failed to realize that he had done so; that is, the reports explain that if a competent physician had performed Abshire's surgery, her right iliac artery would, in reasonable medical probability, not have been transected, and she would not have died. The reports also clearly explain that if Webb had not referred Abshire to Baker, Baker would not have performed surgery on Abshire.

 [13]    We now turn to appellants' arguments that Simpson was not qualified to offer an expert report concerning a cause of action that arose in 2006 because his involvement with hospital quality assurance committees ended in 1997, and that Shorr was unqualified to render an opinion concerning proximate causation because he is not a physician. Appellants cite the general statutory requirements for qualifications of an expert witness. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 74.402(b)(1), 74.403(a) (West 2011). Section 74.402(b)(1) provides as follows:

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, *if the defendant health care provider is an individual,* at the time the testimony is given or was practicing that type of health care at the time the claim arose[.]

Tex. Civ. Prac. & Rem.Code Ann. § 74.402(b)(1) (emphasis added). By its express terms, section 74.402(b)(1) does not apply in this case, since appellants (the health care providers in question) are not individuals.

Section 74.403(a) states that a person may qualify as an expert witness regarding the causal relationship between the alleged departure from the standard of care and the injury only if the person is a physician and "is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." *Id.* § 74.403(a). Simpson's report and curriculum vitae clearly establish that Simpson is a physician, and appellants do not contend that Simpson does not qualify as an expert under the Texas Rules of Evidence; therefore, we reject appellants' argument **\*589** that Simpson's lack of

involvement in hospital quality assurance committees since 1997 renders him unable to qualify as an expert witness. Shorr is not a physician, and his report does not purport to offer an opinion concerning causation. Therefore, we also reject appellants' argument concerning Shorr's qualifications. *See id.* § 74.403(a).

 **[14]**   We now turn to appellants' contentions that the expert reports are speculative and conclusory; fail to adequately address the standard of care, breach, and proximate cause; and fail to identify malice. Lobato explained that the standard of care required physicians and nursing personnel to recognize the signs of hemorrhage, and that if the nurses had promptly recognized Abshire's symptoms, summoned a physician to Abshire's bedside, and instituted the chain of command, Abshire would "more likely than not ... have been appropriately treated and her life saved." Lobato stated that the nurses' actions were, "in reasonable medical probability[,] the proximate cause of Ms. Abshire's death[,]" and that Abshire's death would have been prevented if the standard of care had been followed.

In his report, Simpson explained that the complaints filed by the TBME concerning Baker were publicly available, and Baker had a reputation for incompetence and drug use. Simpson explained that the standard of care required Webb to have a basic knowledge of the skills and professional reputation of the physician to whom he referred Abshire, and to refrain from sending Abshire to a physician with a documented history of drug use, malpractice, and repeated complaints by the TBME. Additionally, Simpson explained that Webb's referral of Abshire to Baker directly caused Baker to perform surgery on Abshire, and that if Baker had not been Abshire's surgeon, her artery would not have been transected, gone undiscovered, and led to Abshire's death. Moreover, Simpson stated that because Webb's employer was owned and operated by the various Renaissance entities, Webb was an employee of the Renaissance entities, and the Renaissance entities were responsible for Webb's conduct.

Simpson indicated that appellants had a duty to follow JCAH standards in credentialing physicians, and that if they had denied or revoked Baker's surgical credentials, in all reasonable medical probability, a competent surgeon would have operated on Abshire, Abshire's artery would not have been severed, and Abshire would not have died. Simpson also opined that all of the Renaissance entities were responsible for credentialing Baker because the entities had common ownership or were involved in a joint enterprise. According to

Simpson, the nurses breached the standard of care by failing to (1) recognize hypovolemia, (2) demand more aggressive fluid resuscitation, (3) demand the continuous presence of a physician at Abshire's bedside, and (4) institute the chain of command. Simpson's report also explained that if the PACU nurses had followed the standard of care, a physician would have realized that Abshire was hemorrhaging, provided appropriate treatment, and saved Abshire's life.

Miller explained in his report that the standard of care required Webb to use reasonable medical judgment to refer Abshire to a competent physician. According to Miller, Webb should have known of Baker's history through the TBME newsletter, information on the TBME website about complaints concerning Baker, the published court cases involving malpractice by Baker, and Baker's loss of privileges at two hospitals. Miller opined that Webb breached the standard of care by referring Abshire to Baker because Webb failed to **\*590** ascertain Baker's qualifications, and that if Webb had not referred Abshire to Baker, Abshire "would not have undergone surgery by ... Baker, would not have had her iliac artery mistakenly and negligently severed during surgery, and would not have died." Because Miller understood that appellants owned Beaumont Spine, where Webb practiced medicine, Miller incorporated his criticisms of Webb into those directed against appellants.

In his report, Shorr explained that the standards applicable to Renaissance Hospital require that before granting privileges, the hospital must evaluate challenges to the applicant's licensure, any relinquishment of the license, termination of medical staff membership, limitation, reduction, or loss of clinical privileges, evidence of an excessive number of liability actions, and health status; must compare practitioner-specific data to aggregate data; and must review morbidity and mortality data. Shorr also explained that when an applicant's privileges are renewed, his ability to perform the requested privileges must be evaluated. Additionally, Shorr stated that a hospital must have a governing body that is responsible for appointing medical staff, and the governing body must examine an applicant's individual character, competence, training, experience, and judgment. Shorr opined that appellants breached the applicable standards by maliciously and negligently credentialing Baker despite his well-documented history of malpractice, drug addiction, mental problems, and loss of privileges at other hospitals. Shorr explained that if appellants had employed the required procedures, they would have discovered Baker's malpractice history and his loss of privileges at other institutions. Shorr

stated that appellants breached the standard of care because they either failed to engage in a proper credentialing process in granting or renewing Baker's privileges, or ignored the information they gathered. Shorr opined that appellants' failure "to prevent Dr. Baker from obtaining or maintaining orthopedic surgery privileges at the Hospital is evidence of it[s] grossly negligent and malicious acts in that the Hospital either failed to follow any credentialing procedure at all, or if it did do any investigation, it knew of the extreme degree of risk Dr. Baker posed to its patients and credentialed him anyway." Finally, like the other experts, Shorr explained that his criticisms of the hospital were imputed to the other appellants because they shared common ownership or were involved in a joint enterprise.

Reviewing the expert reports together, we conclude that the reports discuss the standards of care, breach, and causation with sufficient specificity as to each of the appellants to inform appellants of the conduct appellees have called into question and to provide a basis for the trial court to conclude that the claims have merit. *See Palacios,* 46 S.W.3d at 875; *see also Doades,* 94 S.W.3d at 671–72; *Rittmer,* 65 S.W.3d at 722–23; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(i). Accordingly, we overrule appellants' issues and affirm the trial court's judgment.

AFFIRMED.

**All Citations**

343 S.W.3d 571

**End of Document**                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

323 S.W.3d 527
Court of Appeals of Texas,
Waco.

Ana Maria Gonzalez SALAIS, Individually
and as Representative of the Estate of
Ruben Gonzalez, Deceased, Appellants,
v.
TEXAS DEPARTMENT OF AGING
& DISABILITY SERVICES, Appellee.

No. 10−09−00155−CV.    |    Aug. 4, 2010.

**Synopsis**
**Background:** Mother of patient who died at a Texas Department of Aging and Disability Services (TDADS) facility brought a health-care liability action against TDADS. The 77th District Court, Limestone County, Deborah Oakes Evans, J., granted motion to dismiss by TDADS, and mother appealed.

**Holdings:** The Court of Appeals, Rex D. Davis, J., held that:

[1] paramedic was qualified to provide an expert opinion on the accepted standard of care in restraining patients;

[2] paramedic's expert report represented a good-faith effort to comply with the expert report statute;

[3] physician's expert report did not establish he was qualified to provide an opinion on the cause of patient's death; but

[4] expert reports of paramedic and physician together constituted a good-faith effort to provide a fair summary of the cause of patient's death; and

[5] case would be remanded so that trial court could exercise its discretion regarding mother's request for an extension to cure technical deficiency in physician's report.

Reversed.

Tom Gray, C.J., dissented and filed opinion.

West Headnotes (17)

[1]    **Appeal and Error**
       ☛ Rulings on Motions Relating to Pleadings
       A trial court's decision to dismiss a health-care liability claim under the expert report statute is reviewed by the abuse-of-discretion standard. V.T.C.A., Civil Practice & Remedies Code § 74.351.

       Cases that cite this headnote

[2]    **Appeal and Error**
       ☛ Competency of witness
       A trial court's decision on whether a person is qualified to offer an expert opinion in a health-care liability claim is reviewed under the abuse-of-discretion standard. V.T.C.A., Civil Practice & Remedies Code § 74.351.

       1 Cases that cite this headnote

[3]    **Appeal and Error**
       ☛ Nature and Extent of Discretionary Power
       A trial court has no discretion in determining what the law is or applying the law to the facts.

       Cases that cite this headnote

[4]    **Appeal and Error**
       ☛ Abuse of discretion
       A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion.

       Cases that cite this headnote

[5]    **Evidence**
       ☛ Due care and proper conduct in general
       Paramedic, who provided opinion for mother of developmentally disabled patient who died after being physically retrained by healthcare staff at Texas Department of Aging and Disability Services (TDADS) facility, was qualified to offer an expert opinion on the accepted standards

of care in mother's health-care liability action against TDADS, where, based on mother's allegations, the type of care or treatment and the condition involved was the use of physical restraint and a restraint board on a combative person, and paramedic was a certified practitioner familiar with the standard of care in restraining combative persons and instructed others on such standard of care. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[6]    Health**
　 Affidavits of merit or meritorious defense; expert affidavits

When considering a motion to dismiss under the expert report statute for health-care liability claims, the issue is whether the report represents a good-faith effort to comply with the statutory definition of an expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

**[7]    Health**
　 Affidavits of merit or meritorious defense; expert affidavits

In determining whether a report represents a good-faith effort to comply with the expert report statute for health-care liability claims, the inquiry is limited to the four corners of the report. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

**[8]    Health**
　 Affidavits of merit or meritorious defense; expert affidavits

An expert report need only represent a good-faith effort to provide a fair summary of the expert's opinions, in order to comply with the expert report statute for health-care liability claims; the report does not have to marshal all of the plaintiff's proof and the plaintiff need not present evidence in the report as if it were actually litigating the merits, and, instead, to comply with

the statute the report must address the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff calls into question and to provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

**[9]    Health**
　 Affidavits of merit or meritorious defense; expert affidavits

Paramedic's expert report, provided on behalf of mother of developmentally disabled patient in health-care liability action brought against Texas Department of Aging and Disability Services (TDADS) after patient died while being physically restrained by TDADS facility, represented a good-faith effort to comply with the expert report statute for health-care liability claims, where report noted that paramedic had been qualified as an expert in restraint asphyxia, stated he was familiar with the standard of care for restraining combative persons, stated what steps should be taken to monitor for respiratory distress, and stated that had any of the restrainers prevented the application of the restraint board it was more likely than not that the patient would not have suffered from restraint asphyxia. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[10]    Health**
　 Affidavits of merit or meritorious defense; expert affidavits

Expert reports can be considered together in determining whether the plaintiff in a health care liability action has provided adequate expert opinion regarding the standard of care, breach, and causation. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

**[11]    Health**

☞ Affidavits of merit or meritorious defense; expert affidavits

A physician's report on causation should not be read in isolation, for purposes of the expert report statute for health-care liability claims. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

[12] **Health**
☞ Affidavits of merit or meritorious defense; expert affidavits

The qualifications of an expert must appear in the report itself and cannot be inferred, for purposes of the expert report statute for health-care liability claims. V.T.C.A., Civil Practice & Remedies Code § 74.351.

3 Cases that cite this headnote

[13] **Health**
☞ Affidavits of merit or meritorious defense; expert affidavits

Expert report of physician did not establish that he was qualified to opine on the causal relationship of employees' conduct and patient's death, as required in order for the report to satisfy the expert report statute for health-care liability claims in health care liability action mother of developmentally disabled patient brought against Texas Department of Aging and Disability Services (TDADS) after patient died while being restrained by health care workers at TDADS facility, where physician's curriculum vitae (CV) only disclosed that he was practicing in the field of emergency medicine, and in the past held positions as an emergency medicine physician and a general and trauma surgeon. V.T.C.A., Civil Practice & Remedies Code § 74.351.

3 Cases that cite this headnote

[14] **Health**
☞ Affidavits of merit or meritorious defense; expert affidavits

Merely being a physician is insufficient to qualify as a medical expert under the expert

report statute for health-care liability claims. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

[15] **Health**
☞ Affidavits of merit or meritorious defense; expert affidavits

Expert reports of paramedic and emergency medicine physician, in health care liability action mother of developmentally disabled patient brought against Texas Department of Aging and Disability Services (TDADS) after patient died while being physically restrained by TDADS employees, together constituted a good-faith effort to provide a fair summary of the causal relationship between employees' conduct and patient's death by restraint asphyxia as required by the expert report statute for health-care liability claims, though physician's report did not show that he was qualified to give an expert opinion on causation, as the reports provided enough information linking the breach of the standard of care to the death. V.T.C.A., Civil Practice & Remedies Code § 74.351.

1 Cases that cite this headnote

[16] **Judgment**
☞ Necessity for entry
**Motions**
☞ Entry or Filing of Orders

Any order or judgment, to be effective, must be entered of record.

1 Cases that cite this headnote

[17] **Appeal and Error**
☞ Ordering New Trial, and Directing Further Proceedings in Lower Court

Health care liability action, brought by mother of developmentally disabled patient against Texas Department of Aging and Disability Services (TDADS) after patient died while being physically restrained by TDADS employees, would be remanded by Court of Appeals to the trial court so that the trial court could exercise

its discretion under the expert report statute regarding whether mother should be granted an extension to cure technical deficiency in physician's report, i.e., report did not set forth his qualifications to give an expert opinion on causation, as only the docket sheet indicated that mother's motion for an extension was denied, but docket-sheet entries were not "of-record" rulings. V.T.C.A., Civil Practice & Remedies Code § 74.351(c).

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*530** R. Keith Weber, Woodfill & Pressler LLP, Houston, for Appellants.

John P. Giberson, Atty. General's Office, Tort Litigation Division, Austin, Neal E. Pirkle, Naman, Howell, Smith & Lee LLP, Waco, for Appellee.

Before Chief Justice GRAY, Justice REYNA, and Justice DAVIS.

**OPINION**

REX D. DAVIS, Justice.

Ana Maria Gonzalez Salais appeals the trial court's order dismissing her health-care liability claim against the Texas Department of Aging and Disability Services (TDADS).

Salais's live petition alleges that her son Ruben Gonzalez was a patient at the Mexia State School, a TDADS facility, because of his developmental disability. Late one evening (after midnight), Ruben had refused to go to bed and was then physically restrained by Sheri Thornton and Charles Korn, two TDADS employees. After Joel Thomas, a third employee, arrived, they placed Ruben on a restraint board. Sue Sanderson, a TDADS nurse, was called to the scene and found Ruben pale with no pulse or blood pressure. Sanderson was unable to resuscitate Ruben. An automated external defibrillator (AED) was employed, but it was not used to shock Ruben. Paramedics arrived and their monitor showed a flat line and no cardiac rhythm. Ruben was taken to a hospital, where he was pronounced dead.

Salais also pleads:

In the Prevention & Management of Aggressive Behavior Course Synopsis allegedly provided by Defendant Mexia [State School] to its employees, employees are warned that "[e]xtreme care must be exercised during any horizontal restraint to insure that the person's ability to breathe is not restricted.... [D]uring all horizontal restraints, the person must remain in a side-lying position and monitored continuously. Failure to do so may risk serious injury and death from positional asphyxia, [which] occurs when there is insufficient intake of oxygen as a result of body positioning that interferes with one's ability to breathe." [Ellipsis and brackets in original].

She further pleads that the "Mexia State School Annual Retraining Course Synopsis," allegedly provided to every participant, gives the same warning and also provides "that the person who is restraining the lower body has an important role in monitoring breathing, circulation, and general condition of the restrained individual, and in assisting in maintaining the restrained individual in a side-lying position."

 **\*531** In her health-care liability cause of action, Salais alleges that TDADS [Mexia State School] and TDADS employees Korn, Thornton, and Thomas were negligent in the care and treatment of Ruben in each of the following ways:

1. Failure to recognize and/or appreciate the risk factors for the potential occurrence of death when performing a physical restraint;

2. Misuse of the restraints and restraint board when performing a physical restraint;

3. Failure to anticipate the risk of traumatic asphyxia when performing a physical restraint;

4. Failure to plan the physical restraint according to the increased risk for serious injury to Decedent;

5. Inappropriate management of the complication of performing a physical restraint;

6. Failure to have the requisite knowledge regarding appropriate responses to a combative physical restraint;

7. Failure to perform the appropriate interventions during the physical restraint of Decedent once health complications were encountered;

8. Failure to provide proper education and training to employees who were called upon to assist in the restraint of Decedent.

Section 74.351 of the Civil Practices and Remedies Code provides that within 120 days of filing suit, a claimant must serve a curriculum vitae (CV) and one or more expert reports regarding every defendant against whom a health care claim is asserted. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp. 2009). Salais provided two expert reports. One report was by James Wohlers, a paramedic, which addresses the standard of care and breach elements relating to the use of the restraint board and the AED. The other report, of Donald Winston, M.D., addresses the causation element.

TDADS objected to the reports and moved to dismiss Salais's health-care liability claim under section 74.351. *See id.* The motion asserted that Salais's experts were not qualified and that their reports were inadequate. The trial court granted TDADS's motion to dismiss without stating any grounds. In her first issue, Salais argues that the trial court erred in granting TDADS's motion to dismiss.

 **[1]** **[2]** **[3]** **[4]** We review the trial court's decision to dismiss a health-care liability claim by the abuse-of-discretion standard. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). Also, a trial court's decision on whether a person is qualified to offer an expert opinion in a health-care liability claim is reviewed under the abuse-of-discretion standard. *Moore v. Gatica,* 269 S.W.3d 134, 139 (Tex.App.-Fort Worth 2008, pet. denied). "However, a trial court has no discretion in determining what the law is or applying the law to the facts. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*" *Austin Heart, P.A. v. Webb,* 228 S.W.3d 276, 279–80 (Tex.App.-Austin 2007, no pet.); *see also Methodist Hosp. v. Shepherd–Sherman,* 296 S.W.3d 193, 197 (Tex.App.-Houston [14th Dist.] 2009, no pet.) ("Though we may not substitute our judgment for that of the trial court, the trial court has no discretion in determining what the law is or applying the law to the facts.").

### Wohlers Report

*Qualifications*

TDADS's motion to dismiss and brief assert that Wohlers's report and CV do **\*532** not establish his qualifications to testify about the standards of care applicable to the Mexia State School healthcare staff or to the treatment for individuals with behavioral, mental, and developmental disabilities. Its brief also asserts that Wohlers's report does not show that the "management and care" of Ruben on the occasion in question is "something universally done."

Regarding his qualifications, Wohlers's report states:

> I received my paramedic education from Creighton University in 1992. Initially I was a paramedic in Omaha, Nebraska from 1992 to 1996, then a paramedic for the City and County of Denver from 1996 until 2000. Since 2000, I have been with the Grand Island Fire Department in Grand Island, Nebraska as a paramedic/firefighter. I have also been involved in restraint asphyxia education since 2006. I teach to EMS, Law Enforcement and persons involved in the restraining of combative persons. I have been qualified as an expert in the field of restraint asphyxia.

Wohlers's CV restates the above history and notes his certification as an EMS instructor and that he specializes in "restraint-related issues" and instructs on Advanced Life Support and Basic Life Support topics. His report further states:

> I am familiar with the standard of care for restraining a combative person and understand what steps should be taken to monitor for respiratory distress. Through my education, background and experience, I am knowledgeable in the standard of care that the staff of Mexia State School should have provided to Mr. Gonzales on the night he died.

On the issue of Wohlers's qualifications, we turn to the applicable statute, section 74.402, which provides in pertinent part:

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b, c) (Vernon 2005).

 **[5]**    We disagree that Wohlers was required to be qualified in general as an expert about the standards of care applicable to the Mexia State School healthcare staff for the care and treatment for individuals **\*533** with behavioral, mental, and developmental disabilities. Rather, under the literal language of subsections 74.402(b)(1, 2), Wohlers is only required to be practicing health care in a field of practice that involves *the same type of care or treatment* as that delivered by the defendant health care provider and have knowledge of the accepted standards of care for health care providers for *the care or treatment of the condition involved in the claim. See id.* § 74.402(b)(1, 2); *see, e.g., Group v. Vicento,* 164 S.W.3d 724, 730–31 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). Based on Salais's allegations and the information

in Wohlers's report, the type of care or treatment and the condition involved is the use of physical restraint and a restraint board on a combative person. Wohlers's report and CV show that he is a certified practitioner and instructor in health care services relevant to the health-care liability claim in this case; he has been a paramedic since 1992 and has been instructing on restraint asphyxia since 2006, including teaching persons involved in the restraining of combative persons. His report states that he is familiar with the standard of care for restraining a combative person and is knowledgeable of the standard of care that the staff of Mexia State School should have provided to Ruben on the night he died with respect to the use of physical restraint and a restraint board.

Under the applicable criteria in section 74.402(b), Wohlers's report and CV demonstrate that he is qualified to offer an expert opinion on the accepted standards of care for this type of care or treatment by TDADS healthcare staff of combative persons. To the extent the trial court concluded otherwise, the trial court abused its discretion.

*Adequacy*

TDADS's motion to dismiss asserted that Wohlers's report is inadequate because it does not articulate the relevant standard of care and/or the bases for the relevant standards of care applicable to TDADS and it does not specifically state the manner in which TDADS breached the applicable standard of care.

 **[6]**    When considering a motion to dismiss under subsection 74.351(b), the issue is whether the report represents a good-faith effort to comply with the statutory definition of an expert report. *See Bowie Mem. Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002); *Palacios,* 46 S.W.3d at 878. An "expert report" is "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

 **[7]**   **[8]**    In determining whether the report represents a good-faith effort, the inquiry is limited to the four corners of the report. *Palacios,* 46 S.W.3d at 878. The report need only represent a good-faith effort to provide a fair summary of the expert's opinions. *Id.* The report does not have to marshal all of the plaintiff's proof and the plaintiff need not present

evidence in the report as if it were actually litigating the merits. *Id.* at 879. Rather, to constitute a good-faith effort, the report must address the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff calls into question and to provide a basis for the trial court to conclude that the claims have merit. *Id.* at 875.

**[9]** The Wohlers report notes that he has been qualified as an expert in restraint **\*534** asphyxia. It cites an investigative report that he reviewed and details the course of events and the conduct of three employees (Thomas, Korn, and Thornton) in placing Ruben on a restraint board and, according to Thomas, using a restraint strap across his diaphragm, after which Ruben "was breathing hard, in gasps, and making gurgling sounds." According to Korn, a restraint strap was across Ruben's chest, and Korn observed only a "slight rise" in his chest; Ruben had a weak pulse. Thornton observed Ruben on the restraint board and thought he was asleep, but he looked "funny" and was breathing shallow. Nurse Sanderson arrived, and after finding Ruben's color to be abnormally pale, no blood pressure, and no pulse, she initiated CPR and attempted to use an AED. Mexia Fire/EMS then arrived, took over CPR, and did an endotracheal intubation before transferring Ruben to Parkview Regional Hospital, where he was pronounced dead. Wohlers states:

> I am familiar with the standard of care for restraining a combative person and understand what steps should be taken to monitor for respiratory distress. Through my education, background and experience, I am knowledgeable in the standard of care that the staff of Mexia State School should have provided to Mr. Gonzalez on the night he died.

> The standard of care requires that if any one of the persons involved in the restraining of Mr. Gonzalez had recognized that he was in respiratory distress, he should not have been placed on a restraint board and had straps placed across his chest. Had anyone of the restrainers prevented the application of the restraint board, it is more likely than not that Mr. Gonzalez would not have suffered restraint asphyxia. No one intervened in the application of the restraint board.

Wohlers's report sets forth his familiarity with the standard of care and the basis therefor, what the standard of care is, and how the TDADS staff breached it on the occasion in question. The report addresses the standard of care and breach with sufficient specificity to inform TDADS of the

conduct that Salais calls into question and provides a basis for the trial court to conclude that the claims have merit. *See Palacios,* 46 S.W.3d at 875. It informs TDADS "what care was expected but not given." *Fagadau v. Wenkstern,* 311 S.W.3d 132, 138 (Tex.App.-Dallas 2010, no pet. h.) (citing *Palacios,* 46 S.W.3d at 880). To the extent the trial court concluded otherwise, the trial court abused its discretion.

### Dr. Winston Report

**[10]** **[11]** Section 74.351(i) permits a claimant to satisfy any requirement of section 74.351 for serving an expert report by serving reports of separate experts. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(i); *see Packard v. Guerra,* 252 S.W.3d 511, 527 (Tex.App.-Houston [14th Dist.] 2008, pet. denied). Expert reports can be considered together in determining whether the plaintiff in a health–care liability action has provided adequate expert opinion regarding the standard of care, breach, and causation. *See Walgreen Co. v. Hieger,* 243 S.W.3d 183, 186 n. 2 (Tex.App.-Houston [14th Dist.] 2007, pet. denied); *Martin v. Abilene Regional Med. Center,* No. 11–04–00303–CV, 2006 WL 241509, at \*4–5 (Tex.App.-Eastland Feb. 2, 2006, no pet.) (mem. op.). A physician's report on causation should not be read in isolation. *See Martin,* 2006 WL 241509, at \*4; *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(C) (providing that only a physician can be an expert giving opinion testimony on causal relationship).

**\*535** *Qualifications*

TDADS's motion to dismiss and brief assert that Dr. Winston's report and CV do not establish his qualifications to testify about causation. Its brief first asserts that there is no showing that Dr. Winston is a licensed physician. "Expert" means, "with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5) (C) (Vernon Supp. 2009); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 74.403(a) (Vernon 2005).

Dr. Winston's report is in a letter format, and his letterhead and typed signature block identify him as "Donald Winston, MD." His letterhead also reveals his website

(www.urbansurgeon.com) and his email address at that website. Furthermore, his December 2008 CV reflects that he is a licensed Texas physician (No. F0832, licensed in February 1978 and expiring May 31, 2010). TDADS's assertion that there is no showing that Dr. Winston is a licensed physician is incorrect.

Dr. Winston's report is a letter to Salais's attorney and states in its entirety:

> At your request, I have reviewed an autopsy report and death certificate of Ruben Gonzales, a 15 year old Hispanic male who apparently was a student at the Mexia State School.
>
> I have no way of knowing exactly what took place on or about January 15, 2007, but I have reviewed a Third Amended Petition in Cause 28901A which states that three employees of Mexia State School physically restrained Mr. Gonzales. After a period of time, a nurse at the hospital found Mr. Gonzales dead. Resuscitation failed, and after endotrachial [sic] intubation by Mexia Fire Department EMS, he was taken to Parkview Regional Hospital where he was pronounced dead.
>
> My focus is on the Autopsy report in Case No. JP0187–07–0120ACG done January 16th 2007.
>
> I agree with the physical findings of:
>
> 1. Petechiae in the right and left conjunctivae
>
> 2. Contusions to the right arm and left leg
>
> 3. Subcutaneous hemorrhage on the upper back and lower back
>
> 4. Two subgaleal hemorrhages
>
> 5. Abrasions and contusions on face and arms
>
> 6. Mechanical asphyxia
>
> I disagree with the final opinion of the nine pathologists to the extent that there is evidence that Mr. Gonzales in any way contributed to his own death, but I agree that his death was a homicide caused by restraint and mechanical asphyxia imposed on him by the three Mexia State School employees.
>
> If you have any other questions, please feel free to contact me. [1]

1   To the extent that Salais has asserted a health-care liability claim based on alleged misuse of the AED (it is in the Wohlers report, but it is not pleaded by Salais), there is "no report" at all as to causation, and the trial court properly dismissed that part of the health-care liability claim. *See Benson v. Vernon,* 303 S.W.3d 755, 760–61 (Tex.App.-Waco 2009, no pet.).

**[12]** **[13]** **[14]** TDADS is correct that Dr. Winston's *report* fails to show how he is qualified to render an expert opinion on causation in this case. Rule 702 of the Texas Rules of Evidence requires that an **\*536** expert be qualified by "knowledge, skill, experience, training, or education." TEX.R. EVID. 702. The qualifications of an expert must appear in the report itself and cannot be inferred. *See Benson v. Hall,* No. 10–09–00284–CV, 2010 WL 376957, at *1 (Tex.App.-Waco Feb. 3, 2010, no pet. h.); *Estorque v. Schafer,* 302 S.W.3d 19, 26 (Tex.App.-Fort Worth 2009, no pet.); *Philipp v. McCreedy,* 298 S.W.3d 682, 686 (Tex.App.-San Antonio 2009, no pet.); *Baylor College of Medicine v. Pokluda,* 283 S.W.3d 110, 117 (Tex.App.-Houston [14th Dist.] 2009, no pet.); *Hansen v. Starr,* 123 S.W.3d 13, 19 (Tex.App.-Dallas 2003, pet. denied). Dr. Winston's report does not set forth his qualifications at all. His CV reflects that he is currently practicing in the field of emergency medicine in Houston and has held several positions as an emergency medicine physician and a general and trauma surgeon. Aside from their not being in the report itself, these position descriptions alone are inadequate to show how Dr. Winston is qualified to opine on the causal relationship of Ruben's death. Merely being a physician is insufficient to qualify as a medical expert. *See Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996); *Hagedorn v. Tisdale,* 73 S.W.3d 341, 350 (Tex.App.-Amarillo 2002, no pet.).

Because there is no showing in Dr. Winston's report that he is qualified to give an expert opinion on causation, to the extent the trial court granted the motion to dismiss on this basis, it did not abuse its discretion. We overrule Salais's first issue.

### Adequacy

**[15]** Because of our disposition of the second issue, we must address TDADS's challenge to the adequacy of Dr. Winston's report in its motion to dismiss. On the adequacy of Dr. Winston's report, we are precluded "from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Austin Heart,* 228 S.W.3d at 279. But here, there is no gap, and there is no guessing, that Dr.

Winston's opinion on the cause of Ruben's death—"restraint and mechanical asphyxia imposed on him by the three Mexia State School employees"—*is the same conduct* referred to in the Wohlers report as being the three Mexia State School employees' breach of the standard of care in restraining a person in respiratory distress.

When the reports are read together, as they must be in this case, they satisfy the causal-relationship requirement because they constitute a good-faith effort to provide a fair summary of the causal relationship between the employees' conduct and Ruben's death by restraint asphyxia. *See Martin,* 2006 WL 241509, at *5. Read together, they provide "enough information linking the defendant's breach of the standard of care to the plaintiff's injury." *Baker v. Gomez,* 276 S.W.3d 1, 8 (Tex.App.-El Paso 2008, pet. denied). And because Dr. Winston's report does link the employees' conduct with Gonzalez's death, TDADS's reliance on *Bogar v. Esparza* and *Shaw v. BMW Healthcare, Inc.* is misplaced, as those cases are distinguishable on that basis. *Cf. Bogar v. Esparza,* 257 S.W.3d 354, 364 (Tex.App.-Austin 2008, no pet.) ("In essence, Dr. Adame's report is a second autopsy report, opining about the cause of Ms. Guerrero's death *without explaining who caused it or how.*") (emphasis added); *Shaw v. BMW Healthcare, Inc.,* 100 S.W.3d 8, 12–13 (Tex.App.-Tyler 2002, pet. denied) (op. on reh'g) ("An opinion solely addressing the cause of death does not satisfy the statutory requirements.").

### Extension

Subsection 74.351(c) provides: "If an expert report has not been served within the **\*537** period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c). In her second issue, Salais asserts that the trial court abused its discretion in not granting her alternative motion for a thirty-day extension to cure her expert report's deficiency.

 [16]     The docket sheet appears to reflect the trial court's denial of that motion, but docket-sheet entries are not "of-record" rulings. Any order or judgment, to be effective, must be entered of record. *Kocman v. Kocman,* 581 S.W.2d 516, 518 (Tex.Civ.App.-Waco 1979, no writ); *see also Willis v. Nucor Corp.,* 282 S.W.3d 536, 543 (Tex.App.-Waco 2008, no pet.).

 [17]     Dr. Winston's report is technically deficient—as opposed to being "no report"—because the report lacks his qualifications to give an expert opinion on causation. It is thus appropriate to remand this case to the trial court so it can exercise its discretion whether to grant a thirty-day extension so that Salais can attempt to cure this deficiency. *See Austin Heart,* 228 S.W.3d at 284–85; *see also In re Buster,* 275 S.W.3d 475, 477 (Tex.2008) ("A report by an unqualified expert will sometimes (though not always) reflect a good-faith effort sufficient to justify a 30–day extension.").

Accordingly, we sustain the second issue and remand this cause to the trial court with the instruction to consider and rule on Salais's motion for a thirty-day extension to attempt to cure the deficiency in Dr. Winston's report.

Chief Justice GRAY dissenting.

TOM GRAY, Chief Justice, dissenting.
Ana Maria Gonzalez Salais appeals the trial court's judgment dismissing her health care liability claim against the Texas Department of Aging and Disability Services. Because the trial court did not abuse its discretion in granting TDADS's motion to dismiss or in denying Salais's request for a 30–day extension, we should affirm the trial court's judgment. Because the Court does not, I respectfully dissent.

### BACKGROUND

Salais's son, Ruben Gonzalez, was a patient at a TDADS facility, the Mexia State School. After an altercation with the State School staff, Gonzalez was placed on a restraint board. He then died. Salais sued both TDADS and the Mexia State School. The trial court granted TDADS's motion to dismiss.

In two issues on appeal, Salais argues that the trial court erred in granting TDADS's motion to dismiss pursuant to section 74.351 of the Texas Civil Practice and Remedies Code and erred in denying Salais's request for a 30–day extension pursuant to section 74.351(c) of the Texas Civil Practice and Remedies Code.

### DISMISSAL

Section 74.351 of the Civil Practices and Remedies Code provides that within 120 days of filing, a claimant must serve a curriculum vitae and one or more expert reports regarding every defendant against whom a health care claim is asserted. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp. 2009). "Section 74.351 has numerous subparts, including:

• subpart (b) requiring trial courts to dismiss a claim with prejudice and award fees if "an expert report has not been served" by the statutory deadline;

• subpart (c) allowing a 30–day extension of the deadline if a report is found inadequate; and

**\*538** • subpart ( *l* ) providing that a motion challenging a report's adequacy should be granted only if the report does not represent a good-faith effort to comply with the statute." *Lewis v. Funderburk,* 253 S.W.3d 204, 207 (Tex.2008) (footnotes omitted); TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b), (c), ( *l* ) (Vernon Supp. 2009).

When considering a motion to dismiss under section 74.351, the issue for the trial court is whether the report represents a good-faith effort to comply with the statutory definition of an expert report. *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). An "expert report" means:

> A written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (Vernon Supp. 2009). To constitute a "good-faith effort," the report must discuss the standard of care, breach, and causation with sufficient specificity to fulfill two purposes: (1) to inform the defendant of the specific conduct the plaintiff has called into question; and (2) to provide a basis for the trial court to conclude that the claims have merit. *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879.

The report must include the expert's opinion on each of the three elements that the statute identifies: standard of care, breach, and causal relationship. *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about these elements. *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999).

We review a trial court's order dismissing a claim for failure to comply with the expert report requirements under an abuse-of-discretion standard. *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878. Expert reports that omit at least one of the three specifically enumerated requirements of an expert report cannot constitute a good faith effort to meet the statutory requirements. *See Jernigan v. Langley,* 195 S.W.3d 91, 94 (Tex.2006); *Palacios,* 46 S.W.3d at 879.

Salais provided two reports to serve as her expert report. One report was prepared by James Wohlers, a paramedic from Nebraska, which Salais alleged addressed the expert report elements of the standard of care and the breach of that standard. The other report was prepared by Donald Winston, a physician from Houston. Salais alleged Dr. Winston's report addressed the causation element. TDADS complains, and I agree, that Dr. Winston's report wholly fails to address the causation element.

Assuming without deciding that Dr. Winston is otherwise qualified to render an opinion on causation, he does not. Dr. Winston states in his report that he reviewed the autopsy report of Ruben Gonzalez and the death certificate. Then, he simply states that, although he disagrees with the nine pathologists on whether Gonzalez was in part responsible for his own death, he agrees with them in their conclusion that it was homicide caused by restraint and mechanical asphyxiation "imposed on him by the three Mexia State School employees."

**\*539** What Dr. Winston fails to do is draw the connection or explain the causal link between the negligent actions of a specific health care provider (the elements of standard of care and breach as described by Wohlers, the other purported expert) and the damages/injury (Gonzalez's death). In other words, his report on causation must make the connection that the death by mechanical asphyxiation was caused by the conduct described by Wohlers, assuming that was adequately presented in the other expert report. *See Bowie,* 79 S.W.3d at 53. Because Dr. Winston did not indicate he had reviewed

the other purported expert's report, this required connection is simply missing. Further, it is impermissible to infer that the conduct referenced in one report is the basis for the conclusions in the other report. *See Austin Heart, P.A. v. Webb,* 228 S.W.3d 276, 279 (Tex.App.-Austin 2007, no pet.).

Dr. Winston's report is similar to an expert report discussed in *Shaw v. B.M.W. Healthcare, Inc.,* 100 S.W.3d 8 (Tex.App.-Tyler 2002, pet. denied). In *Shaw,* the Shaws filed two expert reports to address the three elements, one from a physician and one from a registered nurse. The Shaws agreed that the physician's report did not set out the applicable standards of care or address how the defendants breached any standards. They argued, however, that those omissions were irrelevant because the physician only rendered an opinion on the cause of death. Citing to *Palacios,* the Tyler Court of Appeals held that because there was no discussion in the report as to the applicable standard of care and any breaches of that standard, an opinion solely addressing the cause of death did not satisfy the statutory requirements of an expert report. *Shaw,* 100 S.W.3d at 13 (citing *Palacios,* 46 S.W.3d at 879). Like the report in *Shaw,* Dr. Winston's report only addressed Gonzalez's cause of death without a link between the alleged breach and the injury. Accordingly, I would hold that Dr. Winston's report does not meet the requirement of an expert report because there is nothing in the report that addresses the causal connection between the breach by the Mexia State School employees of the standard of care as allegedly contained in Wohlers's report and the injury, the death of Gonzalez, claimed. The causation element has been omitted from the report.

Because Salais's expert reports omit at least one of the three specifically enumerated requirements of subsection (r)(6), they cannot constitute a good faith effort to meet those requirements. I need not decide TDADS's objections to Wohlers's report. Accordingly, because the trial court did not abuse its discretion in granting TDADS's motion to dismiss Salais's suit against TDADS, Salais's first issue should be overruled.

## CONTINUANCE

Salais further argues that should we determine the reports were deficient, we should remand the matter back to the trial court for a 30–day extension. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c) (Vernon Supp. 2009). The

parties agree and the trial court's docket sheet indicates that a request for a 30–day extension was denied. Section 74.351(c) provides in part that the trial court may grant one 30–day extension to the claimant to cure a deficiency in an expert report. *Id.* The term "may" as used in subsection (c) vests the trial court with discretion to grant a 30–day extension. *Bosch v. Wilbarger Gen. Hosp.,* 223 S.W.3d 460, 465 (Tex.App.-Amarillo 2006, pet. denied); *Hardy v. Marsh,* 170 S.W.3d 865, 870–71 (Tex.App.-Texarkana 2005, no pet.).

I assume without deciding that once the trial court determines that the report furnished **\*540** did not constitute a good faith effort to meet the requirements of an expert report, the trial court can, nevertheless, grant a 30–day extension to cure the deficiency. To grant such an extension, the trial court would have to consider the totality of the circumstances surrounding the preparation of the report, such as the difficulty, if any, encountered by the plaintiff in obtaining the necessary experts or in getting the medical records necessary for the expert to review, the diligence of the plaintiff in securing an expert on the specific type of healthcare liability claim, whether a 30–day extension would have allowed the plaintiff to cure the defect, and the extent of the deficiency in the proffered report. This list of considerations is by no means exhaustive.

But in this case, we have not been provided any record from which we could review the trial court's determination. Because we have no record to review, Salais is unable to support the complaint that the trial court abused its discretion in failing to grant a 30–day extension. *See In the Interest of D.W.,* 249 S.W.3d 625, 648 (Tex.App.-Fort Worth 2008, no pet.) (because no record of hearing on motion to extend dismissal deadline, court presumes evidence supported trial court's ruling and no abuse of discretion shown).

Salais's second issue should be overruled.

## CONCLUSION

Having overruled each issue, I would affirm the interlocutory order of dismissal of the trial court. Because the Court does not, I respectfully dissent.

**All Citations**

323 S.W.3d 527

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

451 S.W.3d 535
Court of Appeals of Texas,
El Paso.

TENET HOSPITALS LIMITED, a
Texas Limited Partnership, d/b/
a/ Sierra Medical Center, Appellant,
v.
Mariva J. BARAJAS, Appellee.

No. 08–14–00048–CV.  |  Nov. 21, 2014.

**Synopsis**
**Background:** Patient sued hospital, alleging medical
negligence from allowing her "to drop to the floor" after
knee surgery. Hospital filed motion to dismiss, challenging
sufficiency of the patient's expert reports. The County Court
at Law No. 5, El Paso County, Carlos Villa, J., denied motion,
and hospital appealed.

**Holdings:** The Court of Appeals, Yvonne T. Rodriguez, J.,
held that:

[1] registered nurse was not qualified to render an expert
opinion on applicable standard of care;

[2] first orthopedic surgeon was not qualified to render expert
opinion on applicable standard of care;

[3] second orthopedic surgeon was qualified to offer an expert
opinion regarding accepted standards of health care; and

[4] surgeons' reports represented an objective good faith effort
to provide a fair summary of the causal relationship between
hospital's actions and patient's injury.

Affirmed in part, reversed in part, and remanded.

West Headnotes (24)

[1]     **Appeal and Error**
          Rulings on Motions Relating to Pleadings

A trial court's decision to grant or deny a motion
to dismiss a health care liability claim for failure

to file required expert report is reviewed for an
abuse of discretion. V.T.C.A., Civil Practice &
Remedies Code § 74.351(a).

Cases that cite this headnote

[2]     **Appeal and Error**
          Abuse of discretion

A trial court only "abuses its discretion" when
it acts in an unreasonable or arbitrary manner,
without reference to any guiding rules or
principles.

Cases that cite this headnote

[3]     **Appeal and Error**
          Abuse of discretion

A trial court acts arbitrarily and unreasonably
if it could have reached only one decision, but
instead reached a different one.

Cases that cite this headnote

[4]     **Appeal and Error**
          Abuse of discretion

A trial court "abuses its discretion" when it fails
to analyze or apply the law correctly.

Cases that cite this headnote

[5]     **Appeal and Error**
          Abuse of discretion

A trial court does not abuse its discretion merely
because it decides a matter within its discretion
differently than a reviewing court.

Cases that cite this headnote

[6]     **Health**
          Affidavits of merit or meritorious defense;
         expert affidavits

If a plaintiff with a health care liability claim
timely files an expert report and the defendant
moves to dismiss because of the report's
inadequacy, a trial court must grant the motion
only if it appears to the court, after hearing,
that the report does not represent an objective

good faith effort to comply with the definition of an expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351(a)(l).

Cases that cite this headnote

**[7] Health**
🔑 Affidavits of merit or meritorious defense; expert affidavits

In determining the adequacy of an expert report under the Medical Liability Act, the only information relevant to the inquiry is within the four corners of the document. V.T.C.A., Civil Practice & Remedies Code § 74.001 et seq.

Cases that cite this headnote

**[8] Health**
🔑 Affidavits of merit or meritorious defense; expert affidavits

For an expert's report to constitute a good-faith effort under the Medical Liability Act, the report must provide enough information to fulfill two purposes: first, the report must inform the defendant of the specific conduct the plaintiff has called into question; second, the report must provide a basis for the trial court to conclude that the claims have merit. V.T.C.A., Civil Practice & Remedies Code §§ 74.351(l), 74.351(r)(6).

Cases that cite this headnote

**[9] Health**
🔑 Affidavits of merit or meritorious defense; expert affidavits

An expert report that merely states the expert's conclusions about the standard of care, breach, and causation does not constitute a good-faith effort under the Medical Liability Act; rather, the expert must explain the basis of his statements to link his conclusions to the facts. V.T.C.A., Civil Practice & Remedies Code §§ 74.351(a), 74.351(r)(6).

Cases that cite this headnote

**[10] Health**

**Affidavits of merit or meritorious defense; expert affidavits**

To avoid dismissal due to inadequacy of an expert's report under the Medical Liability Act, a plaintiff need not present evidence in the report as if it were actually litigating the merits. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**[11] Health**
🔑 Affidavits of merit or meritorious defense; expert affidavits

The expert's report in a medical malpractice action can be informal, that is, the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

Cases that cite this headnote

**[12] Evidence**
🔑 Due care and proper conduct in general

In determining whether a medical expert is qualified to testify on a medical question in a health care liability claim, the trial court focus should be on whether the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject. V.T.C.A., Civil Practice & Remedies Code § 74.402.

Cases that cite this headnote

**[13] Evidence**
🔑 Due care and proper conduct in general

A medical expert from one specialty may be qualified to provide an opinion in a health care liability claim if he has practical knowledge of what is commonly done by doctors of a different specialty, and if the subject matter is common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care.

V.T.C.A., Civil Practice & Remedies Code § 74.402(a).

Cases that cite this headnote

**[14]** **Health**

🔑 Affidavits of merit or meritorious defense; expert affidavits

For purposes of a health care liability claim, the medical expert's qualifications must appear in the expert report and cannot be inferred. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[15]** **Evidence**

🔑 Due care and proper conduct in general

Whether a witness is qualified to serve as an expert in a health care liability claim is within the trial court's discretion.

Cases that cite this headnote

**[16]** **Health**

🔑 Affidavits of merit or meritorious defense; expert affidavits

An expert report by a person unqualified to testify does not constitute a good faith effort to comply with the statutory definition of an expert report, under the Medical Liability Act. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

**[17]** **Health**

🔑 Affidavits of merit or meritorious defense; expert affidavits

Based upon her experience as a registered nurse and detailed description of applicable standard of care for floor nurses contained in her report, trial court could have reasonably concluded that nurse had "knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition" involved in hospital patient's health care claim, as required to support finding that her report was adequate as an expert report pursuant to Medical

Liability Act; nurse had worked in various nursing positions at several acute care hospitals including defendant hospital, was senior director of occupational health at ambulatory clinic, and opined that assessment of whether more help was needed should have been performed before attempting to move patient. V.T.C.A., Civil Practice & Remedies Code § 74.402(b)(2).

Cases that cite this headnote

**[18]** **Evidence**

🔑 Due care and proper conduct in general

Proposed nursing expert witness was not actively practicing health care in rendering health care services relevant to medical negligence claim filed against hospital, after patient fell while being assisted by hospital floor nurse from chair to walker, and thus, nurse was not qualified to render an opinion on the standard of care; it was unclear whether nurse was licensed at the time she gave her expert testimony, and although nurse was a licensed, registered nurse, who was serving as a consulting health care provider at time she gave her testimony, nothing in her curriculum vitae or report revealed that she served as a consulting health care provider at time the patient's claim arose. V.T.C.A., Civil Practice & Remedies Code § 74.402(c)(2).

Cases that cite this headnote

**[19]** **Health**

🔑 Affidavits of merit or meritorious defense; expert affidavits

Orthopedic surgeon was not actively practicing health care at time patient's medical negligence claim arose against hospital, and therefore, he was not qualified to render expert opinion in his report on applicable standard of care for floor nurse furnishing post-surgical care to assist obese hospital patients to ambulate from chair to walker; there was no indication surgeon was serving was a consultant health care provider or training health care providers in same field at accredited educational institution at time patient's claim arose or at time he gave his testimony concerning the applicable standard of

care. V.T.C.A., Civil Practice & Remedies Code § 74.402(c)(2).

Cases that cite this headnote

**[20] Evidence**
 🔑 Due care and proper conduct in general

Orthopedic surgeon was qualified on basis of training or experience to offer an expert opinion regarding accepted standards of health care of hospital floor nurses assisting hospital patients post-surgery in patient's negligence action stemming from her fall while being assisted from a chair to a walker; curriculum vitae and report showed that surgeon was certified by licensing agency, possessed substantial training or experience relevant to the claim, and was actively practicing health care, as he expressly stated "I am an orthopedic surgeon," and surgeon's statement that he reviewed patient's case and was submitting his preliminary report established he was serving as consultant at time he gave his expert testimony. V.T.C.A., Civil Practice & Remedies Code § 74.402(b)(3).

Cases that cite this headnote

**[21] Evidence**
 🔑 Cause and effect

A nurse is unqualified to provide expert opinion on causation in medical negligence action. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(5)(C).

Cases that cite this headnote

**[22] Health**
 🔑 Affidavits of merit or meritorious defense; expert affidavits

Physicians' expert reports were not conclusory, but, as required by Medical Liability Act, represented an objective good faith effort to provide a fair summary of causal relationship between hospital floor nurse's actions and post-surgical patient's injury from fall attributed to nurse's breach of standard of care by not assuring chair was locked before patient attempted to stand and by not seeking assistance of other nurses or aides to assist patient to ambulate; doctors stated in their opinion, that patient's fall, as result of breach of care, "was the proximate cause of the right patellar dislocation" and tearing that her doctor found in surgery. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(5)(C).

Cases that cite this headnote

**[23] Health**
 🔑 Proximate Cause

For purposes of a health care liability claim, a causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that, absent this act or omission, the harm would not have occurred; the mere provision of some insight into the plaintiff's claims does not adequately address causation.

Cases that cite this headnote

**[24] Health**
 🔑 Affidavits of merit or meritorious defense; expert affidavits

For purposes of a health care liability claim, the expert report must explain the basis for the causation opinions by linking the expert's conclusions to the alleged breach.

1 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*538** Walter L. Boyaki, Miranda & Boyaki, El Paso, TX, for Appellee.

Ken Slavin, Kemp Smith, El Paso, TX, for Appellant.

Before McCLURE, C.J., RODRIGUEZ, J., and PARKS, Judge, sitting by assignment.

*OPINION*

YVONNE T. RODRIGUEZ, Justice.

Appellant, Tenet Hospitals Limited, d/b/a/ Sierra Medical Center, appeals the trial court's denial of its motion to dismiss Appellee Mariva Barajas's health care liability claim. Sierra Medical Center (SMC) raises a single issue for our review. For the following reasons, we affirm in part and reverse in part.

## BACKGROUND

On March 17, 2011, Barajas underwent a total right knee replacement operation at SMC. The following day, while still a patient at SMC, Barajas requested assistance to move from a recliner to the bedside commode. A nurse attempted to help Barajas get up with a walker; however, the recliner was not locked and Barajas "slid down" to the floor causing her newly-operated knee to bend. A Hoyer lift was used to get Barajas, an obese patient, back into the hospital bed. After the nurse notified Dr. Alvaro Hernandez, the doctor who had performed Barajas's knee replacement, of the fall, no new orders were given.

On March 21, 2011, Barajas was discharged from SMC and sent to Las Palmas Rehab Hospital for therapy. On March 23, 2011, Barajas experienced some popping of the right knee, her therapy was stopped, and x-rays were taken. The x-ray report was normal.

In April and May 2011, Barajas followed-up her care with Dr. Hernandez. On May 2, 2011, Barajas reported she was having pain and x-rays were taken. Barajas was diagnosed with right patellar dislocation. On May 5, 2011, Dr. Hernandez performed right knee patellar dislocation surgery on Barajas. On March 29, 2012, Barajas saw Dr. Charles Zaltz, Dr. Hernandez's partner, for a follow-up. In his medical note, Dr. Zaltz recorded that Barajas fell at SMC the day after her right total knee replacement surgery and stated that the right patellar dislocation and disruption of Barajas's patellar mechanism found on May 2, 2011, was the result of her fall at SMC on March 18, 2011.

In May 2013, Barajas sued SMC for medical negligence alleging that the hospital allowed Barajas "to drop to the floor after the 3/17/11 surgery" and committed **\*539** "[o]ther acts and/or omissions of negligence." Barajas timely served expert reports and the curricula vitae of Registered Nurse Donna Holguin, and Drs. Rene Arredondo and John Allen. SMC subsequently filed objections to the sufficiency of the three expert reports and moved to dismiss Barajas's claim.

Specifically, SMC argued that Drs. Allen and Arredondo were not qualified to offer opinions on the standard of care for registered nurses, and that their opinions as to causation were conclusory. SMC similarly contended Nurse Holguin was unqualified to opine on the standard of care for registered nurses in an acute care hospital setting, and that her report failed to adequately address the standard of care applicable to SMC's nursing staff and any alleged breaches. After a hearing, the trial court overruled SMC's objections and denied its motions to dismiss. This interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (West 2008).

## DISCUSSION

In its sole issue on appeal, SMC challenges the expert reports filed by Barajas. Specifically, SMC contends that the expert reports are not authored by qualified experts and that the reports are conclusory as to causation.

### *Standard of Review*

**[1] [2] [3] [4] [5]** A trial court's decision to grant or deny a motion to dismiss under Section 74.351 is reviewed for an abuse of discretion. *See American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001); *Tenet Hospitals, Ltd. v. Boada,* 304 S.W.3d 528, 533 (Tex.App.-El Paso 2009, pet. denied). A trial court only abuses its discretion when it acts in an unreasonable or arbitrary manner, without reference to any guiding rules or principles. *See Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003); *Boada,* 304 S.W.3d at 533. A trial court acts arbitrarily and unreasonably if it could have reached only one decision, but instead reached a different one. *See Teixeira v. Hall,* 107 S.W.3d 805, 807 (Tex.App.-Texarkana 2003, no pet.); *Boada,* 304 S.W.3d at 533. A trial court also abuses its discretion when it fails to analyze or apply the law correctly. *In re Sw. Bell Tel. Co.,* 226 S.W.3d 400, 403 (Tex.2007) (citing *In re Kuntz,* 124 S.W.3d 179, 181 (Tex.2003)); *Boada,* 304 S.W.3d at 533. However, a trial court does not abuse its discretion merely because it decides a matter within its discretion differently than a reviewing court. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

## Applicable Law

 **[6]** **[7]** "[A] claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (West 2011). If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, a trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." *Id.* § 74.351(*l* ). The definition of an expert report requires that the report contain a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the **\*540** care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6) (West 2011). As the "statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document." *Palacios,* 46 S.W.3d at 878.

 **[8]** **[9]** **[10]** **[11]** "In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort." *Id.* at 879. The report must: (1) inform "the defendant of the specific conduct the plaintiff has called into question;" and (2) "provide a basis for the trial court to conclude that the claims have merit." *Id.* If a report does not meet these purposes and omits any of the statutory requirements, it does not constitute a good faith effort. *Id.* Nor does a report "that merely states the expert's conclusions about the standard of care, breach, and causation" fulfill these purposes. *Id.* Rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). However, "a plaintiff need not present evidence in the report as if it were actually litigating the merits." *Palacios,* 46 S.W.3d at 879. "The report can be informal," that is, "the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.*

## THE PROFFERED EXPERTS' QUALIFICATIONS

In Issue One, SMC argues that Nurse Holguin, and Drs. Allen and Arredondo lack the qualifications to provide opinions on the standard of care for hospital floor nurses. SMC maintains the curricula vitae and reports of the proffered experts fail to satisfy the requirements of Section 74.402.

To be qualified as a medical expert on whether a hospital departed from an accepted standard of health care, the proffered expert must satisfy the requirements of Section 74.402 of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(B) (West 2011). Section 74.402 provides that:

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose; [1]

> [1] We agree with the parties that this subsection of section 74.402 is inapplicable in this case because the health care provider here is SMC, a hospital, and not an individual. *See Renaissance Healthcare Sys., Inc. v. Swan,* 343 S.W.3d 571, 588 (Tex.App.-Beaumont 2011, no pet.); *TTHR, L.P. v. Coffman,* 338 S.W.3d 103, 112 (Tex.App.-Fort Worth 2011, no pet.).

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

 **\*541** (c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(c) (West 2011). "Practicing health care" includes:

(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or

(2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

Id. § 74.402(a).

 [12]  [13]  Not every licensed physician is automatically qualified to testify on every medical question. Tenet Hospitals Ltd. v. Love, 347 S.W.3d 743, 749–50 (Tex.App.-El Paso 2011, no pet.) (citing Broders v. Heise, 924 S.W.2d 148, 152 (Tex.1996)). In determining whether a witness is qualified to testify as an expert, the trial court focus should be on whether the expert has "knowledge, skill, experience, training, or education" regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject. Id. at 750. Accordingly, a medical expert from one specialty may be qualified to provide an opinion if he has practical knowledge of what is commonly done by doctors of a different specialty. Id. If the subject matter is common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care. Caviglia v. Tate, 365 S.W.3d 804, 810 (Tex.App.-El Paso 2012, no pet.) (citing Keo v. Vu, 76 S.W.3d 725, 732 (Tex.App.-Houston [1st Dist.] 2002, pet. denied)).

 [14]  [15]  [16]  Nevertheless, the proffered medical expert's expertise must be evident from the four corners of his report and curriculum vitae. See generally Palacios, 46 S.W.3d at 878; Christus Health Southeast Texas v. Broussard, 267 S.W.3d 531, 536 (Tex.App.-Beaumont 2008, no pet.). The expert's qualifications must appear in the report and cannot be inferred. See Salais v. Texas Dep't of Aging & Disability Servs., 323 S.W.3d 527, 536 (Tex.App.-Waco 2010, pet. denied). Whether a witness is qualified "to serve as an expert is within the trial court's discretion." Palafox v.

Silvey, 247 S.W.3d 310, 314 (Tex.App.-El Paso 2007, no pet.). An expert report by a person unqualified to testify does not constitute a good faith effort to comply with the statutory definition of an expert report. Foster v. Zavala, 214 S.W.3d 106, 116 (Tex.App.-Eastland 2006, pet. denied) (citing In re Windisch, 138 S.W.3d 507, 511 (Tex.App.-Amarillo 2004, orig. proceeding) (examining predecessor to Section 74.351)).

## Nurse Holguin's Report

SMC contends Nurse Holguin is unqualified to testify as an expert on the standard of care for hospital floor nurses providing post-surgical care to patients in March 2011 because "Nurse Holguin does not meet the knowledge requirements of Section 74.402(b)(2)." SMC also asserts Nurse Holguin is not qualified to opine on the applicable standard of care based on her training and experience. In essence, SMC argues Nurse Holguin does not satisfy **\*542** Section 74.402(b)(3). SeeTEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(3) (West 2011).

 [17]  Pursuant to Section 74.402(b)(2), Nurse Holguin may qualify as an expert witness on the issue of whether SMC departed from accepted standards of care only if she has "knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim[.]" Id. § 74.402(b)(2). This case involves the post-operative care of an obese hospital patient who had total right knee replacement surgery. Barajas's alleged that due to the negligence of SMC and its floor nurses she required additional knee surgery after SMC and its floor nurses failed to prevent her from falling to the floor as she was assisted from a recliner to the bedside commode.

Nurse Holguin's curriculum vitae reflects that she has a B.S.N. and M.S.N., and that she has worked in various nursing positions at several acute care hospitals including SMC. From 1991 to 1996, she held the title of Director of Quality Management at Providence Memorial Hospital where she was in charge of quality management, risk management, safety, "ProvCare and Infection Control." She also worked as the Director of Nursing Services at a long-term care facility where she oversaw all aspects of nursing client care. From 1999 to January 31, 2011, Nurse Holguin was the Senior Director of Quality Improvement and Occupational Health at an ambulatory clinic where she acted as the Director

of Nursing, Infection Control Nurse, Safety Officer, and Director of the facility Safety Program.

In her expert report, we note Nurse Holguin does not expressly state she is familiar with the standard of care for nurses for the prevention of falls of obese patients in a hospital setting nor does she state that she has knowledge of the applicable standard of care. However, she does detail knowledge of what SMC floor nurses should have done when assisting an obese patient, who had recently had a total knee replacement, move from a recliner to the bedside commode. Specifically, Nurse Holguin's expert report provides:

Next Nursing note is on 3–18–2011 1330 by April Hurtado (no clinical designation noted). According to the patient she had been "assisted up into a chair earlier by 6 or 7 staff members." The Nursing Note at 1330 states "Patient called for assistance to bedside commode was sitting in recliner chair, attempted to help patient with walker and the chair was not locked, patient slid down to floor knee did bend, patient okay."

This event/fall occurred on 3–18–2011 the first day after the total knee replacement procedure. Any nursing staff member entering this patients' room should have taken note of the patient['s] size and could easily have asked the patient how much assistance had been provided earlier to help her into the recliner chair. These two pieces of information would have provided the basis for indicating whether more help was needed to safely assist this patient rather than receiving assistance from one female staff, who was reportedly in a state of advanced pregnancy. The patient reports that she asked whether more help should be summoned but was told by the person in the room that more help was not necessary.

The nurses note indicates that the "chair was not locked"—another failure on the part of the staff member who undertook this assist—not assuring that the chair would not move as the patient attempted to stand up from the sitting position to a standing position to use the walker to then move to the bedside commode.

**\*543** Instead of being safely moved from the chair to the bedside commode the patient went down to the floor and the newly operated knee "bent", according to the documentation. The staff member who had undertaken the transfer did not keep the patient safe from going to the floor and while going to the floor the knee bent.

...

Had proper assessment been done prior to the unidentified staff member attempting to assist Ms. Barajas this unfortunate "fall" should not have occurred. The staff member failed to provide for this patient['s] safety. Ms. Barraza [sic] was provided with and signed a "Patient Safety Tips" form on admission to the hospital. This form indicates that the patient is to: "Call for help before getting up from a chair or bed" and yet when Ms. Barajas did call for help she was not kept safe because the assisting person did not take into account all of the factors about her that would have indicated the need for the assistance of more than one person. A staff member skilled in the postoperative care of Total Knee Patients should have been called on to make a determination of what type of assistance was needed if the person at the bedside was unable to determine what would be safest for this patient.

Nursing Care of this newly operated orthopedic patient was not appropriate/not adequate since the patient was not kept safe and ended up on the floor which was NOT the desired outcome of a transfer from a chair to a bedside commode.

Because of her experience as a registered nurse as set forth in her curriculum vitae and the detailed description of the applicable standard of care for floor nurses contained in her report, the trial court could have reasonably concluded that Nurse Holguin has "knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in [Barajas's] claim[.]" See TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(2). As such, we conclude Barajas satisfied Section 74.402(b)(2).

 [18]    To determine whether a witness is qualified "on the basis of training or experience," the court shall consider "whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is certified by a licensing agency ... or has other substantial training or experience, in the area of health care relevant to the claim; and (2) is actively practicing health care in rendering health care services relevant to the claim." TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(c) (West 2011). SMC argues Nurse Holguin in not a qualified expert because "[she] is not a licensed nurse and it is unclear whether she was a licensed nurse when she gave her opinions as her [curriculum vitae] does not show when she was licensed." SMC maintains Nurse Holguin's curriculum vitae shows she did not have substantial training or experience as a hospital floor nurse at the time Barajas's claim arose on March 18, 2011, or on September 9, 2013, at

the time she gave her expert opinion. SMC also advances that Nurse Holguin's report and curriculum vitae do not reflect she was actively practicing health care at the time the claim arose or at the time she gave her report.

Despite SMC's argument to the contrary, Nurse Holguin's curriculum vitae clearly indicates she was certified by a licensing agency on March 18, 2011, at the time Barajas's claim arose as it shows that she is licensed by the Texas Board of Nursing and that her license would expire on August 31, 2013. Accordingly, Nurse **\*544** Holguin meets the first prong of section 74.402(c).

Under the second prong of Section 74.402(c), Nurse Holguin must be "actively practicing health care in rendering health care services relevant to the claim." *Id.* § 74.402(c)(2). SMC contends Nurse Holguin cannot meet the second prong because she was not actively practicing health care at any relevant time.

Section 74.402(a) defines "practicing health care" as including "(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider." *Id.* § 74.402(a)(1)-(2). While nothing in Nurse Holguin's curriculum vitae or report indicate that she has experience training health care providers at an accredited education institution, they do show that she is a licensed, registered nurse, who is serving as a consulting health care provider. In her expert report, Nurse Holguin states, "I have reviewed the Nurses Notes and other portions of the Medical Record of ... Barajas.... In order to determine whether the Nursing Care provided to ... Barajas was appropriate on 3–18–2011 when she was being assisted up out of a chair." Thus, it is clear Nurse Holguin was serving as a consulting health care provider at the time she gave her testimony in September 2013.[2]

2    We note SMC does not dispute Barajas's statement that Nurse Holguin served as nurse consultant expert witness.

Relying on *Certified EMS Inc. v. Potts,* 355 S.W.3d 683, 690 (Tex.App.-Houston [1st Dist.] 2011), *aff'd,* 392 S.W.3d 625 (Tex.2013), Barajas argues that because Nurse Holguin was a licensed nurse at the time the claim arose and is a nurse consultant witness, she is sufficiently qualified to be an expert under Section 74.402(a)-(c). In *Potts,* the appellant

objected to a nurse's qualifications to render an expert opinion because she failed to state that she actively practiced in a field requiring her to provide nursing care in a hospital setting. *Id.* at 690. After looking at the nurse's curriculum vitae and report, the appellate court found the trial court did not abuse its discretion in determining that a nurse was qualified to offer an expert report. *Id.* The facts in *Potts* are distinguishable from the facts in this case.

In *Potts,* the trial court found no abuse of discretion because the nurse's curriculum vitae stated that "she is a 'Nurse Consultant/Expert Witness' and a 'Quality Review Nurse' for the Texas Department of Aging and Disability Services," and both the curriculum vitae and report showed that "she is licensed as a nurse and holds a number of nursing certifications." *Id.* Here, it is unclear whether Nurse Holguin was licensed at the time she gave her expert testimony (September 9, 2013), as her curriculum vitae reflects that the expiration date of her nursing license was August 31, 2013. Additionally, nothing in Nurse Holguin's curriculum vitae or report reveal that she served as a consulting health care provider at the time Barajas's claim arose. As such, we conclude Nurse Holguin failed to satisfy the second prong of section 74.402(c) and therefore, the trial court abused its discretion in determining Nurse Holguin was qualified to offer an expert report pursuant to Section 74.402(b)(3). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(3).

### Dr. Allen's Report

Dr. Allen's curriculum vitae shows that he is a British trained orthopaedic surgeon **\*545** and is actively licensed in New Mexico. As part of his medical practice in the United States, Dr. Allen has, in part, worked as an Orthopaedic Fellow at Children's Hospital Medical Center and an Associate in Orthopaedics at Massachusetts General Hospital in Boston. He has served as an Instructor in Orthopaedics at Harvard University. He has acted as a consultant for Liberty Mutual Rehabilitation Center and Eunice Kennedy Shriver Center for Mental Retardation in Boston. He has worked as an orthopaedic surgeon in various capacities in both the United States and United Kingdom. His current office is located in Albuquerque.

In his report, Dr. Allen provided the following standard of care:

The standard of care for the floor nurse at Sierra Medical Center is to use assistance (other personnel) to assist an obese patient back from an unlocked recliner chair to bed and to lock that chair before the patient attempts to stand up.

The nurse at Sierra Medical Center breached the standard of care by not assuring the recliner chair was locked before Ms. Barajas attempted to stand at around 1330 on 03/18/2011. The nurse also breached the standard of care by not seeking assistance of other nurses or aides to assist Ms. Barajas to ambulate from the chair to the bedside commode as she was an obese, newly postoperative knee patient.

Dr. Allen states his education and experience are relevant to the review of the medical care Barajas received by nurses at SMC. He further states that:

> During the many years of [his] orthopedic surgery practice [he has] evaluated patients who have fallen after surgery and ha[s] interacted with hospital nursing staff on prevention of falls by patients before and after surgery, including patients who are obese.

 [19]  SMC contends Dr. Allen "fails to meet the requirements to qualify as an expert in this case" because the four corners of his curriculum vitae and report fail to demonstrate that he is qualified to opine on the standard of care for hospital floor nurses furnishing post-surgical care to hospital patients or that he was actively rendering medical care services when the claim arose in March 2011, or when he offered his opinion in September 2013. Although SMC relies on this Court's decision in *Love* to support their argument, we find *Love* is distinguishable. In *Love,* we held the curricula vitae and reports of two physicians failed to show they were qualified to opine on hospital administration procedures regarding staffing specialists and transferring patients because the curricula vitae and reports contained only one sentence stating that the experts were familiar with the responsibilities, duties, and expectations a hospital provides to its patients. *Love,* 347 S.W.3d at 750–51. We also noted the curricula vitae and reports merely recited that the doctors were specialists who served on various committees, but failed to demonstrate whether their experience involved setting hospital policies

and procedures, requiring hospitals to staff certain specialists, or running a hospital. *Id.* at 751.

Here, the four corners of Dr. Allen's curriculum vitae and report indicate he is an orthopaedic surgeon actively licensed in New Mexico, that he has an office in Albuquerque, and that he has worked as an orthopaedic surgeon in various capacities. Moreover, Dr. Allen states that during his practice as an orthopaedic surgeon, he has evaluated patients who have fallen after surgery and that he has interacted with hospital nursing staff on pre- and post-operative fall prevention of patients, which **\*546** included obese patients. Thus, unlike the experts in *Love,* Dr. Allen's curriculum vitae and report explain why and how he is qualified to render an opinion on the applicable standard of care.

SMC also argues Dr. Allen is unqualified to give expert testimony because he is not actively practicing health care in rendering health care services related to the claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(c)(2) (West 2011). As already discussed above, "practicing health care" includes "(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or (2) serving as a consulting health care provider and being licensed, certified or registered in the same field as the defendant health care provider." *Id.* § 74.402(a)(1)-(2). It is clear Dr. Allen's curriculum vitae reflects he is a licensed orthopaedic surgeon who, in the past, has acted as a consultant health care provider and trained orthopaedic students at Harvard. However, we do not find any indication he was serving as a consultant health care provider or training health care providers in the same field at an accredited educational institution at the time Barajas's claim arose or at the time Dr. Allen gave his testimony. *See Select Specialty Hospital–Houston Ltd. Partnership v. Simmons,* No. 01–12–00658–CV, 2013 WL 3877696, at \*5 n. 2 (Tex.App.-Houston [1st Dist.] Jul 25, 2013, no pet.) (expert nurse was qualified as her curriculum vitae demonstrated she was currently working as a nurse consultant).

Accordingly, we find the trial court abused its discretion in determining that Dr. Allen was qualified to opine on the applicable standard of care and that he was actively practicing health care at the time the claim arose or his testimony was given as set out in sections 74.402(a) and (c).

**Dr. Arredondo's Report**

[20]    SMC challenges Dr. Arredondo's report on the same grounds as Dr. Allen's report. SMC contends Dr. Arredondo's curriculum vitae "fails to provide information on his education, experience and training that qualifies him to opine on hospital floor nurses assisting hospital patients post-surgery." SMC argues Dr. Arredondo is precluded from qualifying as an expert because he is not actively practicing health care.

In determining whether Dr. Arredondo meets the requirements of Section 74.402(b)(3), we look at whether he is (1) certified by a licensing agency or has substantial training or experience relevant to the claim, and (2) whether he is actively practicing health care relevant to the claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(c). According to his curriculum vitae, Dr. Arredondo is licensed by the Texas State Board of Medical Examiners. From 1975 to 2009, Dr. Arredondo's private practice was limited to orthopaedic surgery and physical rehabilitation. In his expert report dated August 23, 2013, Dr. Arredondo states that he reviewed Barajas's case and was submitting his preliminary report. He goes on to state that he is an orthopaedic surgeon, that he has been an orthopaedic surgeon since 1975, and that he is board certified by the American Board of Orthopaedic Surgery. He also states that his education and experience are relevant to the review of medical care rendered by nurses at SMC to Barajas.

Like Dr. Allen, Dr. Arredondo explains that: "During the many years of [his] orthopedic surgery practice, [he has] evaluated patients who had falls after surgery. Over the many years of [his] orthopedic surgery practice, [he has] interacted with hospital floor nurses about prevention of **\*547** falls in obese, post-operative patients." Dr. Arredondo also sets forth the identical standard of care and explanation of how the standard of care was breached as provided by Dr. Allen in his expert report.

Dr. Arredondo's curriculum vitae and report show that he is certified by a licensing agency, and possesses substantial training or experience relevant to Barajas's claim. The curriculum vitae and report also demonstrate Dr. Arredondo is actively practicing health care as he expressly states "I am an orthopedic surgeon. I have been an orthopedic surgeon since 1975. I am board certified by the American Board of Orthopaedic Surgery." Moreover, Dr. Arredondo's statement that he has reviewed Barajas's case and was submitting his preliminary report establishes he was serving as a consultant at the time he gave his expert testimony. Based on the four corners of the curriculum vitae and report, we find no abuse of

discretion as the trial court could have reasonably concluded that Dr. Arredondo satisfied both prongs of Section 74.402(c) and determined that he was qualified as an expert under Section 74.402(b)(3). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(c); *Potts,* 355 S.W.3d at 690 (finding no abuse of discretion in trial court's determination that nurse was qualified to offer an expert report because her curriculum vitae stated that "she is a 'Nurse Consultant/Expert Witness' and a 'Quality Review Nurse' for the Texas Department of Aging and Disability Services," and both the curriculum vitae and report showed that "she is licensed as a nurse and holds a number of nursing certifications").

## CAUSATION

[21]    SMC contends the trial court abused its discretion because the proffered expert reports are conclusory on the issue of causation. SMC also maintains Nurse Holguin's report is improper because she, as a non-physician, is not legally qualified to opine on medical causation. We agree that a nurse is not qualified to opine on medical causation. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5) (C) (West 2011); *Boada,* 304 S.W.3d at 543 (finding nurse unqualified to provide expert opinion on causation).

In response, Barajas maintains Nurse Holguin's opinion is not on causation, but on the standard of care and breach of that standard. We agree with Barajas. Nothing in Nurse Holguin's report summarizes the causal relationship between the breaches of the applicable standards of care and the alleged injuries, harms, and damages suffered by Barajas. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.351(r) (6), 74.403(a). Accordingly, SMC's contention is without merit. We now address the reports of Drs. Allen and Arredondo to determine whether their opinions on causation are conclusory.

[22]    SMC argues the reports of Drs. Allen and Arredondo do not represent a good faith effort to comply with the statutory requirements. According to SMC, the opinions of Drs. Allen and Arredondo are conclusory because "they wholly fail to provide any causal link between the bending of a knee from sliding down a chair and a right patellar dislocation of the knee diagnosed almost two months later." SMC further argues "[t]he reports ... are completely devoid of any factual statements explaining how bending the knee caused the right patellar dislocation ... other than the conclusion that it did."

**[23] [24]** A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that, absent this act or omission, the harm would not have occurred. **\*548** *Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245, 249 (Tex.App.-San Antonio 2004, no pet.). The mere provision of some insight into the plaintiff's claims does not adequately address causation. *Wright,* 79 S.W.3d at 53. Under *Palacios,* an expert report does not need to conclusively prove the case, however, we cannot infer causation. The report cannot "merely state conclusions about any of the elements." *Castillo v. August,* 248 S.W.3d 874, 883 (Tex.App.-El Paso 2008, no pet.). There are no magic words required to establish causation. *Wright,* 79 S.W.3d at 53. However, the expert report must explain the basis for the causation opinions by linking the expert's conclusions to the alleged breach. *Id.*

Drs. Allen and Arredondo's reports indicate the doctors reviewed Barajas's medical records from SMC, Las Palmas Rehab Hospital, Las Palmas Medical Center, Orthopaedic Surgeons Associates, and Nurse Holguin's report. The doctors state that in their opinion as orthopedic surgeons, "the fall that Ms. Barajas suffered" on March 18, 2011 at SMC "was the proximate cause of the right patellar dislocation" and tearing "that Dr. Hernandez found" in surgery on May 5, 2011. According to both physicians, the March 18, 2011 fall "resulted in pain to Ms. Barajas," the need for right knee repair surgery on May 5, 2011, and "rehabilitation, with associated medical costs."

In their reports, Drs. Allen and Arredondo provide an "Overview of Medical Care of [Barajas]" which contains excerpts from Barajas's medical records, including SMC's nursing notes. Both reports note that after having had right total knee replacement surgery, Barajas fell and bent her newly-operated knee when she was assisted out of an unlocked recliner chair on March 18, 2011. At that time, it was noted that Barajas was crying. On March 20, 2011, Barajas was reported to be aching and unsteady. Both expert reports also note that Dr. Hernandez's discharge summary dated March 25, 2011, does not state he was informed Barajas had fallen and bent her newly-operated knee.

In the "Opinions" section of their reports, after setting forth the applicable standard of care, Drs. Allen and Arredondo state that the SMC nurse breached the standard of care by "not assuring the recliner chair was locked before Ms. Barajas attempted to stand" and "by not seeking assistance of other nurses or aides to assist Ms. Barajas to ambulate from the chair to the bedside commode as she was an obese, newly post-operative knee patient." Drs. Allen and Arredondo then reference a note from Dr. Zaltz dated March 29, 2012, in which Dr. Zaltz stated that Barajas fell down at SMC the day after her right total knee surgery, and noted that the right patellar dislocation and disruption of the patellar mechanism that was found on May 2, 2011, was the result of the March 18 fall. Drs. Allen and Arredondo expressly state that they agree with Dr. Zaltz's opinion of the cause of Barajas's right patellar dislocation and that they agree with the statements made in Nurse Holguin's report.

We conclude that the reports of Drs. Allen and Arredondo adequately discuss causation so as to inform SMC of the conduct Barajas has called into question and to provide a basis for the trial court to conclude that Barajas's claim has merit. *See Palacios,* 46 S.W.3d at 879. Drs. Allen and Arredondo's reports on causation are not conclusory. The expert reports state what should have been done by SMC and what happened as a result of their failure to adhere to the applicable standard of care. Accordingly, we conclude Drs. Allen and Arredondo's reports represented an objective good faith effort to provide a fair summary of the causal relationship between SMC's actions and Barajas's injury. **\*549** *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ); *Palacios,* 46 S.W.3d at 878–79.

Lastly, SMC contends Drs. Allen and Arredondo's reports are also conclusory because they fail to rule out other potential causes of Barajas's injury. SMC points to Drs. Allen and Arredondo's reference to a note in Barajas's medical record indicating that during rehab therapy she experienced popping of her right knee. However, as correctly noted by Barajas, nothing in Section 74.351 requires a preliminary expert report to rule out every possible cause of injury, harm, or damages. *See Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace,* 278 S.W.3d 552, 562–63 (Tex.App.-Dallas 2009, no pet.); TEX. CIV. PRAC. & REM.CODE ANN. § 74.35*l*(s) (West 2011) (limiting discovery before an expert report and curriculum vitae are filed). Moreover, a plaintiff need not present evidence in the report as if it were actually litigating the merits. *Wright,* 79 S.W.3d at 52. As the *Palacios* court stated, "the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios,* 46 S.W.3d at 879.

The trial court therefore did not abuse its discretion in overruling SMC's objections regarding causation and denying

its motions to dismiss. *Palacios,* 46 S.W.3d at 875; *Boada,* 304 S.W.3d at 533.

Issue One is sustained in part and overruled in part.

### REMEDY

Because we have concluded that the trial court abused its discretion in overruling the objections to Nurse Holguin's and Dr. Allen's reports on the basis of their respective qualifications, and thereby, in denying SMC's motion to dismiss, we remand the case to the trial court to consider granting the thirty-day extension request by Barajas to cure the deficiencies in Nurse Holguin's and Dr. Allen's reports. *See Love,* 347 S.W.3d at 757 (after concluding trial court erred in overruling objections to expert report and in denying

hospital's motion to dismiss, the appellate court determined the appropriate relief was to remand case to trial court for consideration of whether deficiencies were curable and to determine whether to grant extension of time).

### CONCLUSION

We reverse the trial court's judgment as to Nurse Holguin's and Dr. Allen's expert reports and remand for proceedings consistent with this opinion. We affirm the trial court's judgment as it pertains to the expert report of Dr. Arredondo.

**All Citations**

451 S.W.3d 535

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

338 S.W.3d 103
Court of Appeals of Texas,
Fort Worth.

TTHR, L.P. d/b/a Presbyterian
Hospital of Denton, Appellant,

v.

Amanda COFFMAN, Appellee.

No. 02–10–00162–CV. | March 17, 2011.

**Synopsis**

**Background:** Patient, who submitted a urine sample as part of her treatment at hospital, filed suit against hospital, who released laboratory report on the sample to university's police department, and against university, which suspended patient and removed her from student housing because laboratory report indicated a violation of the school's code of student conduct. The 211th District Court, Denton County, L. Dee Shipman, J., denied hospital's motion to dismiss, and hospital appealed.

**Holdings:** The Court of Appeals, Lee Gabriel, J., held that:

[1] violation of a patient's confidentiality is actionable as a health care liability claim, and subject to requirements of Texas Medical Liability Act (TMLA);

[2] wrongful release of medical information is departure from accepted standards of professional or administrative services directly related to health care under TMLA; and

[3] an expert report was required notwithstanding patient's claim that it would require physician to render a legal opinion.

Reversed and remanded.

Meier, J., filed dissenting opinion.

West Headnotes (16)

[1] **Appeal and Error**
🔑 Cases Triable in Appellate Court

Appellate court would review de novo the applicability of Texas Medical Liability Act (TMLA) to patient's claim for wrongful release of medical information against hospital, which released laboratory report on patient's urine sample to university's police department, thereby causing patient to be suspended because laboratory report indicated a violation of the school's code of student conduct. V.T.C.A., Civil Practice & Remedies Code § 74.351.

Cases that cite this headnote

[2] **Health**
🔑 Actions and Proceedings

Whether a claim is a health care liability claim under Texas Medical Liability Act (TMLA) depends on the underlying nature of the claim being made, and party may not avoid the requirements of the TMLA through artful pleading. V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

[3] **Health**
🔑 Actions and Proceedings

When determining if claim is health care liability claim subject to requirements under Texas Medical Liability Act (TMLA), courts must look to the act or omission that forms the basis of the complaint to determine whether it is either an inseparable part of the rendition of health care services or based on a breach of the standard of care applicable to health care providers. V.T.C.A., Civil Practice & Remedies Code § 74.351.

6 Cases that cite this headnote

[4] **Health**
🔑 Actions and Proceedings

If the factual allegations are related to medical treatment provided by the defendant and constitute an inseparable part of the defendant's rendition of medical services, then the plaintiff's claim is a health care liability claim subject to the requirements of the Texas Medical Liability Act

(TMLA). V.T.C.A., Civil Practice & Remedies Code § 74.351.

2 Cases that cite this headnote

**[5]    Health**

        Actions and Proceedings

Texas Medical Liability Act (TMLA) does not mandate that the injury itself occur during the patient's medical care, just that it be directly related to acts that occurred during the patient's health care. V.T.C.A., Civil Practice & Remedies Code § 74.001(a)(10, 13).

1 Cases that cite this headnote

**[6]    Health**

        Confidentiality; patient records

Duty of confidentiality arises during the patient's medical care and must be maintained as long as the provider possesses the medical records. V.T.C.A., Occupations Code § 159.002(d); 22 TAC § 165.1(b).

Cases that cite this headnote

**[7]    Health**

        Confidentiality; patient records

Health care providers owe the duty of confidentiality to their patients as part of the care they provide.

Cases that cite this headnote

**[8]    Health**

        Actions and Proceedings

Violation of a patient's confidentiality is actionable as a health care liability claim, and subject to requirements of Texas Medical Liability Act (TMLA), regardless of whether it occurred while the patient was in the treatment room or after she had left the facility; provider's duty to create records is directly related to the acts performed by the health care provider or treatments received by the patient, the duty to maintain the confidentiality of those records is inseparable from the duty to maintain the records themselves, and therefore, the duty to create

and maintain the confidentiality of medical records is directly related to the patient's health care. V.T.C.A., Occupations Code § 159.002(d); V.T.C.A., Civil Practice & Remedies Code § 74.001.

2 Cases that cite this headnote

**[9]    Health**

        Actions and Proceedings

The wrongful release of medical information is a departure from accepted standards of professional or administrative services directly related to health care under the Texas Medical Liability Act (TMLA). V.T.C.A., Civil Practice & Remedies Code §§ 74.001(a)(1, 10), 74.351.

2 Cases that cite this headnote

**[10]    Health**

        Necessity and existence of injury

Term "injury," as used in Texas Medical Liability Act (TMLA), did not mean just physical injury. V.T.C.A., Civil Practice & Remedies Code § 74.001(a)(13).

Cases that cite this headnote

**[11]    Health**

        Affidavits of merit or meritorious defense; expert affidavits

Texas Medical Liability Act (TMLA) required patient to submit, within 120 days of filing her petition, an expert report supporting her health care liability claim against hospital for wrongful release of medical information, despite patient's claim that such a report was not possible because it required a physician to render a legal opinion; the standard of care regarding confidentiality of medical information was a standard that applied to all health care providers, and health care providers were expected to know the laws applicable to their profession, such that any otherwise qualified expert could offer an opinion on the standard of care owed to patient. V.T.C.A., Civil Practice & Remedies Code §§ 74.351, 74.402, 74.403(a).

2 Cases that cite this headnote

**[12]    Health**

👉 Affidavits of merit or meritorious defense; expert affidavits

Because patient did not sue any individual providers, but only the hospital, which released laboratory report on patient's urine sample to university's police department, thereby causing patient to be suspended because report indicated violation of school's code of student conduct, a qualified expert, for purposes of expert report requirement under Texas Medical Liability Act (TMLA), would be an individual who had knowledge of the accepted standards of care for providers regarding the confidentiality of medical records and the necessary training or experience to offer an expert opinion. V.T.C.A., Civil Practice & Remedies Code §§ 74.001, 74.402(b).

Cases that cite this headnote

**[13]    Health**

👉 Affidavits of merit or meritorious defense; expert affidavits

Expert report requirement of Texas Medical Liability Act (TMLA) is a procedural requirement that all claimants must complete in order to continue with their claims. V.T.C.A., Civil Practice & Remedies Code §§ 74.402, 74.403(a).

Cases that cite this headnote

**[14]    Health**

👉 Affidavits of merit or meritorious defense; expert affidavits

Alleged absurdity of requiring a physician to opine as to the civil damages that patient suffered as result of hospital's disclosure of her medical information did not transform patient's health care liability claim against the hospital, alleging wrongful release of medical information, into another category of claim that did not require an expert report under Texas Medical Liability Act (TMLA); TMLA nonetheless required a

physician to opine as to causation of patient's damages. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(5)(C).

Cases that cite this headnote

**[15]    Health**

👉 Actions and Proceedings

Recasting a claim as something other than a health care liability claim does not excuse the plaintiff from meeting the requirements of the Texas Medical Liability Act (TMLA). V.T.C.A., Civil Practice & Remedies Code § 74.001.

Cases that cite this headnote

**[16]    Evidence**

👉 Due care and proper conduct in general

If the subject matter is common and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*106** Jeffrey F. Wood, Jones Carr McGoldrick, L.L.P., Dallas, TX, for Appellant.

Johannes B. Massar, Massar & Massar, L.L.P., Dallas, TX, for Appellee.

PANEL: GARDNER, MEIER, and GABRIEL, JJ.

**OPINION**

LEE GABRIEL, Justice.

TTHR, L.P. d/b/a Presbyterian Hospital of Denton (Presbyterian) appeals the denial of its motion to dismiss filed pursuant to Texas Civil Practice and Remedies Code section 74.351(b). *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (Vernon 2011). Presbyterian asserts that the suit filed against it by Appellee Amanda Coffman was a health care liability claim, subject to the requirements of chapter 74 of the civil practice and remedies code. Because we

agree with Presbyterian that Coffman's claim is a health care liability claim, we reverse the trial court's order, render judgment dismissing Coffman's claims against Presbyterian, and remand the case for a determination by the trial court of costs and attorney's fees to be awarded to Presbyterian.

## Background

Coffman sought treatment at Presbyterian on November 5, 2007. As part of her treatment, she submitted a urine sample for testing. Presbyterian staff released the laboratory report on the sample to the University of North Texas Police Department, who then released it to the University of North Texas, where Coffman was a student. The laboratory report indicated a violation of the school's code of student conduct, and Coffman was suspended and removed from student housing.

Coffman claims the release of her test results was negligent and a violation of section 159.002 of the occupations code, which designates medical records as confidential and privileged. *See Tex. Occ.Code Ann. § 159.002 (Vernon 2004)*. Coffman filed suit against Presbyterian and the University of North Texas. The University is not a party to this appeal.

Approximately five months after Coffman filed her petition, Presbyterian moved for dismissal of Coffman's claims against it, arguing that Coffman failed to timely serve an expert report as required by chapter 74 of the civil practice and remedies code, also known as the Texas Medical Liability Act (TMLA). *See Tex. Civ. Prac. & Rem.Code Ann. § 74.351*. Coffman argued that a report is unnecessary because the TMLA only applies to health care liability claims and her claims are not health care liability claims. The trial court denied Presbyterian's motion to dismiss. Presbyterian filed this appeal.

## Standard of Review

 **[1]**   Although appellate courts review a trial court's decision to grant or deny a motion to dismiss for failure to timely serve a section 74.351(a) expert report for an abuse of discretion, *see Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006), the issue presented here requires a determination **\*107** of whether the TMLA applies to Coffman's claims. We therefore review the applicability of the TMLA de novo. *See Marks v.*

*St. Luke's Episcopal Hosp.,* 319 S.W.3d 658, 663 (Tex.2010); *Fudge v. Wall,* 308 S.W.3d 458, 460 (Tex.App.-Dallas 2010, no pet.).

 **[2]**   **[3]**   **[4]**   Whether a claim is a health care liability claim depends on the underlying nature of the claim being made. *Garland Cmty. Hosp. v. Rose,* 156 S.W.3d 541, 543 (Tex.2004). A party may not avoid the requirements of the TMLA through artful pleading. *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 854 (Tex.2005); *Garland Cmty. Hosp.,* 156 S.W.3d at 543. Courts must look to the act or omission that forms the basis of the complaint to determine whether it is either an inseparable part of the rendition of health care services or based on a breach of the standard of care applicable to health care providers. *Garland Cmty. Hosp.,* 156 S.W.3d at 544. If the factual allegations are related to medical treatment provided by the defendant and constitute an inseparable part of the defendant's rendition of medical services, then the plaintiff's claim is a health care liability claim subject to the requirements of the TMLA. *Marks,* 319 S.W.3d at 664.

## Discussion

The sole issue before us is whether a claim for the wrongful release of medical information is a health care liability claim under the TMLA. *See Tex. Civ. Prac. & Rem.Code Ann. §§ 74.001–.507 (Vernon 2011)*. If it is a health care liability claim, Coffman was required to serve an expert report within 120 days of filing her original petition. *See id. § 74.351*. The TMLA requires the dismissal of the claim if a report is not served, and the statute does not grant the court the ability to offer an extension for failing to serve a report within the statutory timeframe. *See Maris v. Hendricks,* 262 S.W.3d 379, 384 (Tex.App.-Fort Worth 2008, pet. denied) (noting that statutory extension to cure a deficient report does not apply when no report is served). The parties agree that if it is not a health care liability claim, Coffman was not required to serve such a report.

Coffman argues that no report is necessary because she filed a common law claim of negligence and a claim under the occupations code. As we stated above, we are required to look at the underlying act or omission forming the basis of the complaint. *See Garland Cmty. Hosp.,* 156 S.W.3d at 543–44. If the claim falls under the definition of a health care liability claim, it is subject to the TMLA, regardless of how it was pleaded. *Id.* at 544.

TMLA defines "health care liability claim" as

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(13). "Health care" is defined to mean "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 74.001(a)(10). "Professional or administrative services" is defined as "those duties or services that a physician or health care provider is required to provide as a condition of maintaining the physician's or health care provider's license, accreditation status, or certification to participate in **\*108** state or federal health care programs." *Id.* § 74.001(a)(24).

## A. Professional or Administrative Services Directly Related to Health Care

Health care providers are required under a number of statutes to maintain the confidentiality of patient records. *See, e.g.,* Tex. Health & Safety Code Ann. §§ 181.152 (Vernon 2010) (disallowing disclosure of protected health information for marketing purposes without patient's consent), 241.155 (Vernon 2010) (requiring a hospital to "adopt and implement reasonable safeguards for the security of all health care information it maintains"); Tex. Occ.Code Ann. § 159.002(b) (requiring records of treatment to be "confidential and privileged and may not be disclosed"); 42 C.F.R. § 482.13(d) (2004) (making confidentiality of records a condition of participation in Medicare and Medicaid); 42 C.F.R. § 482.24 (2004) (same). Failure to do so can result in the loss of the hospital's license, accreditation, and ability to participate in state or federal health care program. *See, e.g.,* Tex. Health & Safety Code Ann. §§ 181.202 (allowing for the revocation of provider's license for a pattern or practice of violating section 181.152), 181.203 (allowing for the exclusion of a hospital from participating in state-funded health care programs for a pattern or practice of violating section 181.152),

241.053 (allowing for the denial, suspension, or revocation of a hospital's license for violating section 241.155); 25 Tex. Admin. Code § 133.121 (2007) (Tex. Dep't of State Health Servs., Enforcement Action) (allowing for the denial, suspension, or revocation of a hospital's license for violating section 241.155); 42 C.F.R. §§ 482.13(d) (conditioning participation in Medicare and Medicaid on the protection of patient's right to confidentiality); 482.24 (conditioning participation in Medicare and Medicaid on maintaining patient's medical records). Because confidentiality of records is required "as a condition of maintaining the ... health care provider's license, accreditation status, or certification to participate in state or federal health care programs," the duty to maintain the confidentiality of patient records is a professional or administrative service as defined by the TMLA. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(24) (defining professional or administrative services).

The duty of confidentiality is also directly related to health care based on its definition in the TMLA. *See* Tex. Civ. Prac. & Rem.Code. Ann. § 74.001(a)(10) (defining "health care"). A patient's medical records are required to be created during the patient's care. *See* 22 Tex. Admin. Code § 165.1(a) (2010) (Tex. Med. Board, Medical Records). They must memorialize each patient encounter, including all assessments, impressions, and diagnoses. *Id.* The duty to create records is directly related to the acts performed by the health care provider or treatments received by the patient. The duty to maintain the confidentiality of those records is inseparable from the duty to maintain the records themselves. Therefore, the duty to create and maintain the confidentiality of medical records is directly related to the patient's health care. *Cf. Fudge,* 308 S.W.3d at 463–64 (holding that letter written by counselor to social worker regarding counselor's "professional assessment and evaluation" of child was "clearly" related to and "inseparable from" treatment of child).

 **[5]**   **[6]**   **[7]**   **[8]**   Coffman argues that the injury did not occur *during* her medical care, as required by the TMLA. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(1). However, the statute does not mandate that the injury itself occur during the patient's medical care, just that it be directly related to acts that occurred during the patient's **\*109** health care. *Id.* § 74.001(a)(10), (13) (defining "health care liability claim" as a "claimed departure from accepted standards of ... professional or administrative services directly related to ['any act or treatment performed or furnished ... for, to, or on behalf of a patient during the patient's medical care']"). Coffman's

urine analysis occurred during, and as a part of, her care at Presbyterian. The results of the analysis were recorded in her medical records, as a professional or administrative service directly related to the care she received. The duty of confidentiality arises during the patient's medical care and must be maintained as long as the provider possesses the medical records. *See, e.g.,* Tex. Occ.Code. Ann. § 159.002(d) (stating that confidentiality "continues to apply ... regardless of when the patient receives the services of a physician"); 22 Tex. Admin. Code § 165.1(b) (2010) (Tex. Med. Board, Medical Records) (requiring physicians to maintain medical records for seven years and destruction of such records "shall be done in a manner that ensures continued confidentiality"); 42 C.F.R. § 482.24 (requiring medical records to be retained for five years as a condition for participating in Medicare and Medicaid). Providers owe the duty of confidentiality to their patients as part of the care they provide. *See* statutes requiring health care providers to keep patient's records confidential cited *supra* Part A. We therefore conclude that a violation of a patient's confidentiality is actionable as a health care liability claim regardless of whether it occurred while the patient was in the treatment room or after she had left the facility.

 [9]    Coffman also argues that it is "inconceivable" that the legislature intended to include breaches of confidentiality under the TMLA when one considers the purpose of the statute. We agree with Coffman that the purpose of original statute was to address medical malpractice claims. *See Marks,* 319 S.W.3d at 663 (noting that article 4590i, the predecessor to the current chapter 74 of the civil practice and remedies code, was enacted to "remedy a medical malpractice insurance crisis"). However, the statute has been expanded by the legislature since its enactment, and we must give effect to those amendments. *See Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 892 (Tex.2000) ("This Court's ultimate goal in construing a statute is to give effect to the Legislature's intent as expressed in the language of the statute."); *Spradlin v. Jim Walter Homes, Inc.,* 34 S.W.3d 578, 580 (Tex.2000) (noting that courts must "give effect to all the words of a statute"). The legislature added and defined the phrase "professional or administrative services," and we will not now read it out of the statute. There can be no "administrative service" more directly related to the rendition of health care than the memorialization of that care. And the duty to maintain the confidentiality of those records cannot be separated from the duty to maintain them. We therefore hold that the wrongful release of medical information is a departure from accepted standards of professional or administrative services directly related to health care under the TMLA.

**B. Injury or Death**

 [10]    Coffman argues that the TMLA does not apply because "injury" as used in the statute can only be understood as meaning physical injury. Coffman relies on *Thomas v. State,* 923 S.W.2d 645 (Tex.App.-Houston [1st Dist.] 1995, no pet.), and *Pallares v. Magic Valley Electric Co-op., Inc.,* 267 S.W.3d 67 (Tex.App.-Corpus Christi 2008, pet. denied).

*Thomas* involved a felony conviction for failure to stop and render aid. 923 S.W.2d at 647. The statute required the "driver **\*110** of a vehicle involved in an accident resulting in injury to or death of any person" to return to the scene of the accident. [1] Act of 1947, 50th Leg., R.S., ch. 421, 1947 Tex. Gen. Laws 967, *repealed by* Act of April 21, 1995, 74th Leg., R.S., ch. 165, § 24(a), 1995 Tex. Gen. Laws 1870, 1871. The court determined that "injury" in the statute meant "personal injury." *Thomas,* 923 S.W.2d at 647–48.

[1]    The current version of the statute appears in the transportation code. *See* Tex. Transp. Code Ann. § 550.021 (Vernon Supp.2010).

The statute in *Thomas* is unanalogous to the TMLA for many reasons. First, the section of the code in *Thomas* was entitled "Accidents involving death or personal injuries." *Id.* at 647. Second, the section was replete with other references to "personal injury," and it assumed that a person was physically struck by a vehicle and required the driver to render aid to the person, including taking the victim to a hospital or doctor. *Id.* And third, it further required the State, in prosecuting the driver under the statute, to prove that the injury was to "any part of the human body" and that it "necessitate[d] treatment." *Id.*

None of the indications present in *Thomas* that led the court to conclude that "injury" meant "personal injury" are present in the TMLA. The statute in *Thomas* required an underlying tort. *Id.* The TMLA allows for recovery regardless of "whether the claimant's claim or cause of action sounds in tort or in contract." Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a) (13). The statute in *Thomas* made repeated references to "personal injury." 923 S.W.2d at 647. The only reference to physical injury to which Coffman points is in the definition of claimant, where it states, "All persons claiming to have sustained damages as the result of the bodily injury or death of a single person are considered a single claimant." Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(2). However, the sentence does not function to limit claimants to patients,

*see, e.g., Fudge,* 308 S.W.3d at 464 (holding that father's and grandmother's claims for libel were health care liability claims); *Groomes v. USH of Timberlawn, Inc.,* 170 S.W.3d 802, 804 (Tex.App.-Dallas 2005, no pet.) (holding that patient's mother's claims for her own emotional distress were health care liability claims), much less to limit claimants to patients with physical injuries. We therefore do not find *Thomas* instructive on the present issue.

In *Pallares,* the Corpus Christi Court of Appeals held that a health care insurance provider was not a claimant under the TMLA because "it did not undergo treatment by Pallares." 267 S.W.3d at 73. The court went on to state, without support, "Moreover, [the insurance provider] does not fit within the definition of a claimant as provided in the [TMLA] because the record does not demonstrate that any person directly sustained bodily injury or death proximately caused by the health care treatment provided by Pallares." *Id.* The court then returned to its analysis regarding the insurance provider's status as a non-patient. The court mentions "bodily injury" in response to the statute's language regarding, as stated above, a non-patient's ability to seek redress when its injuries result from someone else's "bodily injury or death." *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(2). That is, the court was addressing the insurance provider's standing absent any subrogation rights. *See Pallares,* 267 S.W.3d at 73 n. 5 (commenting, in reference to the above-quoted sentence, on the **\*111** lack of evidence in the record regarding the insurance provider's subrogation rights with respect to the patient). Further, the court did not distinguish its facts from the case the insurance provider relied upon on the basis that the other case involved nonphysical injuries. *Id.* at 73–74 (distinguishing *Inst. for Women's Health, P.L.L.C. v. Imad,* No. 04–05–00555–CV, 2006 WL 334013, at \*2 (Tex.App.-San Antonio Feb. 15, 2006, no pet.) (mem.op.) (noting that the claimants sought damages for mental anguish, loss of companionship and society, and medical bills)). [2]

[2]  Coffman also points to *Benson v. Vernon,* 303 S.W.3d 755, 759 (Tex.App.-Waco 2009, no pet.), to support her suggested interpretation of *Pallares.* In *Benson,* the Waco Court of Appeals held that the plaintiff's allegation of "alteration and fabrication of medical records" was "not a health care liability claim required to be addressed in an expert report." *Id.* The court offered no analysis to support its distinction of that claim from the other allegations made regarding the health care that the plaintiff received. Chief Justice Gray, in his concurrence and dissent, specifically disagreed with the majority's holding that alteration and fabrication of medical records

are not health care liability claims. *Id.* at 767 (Gray, C.J., concurring and dissenting) ("There must be a standard in the medical industry for the extent and nature of what gets entered by the physician or health care provider in the medical records of a patient."). Further, we are concerned that *Benson* runs afoul of the supreme court's holding in *Yamada v. Friend,* 335 S.W.3d 192, 197–98 (Tex.2010) (holding that claims based on the same facts as health care liability claims cannot be split because "then the TMLA and its procedures and limitations will effectively be negated"). We therefore do not find *Benson* persuasive on this issue.

There have been many instances in which nonphysical injuries have resulted in health care liability claims. *See, e.g., Murphy v. Russell,* 167 S.W.3d 835, 837 (Tex.2005) (sedation contrary to instructions); *Walden v. Jeffery,* 907 S.W.2d 446, 448 (Tex.1995) (ill-fitting dentures); *Armstrong v. Robinsons,* No. 14–08–01077–CV, 2010 WL 4817100, at \*2 (Tex.App.-Houston [14th Dist.] Nov. 23, 2010, no pet.) (mem.op.) (ill-fitting dentures); *Fudge,* 308 S.W.3d at 460 (libel); *Sloan v. Farmer,* 217 S.W.3d 763, 768 (Tex.App.-Dallas 2007, pet. denied) (employment termination); *Imad,* 2006 WL 334013, at \*2 (mental anguish); *MacPete v. Bolomey,* 185 S.W.3d 580, 582, (Tex.App.-Dallas 2006, no pet.) (CPS investigations, criminal proceedings, and a child custody case); *Groomes,* 170 S.W.3d 802, 804 (false imprisonment); *Smalling v. Gardner,* 203 S.W.3d 354, 365 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (kidnapping, false imprisonment, child abduction, fraud, breach of contract, deceptive trade practices, and conspiracy). We are not persuaded that all of these cases were incorrectly decided. We therefore refuse to add the word "physical" to the injury requirement of the TMLA.

**C. Rendering an Opinion**

 **[11]**   Lastly, Coffman argues that an expert report here would require the expert to render a legal opinion and, because the statute requires a physician to render the expert opinion, it cannot be created. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 74.402, 74.403(a).

 **[12]**   The TMLA requires a claimant, within 120 days of filing her petition, to serve an expert report on each party. *Id.* § 74.351(a). The expert report must provide the expert's opinion regarding "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between the failure and the injury, harm, or

damages claimed." *Id.* § 74.351(r)(6). An expert may only provide an opinion on the standard of care if he

(1) is practicing health care in a field of practice that involves the same type **\*112** of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b). The first requirement of subsection 74.402(b) notably applies only "if the defendant health care provider is an individual." *Id.* Coffman did not sue any individual providers, but only the hospital. Therefore, a qualified expert in this case would be an individual who has knowledge of the accepted standards of care for providers regarding the confidentiality of medical records and the necessary training or experience to offer an expert opinion. *Id.* § 74.402(b)(2)-(3). [3]

[3]    Section 74.351(r)(5)(C) requires a physician to testify as to causation. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(5)(C). However, the statute allows for a plaintiff to meet the statute's requirements through serving separate reports by different experts on liability and causation. *See id.* § 74.351(i) ("Nothing in this section shall be construed to mean that a single expert must address ... both liability and causation issues for a physician or health care provider.").

 **[13]**    We first note that the expert report requirement of the TMLA is a procedural requirement that all claimants must complete in order to continue with their claims. The supreme court has said that the expert report

does not establish a requirement for recovery. It may be that once discovery is complete and the case is tried, there is no need for expert testimony.... But the Legislature envisioned that discovery ... should not go forward unless at least one expert has examined the case.... The fact that

in the final analysis, expert testimony may not be necessary to support a verdict does not mean the claim is not a health care liability claim.

*Murphy,* 167 S.W.3d at 838 (commenting on former revised civil statutes article 4590i, the predecessor to chapter 74). Coffman's claims are based on a violation of a standard of care applicable to health care providers. These claims necessitate a threshold examination by an expert on that standard of care and a determination by that expert that Presbyterian fell below that standard and proximately caused Coffman's injuries. The expert report required at the commencement of the litigation provides the validation necessary to justify proceeding with the lawsuit.

 **[14]**    As to the issue of causation, Coffman points out that the facts of this case would require a physician to opine on what civil damages Coffman suffered because of the disclosure of her health care information. *See* Tex. Occ.Code Ann. § 159.009(b) (Vernon 2004) ("The aggrieved person may prove a cause of action for civil damages."). Because it seems absurd to require a physician to testify as to civil damages, Coffman argues that her claim cannot therefore be a health care liability claim.

 **[15]**    The legislature has prescribed that it is necessary for a physician to opine as to causation of damages. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(5)(C). For this court to agree with Coffman's argument, made without citation to authority, that the requirement is "absurd," and therefore should transform a clear health care liability claim into another category **\*113** that does not require an expert report, would violate legislative intent. *See Marks,* 319 S.W.3d at 673 (Johnson, J., concurring) ("If policy considerations support limiting or excluding subcategories of claims when the unambiguous statutory language includes the overall category ..., then incorporating those exclusions into the statute is a Legislative prerogative, not a judicial one."). The inclusion of "professional or administrative services" to the definition of a health care liability claim may have created some arguably odd procedural demands for some claims. Nevertheless, this requirement does not make those claims something other than health care liability claims. In *Marks,* for instance, the plaintiff's expert physician opined on the proper maintenance and construction of a hospital bed. *Id.* at 671 (Johnson, J., concurring). It is unusual for a physician to render such an opinion, but in that case, it was required. *See id.* at 664 (holding that plaintiff's claim was a health care liability claim and required an expert report). As we noted

above, recasting a claim as something other than a health care liability claim does not excuse the plaintiff from meeting the requirements of the TMLA. *See Diversicare,* 185 S.W.3d at 854; *Garland Cmty. Hosp.,* 156 S.W.3d at 543. An expert report on causation written by a physician is one of those requirements, and Coffman failed to meet it.

 **[16]** Coffman further argues that an expert rendering an opinion on the standard of care could only know "under what circumstances confidential patient information can be disclosed" by reading and interpreting the statute and legal commentary, which would amount to a legal opinion. Coffman fails to recognize in her argument that the duty of confidentiality is a requirement of a health care provider's license and accreditation and therefore all providers are expected to know the rules and regulations regarding dissemination of protected patient information. [4] *See* statutes conditioning licenses, accreditation, or participation in state or federal health care programs on the continued practice of keeping medical information confidential cited *supra* Part A. This court has noted before that " 'there are certain standards of medical care that apply to ... any medical doctor.' If the subject matter is common and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care." *Menefee v. Ohman,* 323 S.W.3d 509, 514 (Tex.App.-Fort Worth 2010, no pet.) (citing *Blan v. Ali,* 7 S.W.3d 741, 746 (Tex.App.-Houston [14th Dist.] 1999, no pet.)). The required expert opinion in this case would be on a standard of care that is specialized and applicable to health care providers. When and to whom to release medical information necessarily involves professional judgment. Thus, we do not agree with Coffman that to require an expert opinion on a standard of care imposed on all health care providers would be a "tortured and absurd construction" of **\*114** the TMLA. Because the standard of care regarding confidentiality is a standard that applies to all health care providers and because health care providers are expected to know the laws applicable to their profession, any otherwise qualified expert could offer testimony on the standard of care owed to Coffman. Because the report is possible and necessary, we sustain Presbyterian's sole issue.

[4]     Professional medical associations like the American Medical Association require their members to uphold ethical codes, which include the pledge to keep medical records confidential. *See* AMA Council of Ethical & Judicial Affairs, Formal Op. 7.025 (1999) ("Physicians have a responsibility to be aware of the appropriate guidelines in their health care institution,

as well as the applicable federal and state laws."); *see also* AMA CEJA, Access to Medical Records by Non–Treating Medical Staff 1–2 (1999), *available at* http://www.ama-assn.org/ama1/pub/upload/mm/369/ceja_6a 99.pdf (noting that the American Hospital Association guidelines state that "all individuals who use or receive information from the medical record are responsible, in part, for ensuring the confidentiality of that information").

### Conclusion

Having sustained Presbyterian's sole issue, we reverse the trial court's order and render judgment dismissing Coffman's claims against Presbyterian. The case is remanded to the trial court for further proceedings consistent with this opinion as to Presbyterian's claim for attorney's fees and costs.

MEIER, J., filed a dissenting opinion.

BILL MEIER, Justice, dissenting.

I dissent because I disagree with the majority's conclusion that Coffman's claim is a health care liability claim. The gravamen of the claim and the injury- or damage-causing event is the release by Presbyterian of the confidential results of Coffman's urine test to the University of North Texas Police Department, ultimately resulting in her dismissal from the university. I do not believe that the unauthorized release of the confidential information meets the requirement articulated by Justice Medina in *Marks v. St. Luke's Episcopal Hospital,* stating

> Whether the underlying claim involves a health care provider's negligent act or omission, or the patient's exposure to some other safety risk, the relationship between the injury causing event and the patient's care or treatment must be substantial and direct for the cause of action to be a health care liability claim under the MLIIA.

319 S.W.3d 658, 664 (Tex.2010). Because the majority concludes otherwise, I respectfully dissent.

**All Citations**

338 S.W.3d 103, 267 Ed. Law Rep. 913

---

**End of Document**                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 4. Liability in Tort
      Chapter 74. Medical Liability (Refs & Annos)
        Subchapter I. Expert Witnesses (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 74.402

§ 74.402. Qualifications of Expert Witness in Suit Against Health Care Provider

Effective: September 1, 2003
Currentness

(a) For purposes of this section, "practicing health care" includes:

(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or

(2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

(d) The court shall apply the criteria specified in Subsections (a), (b), and (c) in determining whether an expert is qualified to offer expert testimony on the issue of whether the defendant health care provider departed from accepted standards of health care but may depart from those criteria if, under the circumstances, the court determines that there is good reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria.

(e) This section does not prevent a health care provider who is a defendant, or an employee of the defendant health care provider, from qualifying as an expert.

(f) A pretrial objection to the qualifications of a witness under this section must be made not later than the later of the 21st day after the date the objecting party receives a copy of the witness's curriculum vitae or the 21st day after the date of the witness's deposition. If circumstances arise after the date on which the objection must be made that could not have been reasonably anticipated by a party before that date and that the party believes in good faith provide a basis for an objection to a witness's qualifications, and if an objection was not made previously, this subsection does not prevent the party from making an objection as soon as practicable under the circumstances. The court shall conduct a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial. If the objecting party is unable to object in time for the hearing to be conducted before the trial, the hearing shall be conducted outside the presence of the jury. This subsection does not prevent a party from examining or cross-examining a witness at trial about the witness's qualifications.

**Credits**
Added by Acts 2003, 78th Leg., ch. 204, § 10.01, eff. Sept. 1, 2003.

Notes of Decisions (82)

V. T. C. A., Civil Practice & Remedies Code § 74.402, TX CIV PRAC & REM § 74.402
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.